IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BONAN HUANG<br>NAN HUANG,<br><br>Defendants. | Case No.<br><br>PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER FREEZING ASSETS, GRANTING OTHER RELIEF, AND TO SHOW CAUSE |

Defendants Bonan Huang and Nan Huang—in breach of their duties to their employer, a major credit card company ("Credit Card Company")—misappropriated material, nonpublic information from Credit Card Company, which they then unlawfully traded on to generate ill-gotten gains. Credit Card Company terminated Bonan Huang's and Nan Huang's employment on Friday, January 16, 2015, based on their violations of company policies and procedures, which may have alerted defendants to the fact that unlawful insider trading scheme had been discovered. Moreover, Bonan Huang is a Chinese citizen present in the United States pursuant to a work visa and, just yesterday, requested a transfer of $250,000 out of one of his brokerage accounts in which he placed his illegal trades. As result, there is a real and substantial risk that Bonan Huang or Nan Huang may transfer their ill-gotten gains out of the United States or otherwise dissipate their assets. Accordingly, plaintiff Securities and Exchange Commission (the "Commission") respectfully requests that this Court grant this motion and issue a temporary restraining order freezing Bonan Huang's and Nan Huang's brokerage account and bank account assets that are related to the allegations in the Commission's Complaint and prohibiting Bonan Huang and Nan Huang from destroying, altering, or concealing records of any kind, order Bonan Huang and Nan Huang to show cause why a preliminary injunction freezing such assets should

not be entered, grant the Commission expedited discovery in connection with its request for such a preliminary injunction, and authorize the substitution of service by personal delivery, facsimile, overnight courier, email or first-class mail of these papers and any resulting Order.

## FACTS

### I. Background

From July 2011 until he was terminated on January 16, 2015, Bonan Huang (who is a Chinese citizen) worked in the fraud department at Credit Card Company as a senior data analyst. Declaration of Daniel L. Koster ("Koster Decl.") ¶ 6. Similarly, from December 2008 until he was terminated on January 16, 2015, Nan Huang worked in the fraud department at Credit Card Company as a senior data analyst. Id. ¶ 8. As employees of Credit Card Company—and, in particular, as employees in the fraud department—Bonan Huang and Nan Huang had access to and were entrusted with a significant amount of Credit Card Company's confidential nonpublic information and data.

In particular, Credit Card Company maintained a database of its customers' credit card activity. This database collected every credit card transaction made by a Credit Card Company customer, including the date of the transaction, the amount of the transaction, and the merchant to be paid. Id. ¶ 13. Credit Card Company's database could be searched using keywords such as a merchant's name. This information was confidential and nonpublic, and Credit Card Company only allowed its employees to search this database when necessary to aid them in the fulfilling their job functions. Id. ¶ 14.

### II. Bonan Huang and Nan Huang Misappropriated Credit Card Company's Confidential and Nonpublic Information

From at least November 2013 to January 2015, Bonan Huang and Nan Huang conducted hundreds, if not thousands, of searches for credit card transaction data for more than 170

2

publicly-traded consumer retail companies, and often saved this data for later personal use. Credit Card Company investigated searches of this database by Bonan Huang and Nan Huang, and provided the Commission a large spreadsheet identifying searches conducted by Bonan Huang and Nan Huang. Id. ¶ 15. Credit Card Company has informed the Commission that there was no legitimate reason for Bonan Huang and Nan Huang to conduct these searches on Credit Card Company's database. On January 16, 2015, Credit Card Company terminated Bonan Huang and Nan Huang for violating Credit Card Company's policies and procedures. Id. ¶ 16.

### III. Bonan Huang and Nan Huang Earned Significant Profits Trading Based on Credit Card Company's Misappropriated Confidential and Nonpublic Information

From January 2012 to January 2015 Bonan Huang and Nan Huang deposited a total of $147,300 into six OptionsHouse accounts.[1] Id. ¶ 41. Bonan Huang and Nan Huang each used these accounts to make thousands of trades, primarily involving options to purchase or sell shares of more than 170 publicly-traded consumer retail companies for which they misappropriated nonpublic credit card transaction data. Id. ¶ 17. Bonan Huang and Nan Huang made approximately $2,826,500 trading during this period in their OptionsHouse account. This is a truly staggering three-year return of approximately 1,819%. Id. ¶ 41.

Bonan Huang and Nan Huang generated such remarkable profits by trading based on Credit Card Company's confidential and nonpublic credit card transaction data, as demonstrated by the following three examples:

Trading on Company A

- On January 15, 2014, Company A, a consumer retail company that sells outdoor sporting goods, announced it would publicly release its fourth quarter and full fiscal year 2013 financial results before the market opened on February 13, 2014. Id. ¶ 18.

---

[1] Collectively, Bonan Huang and Nan Huang had six separate accounts with OptionsHouse. Bonan Huang opened the first account in December 2011 and began trading in January 2012. Subsequently, Bonan Huang opened two additional accounts and Nan Huang opened three accounts at OptionsHouse. Id. ¶ 40.

3

- On February 7, 2014 and February 8, 2014, Nan Huang conducted a search on Credit Card Company's nonpublic Sales Database for credit card sales data for Company A. Id. ¶ 19 and Ex. B.

- On February 12, 2014, Bonan Huang conducted a search on Credit Card Company's database for credit card sales data for Company A. Id. ¶ 20 and Ex. C.

- On February 12, 2014 or February 13, 2014, when Company A's stock price was approximately $70 a share, defendant Bonan Huang purchased 19 contracts of put options on Company A's stock with strike prices ranging from $650 to $70 and expiration dates of February 22, 2014, and sold 13 put options on Company A's stock with a strike price of $60 for [ ]a total net cost of $4,277. The combination of these put positions is essentially a bet that the price of Company A's stock would decline but would be above $60 and below $65. Purchasing these put options meant that Bonan Huang would profit from a decrease in the share price for Company A's stock by February 22, 2014. Id. ¶ 21 and Ex. D.

- On February 12, 2014 or February 13, 2014, when Company A's stock price was approximately $70, defendant Nan Huang purchased 170 contracts of put options on Company A's stock with strike prices of $65 and $70 and expiration dates of February 22, 2014, for $51,890. Purchasing these put options meant that Nan Huang would profit from a decrease in the share price for Company A's stock by February 22, 2014. Id. ¶ 22 and Ex. E.

- Before the market opened on February 13, 2014 Company A released their sales and earnings data for the fourth quarter of 2013. Company A announced that their same quarter sales were decreased approximately 10%, and the share price for Company A decreased from $69.81 to $64.26, or approximately 8% that day. Id. ¶ 23 and Exs. F and G.

- On February 13, 2014, Bonan Huang closed his options positions for Company A for a profit of $1,450.05, realizing an approximate 34% return on his one-day investment. Id. ¶ 24 and Ex. D.

- On February 13, 2014, defendant Nan Huang sold his options for Company A for $107,950 realizing a 108% return on his one-day investment. Id. ¶ 25 and Ex. E.

Trading on Company B

- On April 22, 2014, Company B, a consumer retail company that sells women's and men's fashion accessories, announced that it would publicly report its third quarter financial results on the morning of April 29, 2014. Id. ¶ 26 and Ex. H.

- On April 27, 2014, defendant Bonan Huang conducted a search of Credit Card Company's nonpublic Sales Database for credit card sales data for Company B, a consumer retail company that sells women's fashion accessories. Id. ¶ 27 and Ex. I.

- On April 28, 2014, when Company B's stock price was approximately $50 a share, defendant Bonan Huang purchased 420 contracts of put options on Company B's stock with strike prices ranging from $46 to $50.50 and expiration dates ranging from May 2, 2014 to May 17, 2014, for $63,440. Purchasing these put options meant that Bonan Huang would profit from an imminent decrease in Company B's stock price. Id. ¶ 28 and Ex. J.

- Also on April 28, 2014, defendant Nan Huang purchased 230 contracts of put options on Company B's stock with a strike price of $50 and an expiration date of May 2, 2014, for $38,830. Purchasing these put options meant that defendant Nan Huang would profit from an imminent decrease in Company B's stock price. Id. ¶ 29 and Ex. K.

- On April 29, 2014, Company B released their sales and earnings data for the third quarter of 2013. This data showed that Company B's same quarter net sales decreased approximately 7% and the share price for Company B fell almost $5 a share from April 28, 2014 to the market close on April 29, 2014. Id. ¶ 30 and Exs. L and M.

- On April 29, 2014 defendant Bonan Huang sold his options for Company B for $147,140 realizing a one-day return of approximately 132%. Id. ¶ 31 and Ex. J.

- On April 29, 2014 defendant Nan Huang sold his options for Company B for $97,200 realizing a one-day return of approximately 150%. Id. ¶ 32 and Ex. K.

Trading on Company C

- On June 16, 2014, Company C, a consumer retail company that sells "fast-casual" food, announced that it would publicly announced its second quarter 2014 financial results after the market closed on July 21, 2014. Id. ¶ 33 and Ex. N.

- On July 20, 2014, both defendant Bonan Huang and defendant Nan Huang conducted searches on Credit Card Company's nonpublic Sales Database for credit card sales data for Company C, a consumer retail company that sells "fast-casual" food. Id. ¶ 34 and Ex. O.

- On July 21, 2014, when Company C's stock price was approximately $589 a share, defendant Bonan Huang purchased 21 contracts of call options on Company C's stock with strike prices ranging from $582.50 to $627.50 and expiration dates ranging from August 5, 2014 to November 5, 2014, for $43,270. Purchasing these call options meant that Bonan Huang would profit from an increase in the price of Company C's stock. Id. ¶ 35 and Ex. P.

- On July 21, 2014, defendant Nan Huang purchased 34 contracts of call options on Company C's stock with strike prices ranging from $597.50 to $617.50 and expiration dates ranging from August 5, 2014 to November 5, 2014, for $56,500. Purchasing these call options meant that Nan Huang would profit from an increase in the price of Company C's stock. Id. ¶ 36 and Ex. Q.

- On July 21, 2014, after the market closed, Company C released their sales and earnings data for the second quarter of 2014. This data showed that Company C's same quarter revenue increased by 28.6%. By market close on July 22, 2014, Company C's share price had increased from approximately $590 a share to approximately $660 a share, for a one-day increase of approximately 10.6%. Id. ¶ 37 and Exs. R and S.

- On July 22, 2014 defendant Bonan Huang sold his options for Company C for $133,066, realizing a one-day return of approximately 208%. Id. ¶ 38 and Ex. P.

- On July 22, 2014 (and dates shortly thereafter) defendant Nan Huang sold his options for Company C for approximately $244,710, realizing a short-term return of approximately 333%. Id. ¶ 39 and Ex. Q.

\* \* \*

Bonan Huang also has brokerage accounts at Scottrade and Tradestation, in which he appears to conducted similar trading as his accounts at OptionsHouse. Nan Huang also has accounts at InterActive Brokers, E*Trade, and Legent, in which he appears to have conducted similar trading as his accounts at OptionsHouse. Id. ¶ 43.

## IV. Bonan Huang and Nan Huang Have Transferred Significant Amounts of Trading Profits Out of Their Brokerage Accounts

During the relevant time period, Bohan Huang and Nan Huang transferred large amounts of money out of their brokerage accounts—approximately $1,763,500 out of these six accounts. Id. ¶ 41. This money was transferred to bank accounts at Bank of America and Barclays Bank Delaware.[2]

As of January 15, 2015, the total balance in the six accounts was approximately $1,063,000. Id. ¶ 41. On January 20, 2015 at approximately 1:00 p.m., OptionsHouse informed the

---

[2] Bonan Huang transferred some of the trading proceeds from his OptionsHouse accounts to bank accounts at Bank of America. Nan Huang transferred some of the trading proceeds from his OptionsHouse account to bank accounts at Barclays Bank Delaware. Id. ¶ 42.

6

Commission staff that Bonan Huang has requested OptionsHouse to transfer $250,000 out of one of his brokerage accounts. Id. ¶ 49.

### V. Bohan Bonan Huang and Nan Huang Trading Based on Misappropriated Confidential and Material, Nonpublic Credit Card Company Data is a Violation of Credit Card Company's Policies and Procedures

During the time period when Bonan Huang and Nan Huang accessed Credit Card Company's nonpublic Sales Database, Bonan Huang and Nan Huang knew or were reckless in not knowing that they owed their employer a fiduciary duty, or an obligation arising from a relationship of trust and confidence, to maintain the confidentiality of Credit Card Company's data and not to use it for their own personal use. Credit Card Company had policies and procedures in place imposing an obligation on its employees to maintain the confidentiality of its information and prohibiting its employees from trading on material, nonpublic information. Id. ¶ 45. Credit Card Company's "End User Responsibilities and Acceptable Use Standard," which applied to defendants Bonan Huang and Nan Huang stated, in part:

> Use all computing assets primarily for business purposes. Ensure that any personal use does not interfere with normal business activities, involve any illegal or illicit behaviors, associate with any for-profit outside business activity, involve solicitation, or impact the [Credit Card Company] brand.

Id. ¶ 46 and Ex. T.

Additionally, Credit Card Company's "Code of Business Conduct and Ethics," dated July 2013, which applied to defendants Bonan Huang and Nan Huang, specifically and explicitly prohibited trading on the basis of material nonpublic information obtained during the course of employment with Credit Card Company:

> **Do not engage in insider trading or tipping.**
>
> [Credit Card Company] will not tolerate or excuse violations of insider trading laws. In general, these laws prohibit buying or selling stock in any public company, including

7

> [Credit Card Company], when you have material information that has not been released to the public.
>
> You must also refrain from communicating material nonpublic information to anyone who might use it to buy or sell securities. "Tipping" others may violate laws and can result in penalties to all parties involved, including [Credit Card Company]. For additional information, see the Securities Law Policy.
>
> Material information not available to the public may be provided only to colleagues who need the information to perform their duties. If you have access to such information, you must not use it to buy or sell related securities, stock or derivatives until the second business day after the information has been made public. Even if public announcements are made regarding inside information, you may not release information that is still confidential.
>
> The same restrictions apply to trading stock of [Credit Card Company] business partners; you cannot use any material nonpublic information you may obtain about their businesses for your own personal advantage . . . . In addition, you may not communicate material nonpublic information to others who could then use the information to buy or sell securities.
>
> When in doubt, assume information is material and nonpublic, and do not act upon it. Simply put, you must not take part in any trading that may appear improper.

Id. ¶ 47 and Ex. U.

Credit Card Company informed the Commission that on January 16, 2015, Bonan Huang and Nan Huang were terminated for violating Credit Card Company's policies and procedures. Id. ¶ 48.

## **ARGUMENT**

Defendants Bonan Huang and Nan Huang violated the federal securities laws by engaging in insider trading, and, as a result, each reaped substantive profits. To preserve the status quo, and to prevent defendants Bonan Huang and Nan Huang from transferring their assets overseas or otherwise dissipating them, the Commission respectfully requests that this Court enter a temporary restraining order freezing Bonan Huang's and Nan Huang's brokerage account and bank account assets that are related to the allegations in the Commission's Complaint and

8

prohibiting Bonan Huang and Nan Huang from destroying documents, order Bonan Huang and Nan Huang to show cause why a preliminary injunction freezing such assets should not be entered, grant the Commission expedited discovery in connection with its request for such a preliminary injunction, and authorize the substitution of service by overnight courier service addressed to the defendants' last known residential addresses of these papers and any resulting Order.

I.  **This Court Should Enter a Temporary Restraining Order Freezing the Assets of Bonan Huang and Nan Huang**

   **A. Legal Standard for an Asset Freeze**

   As this court has recognized, "[i]n initiating securities litigation, the Government frequently obtains a court-ordered freeze of the defendant's assets." SEC v. Forte, 598 F.Supp.2d 689, 692 (E.D. Pa. 2009) (denying request to release funds from asset freeze) (citing SEC v. Unifund SAL, 910 F.2d 1028, 1041 (2d Cir. 1990)). "A freeze of assets is designed to preserve the status quo by preventing the dissipation and diversion of assets." SEC v. Infinity Group Co., 212 F.3d 180, 197 (3d Cir.), cert. denied sub nom, Springer v. SEC, 532 U.S. 905 (2001) (citing Commodity Futures Trading Commission v. American Metals Exchange Corp., 991 F.2d 71, 79 (3d Cir. 1993)). This is important in order safeguard the proceeds of the fraud and any other assets that may be needed to satisfy any judgment for disgorgement and civil penalties that the Commission may later obtain. See, e.g., Unifund SAL, 910 F.2d at 1041-42; SEC v. General Refractories, Co., 400 F. Supp. 1248, 1259-60 (D.D.C. 1975).

   To obtain an asset freeze at the temporary restraining order or preliminary injunction stage, the Commission need only show that "either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." Smith v. SEC, 653 F.3d 121, 128 (2d Cir. 2011) (internal quotations omitted). This standard is considerably

9

lower than what applies in a civil litigation between private parties. The "SEC need not show a threat of irreparable injury or an inadequate remedy at law." SEC v. Hughes Capital Corp., 1993 U.S. Dist. LEXIS 21283, at *41-*42 (D.N.J. Sept. 2, 1993) (citing SEC v. Graystone Nash, Inc., 820 F. Supp. 863, 875 n. 13 (D.N.J. 1993)); see also SEC v. Unifund SAL, 910 F.2d 1028, 1036, 1038 (2d Cir. 1990) (citing similar cases).

### B. The Commission is Likely to Succeed on the Merits

The evidence demonstrates that defendants Bonan Huang and Nan Huang have violated the federal securities laws by trading on the information they misappropriated from their employer. An individual violates Section 10(b) of the Exchange Act and Rule 10b-5 thereunder when he trades in a security: (1) on the basis of; (2) material nonpublic information; (3) in breach of a fiduciary duty or other duty arising out of a relationship of trust and confidence; and (4) has the requisite scienter. See Dirks v. SEC, 463 U.S. 646, 653-54 (1983); Chiarella v. United States, 445 U.S. 222, 227-35 (1980). Each of these elements is satisfied.

#### 1. Defendants Traded on the Basis of Material, Nonpublic Information

An individual trades "on the basis of" material, nonpublic information if the individual was "aware of the material nonpublic information when the person made the purchase or sale." 17 C.F.R. § 240.10b5-1. The Commission can prove that an individual traded on the basis of material, nonpublic information through inferences from circumstantial evidence. See SEC v. Soroosh, No. C-96-3933-VRW, 1997 WL 487434, at *3-*7 (N.D. Cal. Aug. 5, 1997) (finding for the Commission after a trial on the merits based, in part, on circumstantial evidence of insider trading); SEC v. Pardue, Civ. A. No. 02-8048, 2005 WL 736884, at *5 (E.D. Pa. Apr. 1, 2005); SEC v. Singer, 786 F. Supp. 1158, 1164-65 (S.D.N.Y. 1992) ("[C]ircumstantial evidence such as suspicious timing of trades, contacts between potential tippers and tippees, and incredible

reasons for such trades provide an adequate basis for inferring that tipping activity has occurred.").

Information is material if there is a substantial likelihood that the disclosure of that information would be viewed by the reasonable investor as having significantly altered the "total mix" of information made available. See Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). Thus, central to the issue of materiality is whether the information, "if divulged to the public, would have been likely to affect the decision of potential buyers and sellers." State Teachers Ret. Bd. v. Fluor Corp., 654 F.2d 843, 854 (2d Cir. 1981) (internal quotations omitted). Material information includes "any fact 'which in reasonable and objective contemplation *might* affect the value of the corporation's stock or securities.'" SEC v. Mayhew, 121 F.3d 44, 52 (2d Cir. 1997) (quoting SEC v. Tex. Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968)) (emphasis in original).

Generally, the determination of materiality is an objective one, but the subjective views of the proposed defendants can be evidence of materiality. See SEC v. Shapiro, 494 F.2d 1301, 1307 (2d Cir. 1974). Steffes, 805 F. Supp. 2d at 613-14; SEC v. Garcia, No. 10 CV 5268, 2011 WL 6812680, at *14 (N.D. Ill. Dec. 28, 2011) (discussing Steffes).

The evidence, here, is that Bonan Huang and Nan Huang amassed sales data from the credit card activity of millions of Credit Card Company customers at numerous consumer retail corporations over periods of time ranging from a few days to a few years. As one of the largest credit card issuers in the country, this aggregated data provided them with nonpublic information concerning quarterly sales and earnings for the consumer retail companies and, accordingly, was material. See Flynn v. Bass Bros. Enterprises, Inc., 744 F.2d 978, 985 (3d Cir. 1984) (projections of sales performance may be material); Marx v. Computer Sciences Corp., 507 F.2d

11

485 (9th Cir. 1974) ("Nor can there be any doubt that the forecast of earnings was a material fact. . . . And generally earning projections of a company constitute a prime factor in estimating the worth of its stock."); <u>SEC v. Brethen</u>, 1992 U.S. Dist. LEXIS 20665 (S.D. Oh. 1992) (preliminary sales forecasts and rolling forecasts deemed material).

In addition, the fact that Bonan Huang and Nan Huang, before placing their trades, expended considerable effort to conduct their queries and amass substantial data, even though it was outside of their job responsibilities, shows that they considered the information to be material in forming their own investment decisions. This conduct strongly evidences materiality. <u>Mayhew</u>, 121 F.3d at 52 (citing <u>Tex. Gulf Sulphur Co.</u>, 401 F.2d at 851) ("[A] major factor in determining whether information was material is the importance attached to it by those who knew about it."). In addition, Bonan Huang and Nan Huang, after acquiring this data, traded in the securities of consumer retail corporations in advance of sales and earnings announcements and generated suspiciously large, consistent profits. The timing of their trades and their unusually profitable trading patterns further evidences materiality. <u>Steffes</u>, 805 F. Supp. 2d at 613-14 ("[T]he SEC's allegations that Defendants possessed material, nonpublic information are rendered more plausible by the great aplomb with which Defendants are alleged to have acted on the information once they received it."); <u>SEC v. Garcia</u>, No. 10 CV 5268, 2011 WL 6812680, at *14 (N.D. Ill. Dec. 28, 2011); see <u>SEC v. Shapiro</u>, 494 F.2d 1301, 1307 (2d Cir. 1974) (trading immediately after communication between alleged tipper and alleged tippee suggests that information communicated was material).

2. <u>Defendants Breached Their Fiduciary Duty to Credit Card Company</u>

Under the misappropriation theory of insider trading liability, a person who is not an insider of the issuer of the securities traded violates the antifraud provisions by knowingly or

12

recklessly using material, nonpublic information in connection with a securities transaction in breach of a duty owed to the source of the information. United States v. O'Hagan, 521 U.S. 642, 653-43 (1997). The misappropriation theory is thus designed to "protec[t] the integrity of the securities markets against abuses by 'outsiders' to a corporation who have access to confidential information that will affect th[e] corporation's security price when revealed, but who owe no fiduciary or other duty to that corporation's shareholders." Id.

A fiduciary relationship or duty of trust and confidence exists where there is clear acceptance of a duty of confidentiality, or where such acceptance may be implied from a similar relationship of trust and confidence between the parties. See United States v. Falcone, 257 F.3d 226, 234 (2d Cir. 2001); 17 C.F.R. § 240.10b5-2. An employment relationship can create a duty of trust and confidence on the part of the employee to his employer when the employee is entrusted with confidential information by the employer. See e.g., SEC v. Cherif, 933 F.2d 403, 410 (2d Cir. 1991); SEC v. Clark, 915 F.2d 439, 448 (9th Cir. 1990). By becoming a part of such a relationship, an individual is implicitly stating that he will not divulge or use to his own advantage information entrusted to her in the utmost confidence. Clark, 915 F.2d at 447-48. He defrauds the other party by playing the role of the trustworthy employee or agent and then by using the stolen information to his own advantage. Id.

Here, Bonan Huang and Nan Huang breached a fiduciary duty owed to Credit Card Company, their employer, by using confidential sales data from Credit Card Company's database entrusted to them for their own personal gain. Moreover, their actions violated Credit Card Company's policies and procedures. Specifically, Bonan Huang and Nan Huang violated Credit Card Company's "End User Responsibilities and Acceptable Use Standard," which provided, in relevant part:

13

> Use all computing assets primarily for business purposes. Ensure that any personal use does not interfere with normal business activities, involve any illegal or illicit behaviors, associate with any for-profit outside business activity, involve solicitation, or impact the [Credit Card Company] brand.

Koster Decl. ¶ 46 and Ex. T. Bonan Huang and Nan Huang also violated Credit Card Company's "Code of Business Conduct and Ethics," dated July 2013, which provided, in relevant part:

> [Credit Card Company] will not tolerate or excuse violations of insider trading laws. In general, these laws prohibit buying or selling stock in any public company, including [Credit Card Company], when you have material information that has not been released to the public.
>
> You must also refrain from communicating material nonpublic information to anyone who might use it to buy or sell securities. "Tipping" others may violate laws and can result in penalties to all parties involved, including [Credit Card Company]. For additional information, see the Securities Law Policy.
>
> Material information not available to the public may be provided only to colleagues who need the information to perform their duties. If you have access to such information, you must not use it to buy or sell related securities, stock or derivatives until the second business day after the information has been made public. Even if public announcements are made regarding inside information, you may not release information that is still confidential.
>
> The same restrictions apply to trading stock of [Credit Card Company] business partners; you cannot use any material nonpublic information you may obtain about their businesses for your own personal advantage . . . . In addition, you may not communicate material nonpublic information to others who could then use the information to buy or sell securities.
>
> When in doubt, assume information is material and nonpublic, and do not act upon it. Simply put, you must not take part in any trading that may appear improper.

Koster Decl. ¶ 47 and Ex. U.

Bonan Huang's and Nan Huang's actions here directly violated Credit Card Company policies and resulted in a breach of their fiduciary duty to Credit Card Company.

14

3. <u>Defendants Acted With Scienter.</u>

Scienter is defined as "a mental state embracing intent to deceive, manipulate or defraud." <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 n.12 (1976). Scienter may be established by showing intentional or severely reckless conduct. <u>Broad v. Rockwell Int'l Corp.</u>, 642 F.2d 929, 961-62 (5th Cir.); <u>SEC v. Kornman</u>, 391 F. Supp. 2d 477, 493 (N.D. Tex. 2005). In an insider trading case, scienter can be inferred from circumstantial evidence. <u>Michaels v. Michaels</u>, 767 F.2d 1185, 1199 (7th Cir. 1985) (stating that scienter can be inferred from circumstantial evidence in insider trading case). Moreover, in an insider trading case under the misappropriation theory, the Commission can demonstrate scienter by showing, through direct and circumstantial evidence, that a trader acted knowingly or recklessly when breaching the duty of trust and confidence described above. <u>SEC v. Obus</u>, 693 F.3d 276, 286 (E.D. Mich. 2011). Such knowing or reckless conduct can be established where the trader was informed of the confidential nature of the information through posted or verbal warnings or employee handbooks and/or where other individuals who were similarly situated as the trader were aware that the information was confidential. <u>U.S. v. Carpenter</u>, 791 F.2d 1024, 1033-34 (2d Cir. 1986); <u>SEC v. Musella</u>, 578 F. Supp. 425, 439-440 (S.D.N.Y. 1984)

Here, both Bonan Huang and Nan Huang were expressly warned that "[Credit Card Company] will not tolerate or excuse violations of insider trading laws. In general, these laws prohibit buying or selling stock in any public company, including [Credit Card Company], when you have material information that has not been released to the public." Koster Decl. ¶ 47 and Ex. U. Additionally, Bonan Huang and Nan Huang were warned that they "must not use [material information] to buy or sell related securities, stock or derivatives until the second business day after the information has been made public." <u>Id</u>. The fact that both Bonan Huang

15

and Nan Huang—in spite of these clear warnings—gathered and traded on material, nonpublic information from Credit Card Company's sales data on hundreds, if not thousands, of occasions demonstrates that they acted with scienter.

### C. The Commission's Requested Asset Freeze Against Bonan Huang and Nan Huang is Appropriate Under the Circumstances

Bonan Huang and Nan Huang may attempt to transfer their assets overseas, or otherwise dissipate their assets, and therefore an asset freeze is appropriate under the circumstances. Moreover, Bonan Huang and Nan Huang have a history of transferring assets out of their brokerage accounts (Koster Decl. ¶ 41), and Bonan Huang is a Chinese citizen. Koster Decl. ¶ 6. Between January 2012 and January 2015, Bonan Huang and Nan Huang transferred approximately $1,763,500 out of their six accounts at OptionsHouse. Koster Decl. ¶ 41. As of January 15, 2015, the total balance in the six accounts was approximately $1,063,000, which is less than the approximately $2,826,500 in profits they made by trading in such accounts during this period. Id. And at least Bonan Huang sought, just yesterday, to deplete that amount further. On January 20, 2015—the first trading day following his termination from Credit Card Company—Bonan Huang requested that OptionsHouse to transfer $250,000 out of one of his brokerage accounts. Koster Decl. ¶ 49.

Here, where one of the two defendants has already attempted to transfer funds out of his trading brokerage account, the requested asset freeze—which is limited to the assets of Bonan Huang and Nan Huang held at any financial or brokerage institution where they conducted the trading that is alleged in the Complaint to have violated the securities laws[3]—is both appropriate and reasonable. American Metals Exchange Corp., 991 F.2d at 79 (affirming district court's

---

[3] The accounts affected by the requested asset freeze are at the following financial institutions: Apex Clearing Corp.; OptionsHouse; Scottrade, Inc.; Tradestation Securities; E*Trade Financial Corporation; Legent Clearing; InterActive Brokers; Penson Financial Services, Inc.; Bank of America; Barclays Bank Delaware; and Capital One Financial Corporation.

blanket asset freeze and holding "we will allow the freeze to remain in effect until the district court determines whether it can make an informed determination of the amount of unlawful proceeds retained by Maxwell, and, if it can, what that amount may approximate").

## II. This Court Should Enter an Order Prohibiting the Destruction of Documents

In order to protect all documents and tangible things necessary to establish a complete record in this matter, the Commission seeks an order prohibiting the destruction of documents or tangible things. Such "innocuous" orders are routinely granted to protect the integrity of the litigation. See, e.g., Unifund SAL, 910 F.2d at 1040 n.11. Good faith preservation of documents cannot be assumed in the context of such a massive insider trading scheme.

## III. This Court Should Enter an Order to Show Cause Why a Preliminary Injunction Should Not be Entered and Granting the Commission Expedited Discovery

The continuation of any relief obtained pursuant to this Motion, and the consequent preservation of the status quo, is dependent upon the Court's entry of a preliminary injunction within fourteen days. Fed. R. Civ. P. 65(b)(2). Accordingly, the Commission requests that the Court enter an order to show cause why a preliminary injunction imposing the same relief as set forth in the temporary restraining order should not be entered. The Commission also requests expedited discovery in aid of its request for a preliminary injunction.

## IV. This Court Should Authorize Substitution of Service

The Commission respectfully requests that this Court to authorize service of any Order issued by the Court in connection with this Motion, as well as the papers on which the Order was granted, on Bonan Huang and Nan Huang, or their attorney who agrees to accept service on their behalf, by personal delivery, facsimile, overnight courier, email or first-class mail of these papers and any resulting Order.

## CONCLUSION

Because the Commission has demonstrated a likelihood of success of the merits, the Court should enter a temporary restraining order freezing Bonan Huang's and Nan Huang's brokerage account and bank account assets that are related to the allegations in the Commission's Complaint and prohibiting Bonan Huang and Nan Huang from destroying documents, order Bonan Huang and Nan Huang to show cause why a preliminary injunction freezing such assets should not be entered, grant the Commission expedited discovery in connection with its request for such a preliminary injunction, and authorize the substitution of service by personal delivery, facsimile, overnight courier, email or first-class mail of these papers and any resulting Order.

Respectfully submitted,

BY: _____
G. Jeffrey Boujoukos
David L. Axelrod
Christopher R. Kelly
Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

Dated: January 21, 2015