**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | Case No.  2:15-cv-00269-MAK |
| Plaintiff, | |
| v. | |
| BONAN HUANG, et al. | |
| Defendants. | |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S**
**APPENDIX TO MOTION FOR SUMMARY JUDGMENT AGAINST**
**DEFENDANTS BONAN HUANG AND NAN HUANG**

**PART 4 OF 10**
**(0197-0486)**

November 5, 2014, for $41,170.  Exhibit 12 is the OptionsHouse trading activity reflecting these trades.  Purchasing these call options meant that Bonan Huang would profit from an increase in the price of Chipotle's stock.

20.     On July 21, 2014, defendant Nan Huang purchased 34 contracts of call options on Chipotle's stock with strike prices ranging from $597.50 to $617.50 and expiration dates ranging from August 5, 2014 to November 5, 2014, for $56,500.  Exhibit 13 is the partially redacted OptionsHouse trading activity reflecting these trades.  Purchasing these call options meant that Nan Huang would profit from an increase in the price of Chipotle's stock.

21.     On July 21, 2014, after the market closed, Chipotle released its sales and earnings data for the second quarter of 2014.  This data showed that Chipotle's same quarter revenue increased by 28.6%.  By market close on July 22, 2014, Chipotle's share price had increased from approximately $590 a share to approximately $660 a share, for a one-day increase of approximately 11.8%.  Exhibit 14 is a true and correct copy of the press release issued by Chipotle on July 21, 2014.  Exhibit 15 is a true and correct copy of daily share price for Chipotle during the relevant time period.

22.     On July 22, 2014 defendant Bonan Huang sold his options for Chipotle for $128,566, realizing a one-day return of approximately 220%.  See Exhibit 12.

23.     On July 23, 2014 (and dates shortly thereafter) defendant Nan Huang sold his options for Chipotle for approximately $215,310, realizing a short-term return of approximately 281%.  See Exhibit 13.

24.     Exhibit16 is a document bearing Bates numbers SEC-UNITED-E-0000003-006 produced by United Airlines in this matter.

5

25.     Exhibit17 is a document bearing Bates numbers SEC-UNITED-P-0000012-015, produced by United Airlines in this matter.

26.     Exhibit 18 is a download from Yahoo! Finance showing certain periodic analyst estimates for earnings and revenue for Chipotle.

27.     Exhibit 19 is a press release from Restoration Hardware dated September 10, 2013.

28.     Exhibit 20 is a document bearing Bates numbers SECP-COF-00001848-850, produced by Capital One in this matter.

29.     Exhibit 21 is an excerpt from a document bearing the name 4ZE89435.xls and production ID # ID # _P_I01:00000022, produced by OptionsHouse in this matter.

30.     Exhibit 22 is an excerpt from a document bearing the name 5PD45586.xls and production ID # _P_I01:0100000014, produced by OptionsHouse in this matter.

31.     Exhibit 23 is Plaintiff's First Set of Interrogatories Directed to Bonan Huang.

32.     Exhibit 24 is Plaintiff's First Set of Interrogatories Directed to Nan Huang.

33.     Exhibit 25 is Plaintiff's Second Set of Interrogatories Directed to Bonan Huang.

34.     Exhibit 26 is Plaintiff's Second Set of Interrogatories Directed to Nan Huang.

35.     Exhibit 27 is Plaintiff's First Set of Requests for Admission Directed to Bonan Huang.

36.     Exhibit 28 is Plaintiff's First Set of Requests for Admission Directed to Nan Huang.

37.     Exhibit 29 is Plaintiff's Second Set of Requests for Admission Directed to Bonan Huang.

38.     Exhibit 30 is Plaintiff's Second Set of Requests for Admission Directed to Nan Huang.

39.     Exhibit 31 is Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories Directed to Bonan Huang.

40.     Exhibit 32 is Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories Directed to Nan Huang.

41.     Exhibit 33 is Defendant Bonan Huang's Answers to Plaintiff's Second Set of Interrogatories.

42.     Exhibit 34 is Defendant Nan Huang's Answers to Plaintiff's Second Set of Interrogatories.

43.     Exhibit 35 is Defendant Bonan Huang's Supplemental Answers to Plaintiff's Second Set of Interrogatories, dated September 28, 2015.

44.     Exhibit 36 is Defendant Nan Huang's Supplemental Answers to Plaintiff's Second Set of Interrogatories, dated September 28, 2015.

45.     Exhibit 37 is Defendant Bonan Huang's Answers to Plaintiff's First Set of Requests for Admission.

46.     Exhibit 38 is Defendant Nan Huang's Answers to Plaintiff's First Set of Requests for Admission.

47.     Exhibit 39 is Defendant Bonan Huang's Responses to Plaintiff's Second Set of Requests for Admission.

48.     Exhibit 40 is Defendant Nan Huang's Responses to Plaintiff's Second Set of Requests for Admission.

49.     Exhibit 41 contains address information downloaded from the website of Scottrade, Inc., a brokerage firm utilized by Defendant Bonan Huang.

50.     Exhibit 42 contains address information downloaded from the website of Apex Clearing Corporation, the parent company of a brokerage firm utilized by Defendant Nan Huang.

51.     Exhibit 43 contains address information downloaded from the website of MB Trading, a brokerage firm utilized by Defendant Nan Huang.

52.     Exhibit 44 contains address information downloaded from the website of COR Clearing LLC, a brokerage firm utilized by Defendant Nan Huang.

53.     Exhibit 45 contains address information downloaded from the website of OM Securities, LLC (doing business as OptionsHouse), a brokerage firm utilized by Defendants Bonan Huang and Nan Huang.

54.     Exhibit 46 contains address information downloaded from the website of TradeStation Securities, Inc., the parent company of a brokerage firm utilized by Defendant Bonan Huang.

55.     Exhibit 47 contains address information downloaded from the website of Interactive Brokers, LLC, a brokerage firm utilized by Defendant Nan Huang.

56.     Exhibit 48 contains address information downloaded from the website of E*Trade Financial Corporation, the parent company of a brokerage firm utilized by Defendant Nan Huang.

0200

I declare under penalty of perjury that the foregoing is true and correct.  Executed on October 23, 2015, at Philadelphia, Pennsylvania.

Dustin E. Ruta

0201

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No. 2:15-cv-00269-MAK (E.D.Pa.) |
| BONAN HUANG, NAN HUANG, | ) ) ) ) | |
| Defendants. | ) | |

**EXPERT REBUTTAL REPORT**

**October 9, 2015**

**of**

**Torben Voetmann**

*Torben Voetmann*
_____

Torben Voetmann, October 9, 2015

## TABLE OF CONTENTS

I.     Assignment ................................................................................................................. 1

II.    Qualifications .............................................................................................................. 1

III.   Documents Reviewed And Compensation .................................................................. 2

IV.    Summary Of Opinions ................................................................................................ 3

V.     Mr. Graham Considers Only Revenue Data To Be Material To A Reasonable Investor ...... 6

       A.     Mr. Graham Fails To Consider That The Ability To Predict Earnings Or Cash
              Flows Is More Relevant Than Forecasting Revenues .................................... 6

       B.     Mr. Graham Fails To Connect His Analysis to Underlying Stock Price
              Movements ...................................................................................................... 8

VI.    Mr. Graham's Correlation Analysis Does Not Establish By An Economically Reliable
       Methodology That The Transaction Data Was Material To A Reasonable Investor .......... 10

       A.     Mr. Graham's Interpretation of His Correlation Results Contradicts Fundamental
              Statistical Principles ..................................................................................... 10

       B.     Mr. Graham's Findings of Statistically Significant Correlation Between
              Aggregate Revenues and Transaction Data Disappear When Stock Returns Are
              Used Instead .................................................................................................. 12

VII.   Mr. Graham's Regression Analysis Is Fundamentally Flawed Because It Fails To
       Consider The Incremental Explanatory Power Of The Defendants' Transaction Data
       For Abnormal Stock Returns ..................................................................................... 14

VIII.  There Is No Evidence That The Defendants' Transaction Data Reflected Any
       Additional Information Beyond That Already Captured In The Market ...................... 16

IX.    Mr. Graham Confounds His Analysis Of The Defendants' Trading Profits With Ex-Post
       Information And Erroneously Includes Gains Generated After Revenue
       Announcements ......................................................................................................... 21

X.     Dr. Cain's Analysis is Built on A Flawed Premise that A Correlation Exists between
       Revenues and the Transaction Data ........................................................................... 23

XI.    Dr. Cain's Calculations Overstate Ill-Gotten Gains To The Defendants .................... 24

XII.   Conclusion ............................................................................................................... 25

i

## I.    ASSIGNMENT

1.    I have been asked by counsel for Bonan and Nan Huang (jointly, the "Defendants") to review and respond to the opinions expressed in the Expert Report of Mr. Stephen Graham ("Graham Report") filed on September 18, 2015, and the Expert Report of Dr. Matthew D. Cain ("Cain Report") filed on September 18, 2015, both on behalf of the Securities and Exchange Commission ("SEC"). Specifically, I have been asked to:

   a.   Evaluate Mr. Graham's assumptions and methodology for determining that the credit card transaction data obtained by the Defendants from the Capital One database ("Teradata") for certain stocks (the "tainted" companies) was material to a reasonable investor and examine his correlation analysis demonstrating a predictive relationship between the transaction data and revenues;

   b.   Analyze Mr. Graham's regression analysis demonstrating a predictive relationship between the transaction data and revenue growth for tainted companies after controlling for analyst expectations and his calculation and assessment of the Defendants' trading profits as "extraordinary"; and

   c.   Examine Dr. Cain's calculations of ill-gotten gains to the Defendants.

## II.    QUALIFICATIONS

2.    I am a Principal at The Brattle Group, a financial and economic consulting firm, and an adjunct professor at the University of San Francisco's School of Management. Prior to joining The Brattle Group, I was a visiting professor at the Wharton School of the

0204

University of Pennsylvania where I taught in the undergraduate and graduate school of business.  I have also taught for the New York Institute of Finance and Financial Modeling World.  I received a Bachelor of Science degree in Business Administration from Aarhus School of Business in 1991, a Master's degree in Finance from the Aarhus School of Business in 1993, and my doctorate in Finance from Copenhagen Business School in 2000.

3. My academic and professional work has been in the fields of financial econometrics (*e.g.,* the application of statistical methods within an economic framework), securities prices and capital markets.  I have published articles on economic and financial topics in peer-reviewed journals, including the *Journal of Corporate Finance*, *Review of Finance*, and the *European Journal of Finance*, *Managerial and Decision Economics,* and *International Review of Financial Analysis.* I have also authored a chapter on event studies using regression analysis in a widely cited textbook titled Financial Modeling.  In addition, I have taught undergraduate and graduate-level courses in corporate finance, corporate valuation, managerial finance, capital markets and investment banking.  I am currently teaching in the MBA and MSFA programs at the University of San Francisco.

4. A copy of my curriculum vitae and a list of prior testimony over the last four years are attached hereto as Appendix A.

## III.    DOCUMENTS REVIEWED AND COMPENSATION

5. A list of the documents I have relied upon in forming my opinions is attached hereto as Appendix B. The opinions presented in this report are the result of the information available to me as of the date of this report and I reserve the right to supplement or modify

my opinions if new information becomes available.[1]  I also reserve the right to respond to any additional report(s) or opinions offered by experts for the SEC.

6.   The Brattle Group is being compensated for my work in this matter at my hourly rate of $550.  Staff at The Brattle Group have assisted me by performing work at my direction. All the opinions and conclusions stated in this report are my own. The Brattle Group's compensation is not affected by the outcome of this matter.

**IV.    SUMMARY OF OPINIONS**

7.   Below is a summary of my opinions based on my review of materials presented in the Graham Report, the Cain Report, and my knowledge and experience in finance. Overall, I find Mr. Graham's and Dr. Cain's analyses to be flawed and insufficient. The bases for this opinion are detailed in the sections that follow.

    a.   Mr. Graham's analysis rests on the assumption that only revenue data is material to a reasonable investor. This reasoning is flawed for two reasons. First, he fails to consider that the ability to predict earnings or cash flows is more relevant than forecasting revenues. Second, he fails to connect his analysis to underlying stock price movements as a proxy of information relevant to a reasonable investor. Mr. Graham's proposed research methodology contradicts standard approaches to assessing the relevance of financial forecasts in the market and does not demonstrate by an economically

---

[1]    I have received a production of a larger number of documents relied upon by Mr. Graham and Dr. Cain, including pdfs of the Defendants' account statements.

reliable methodology that the Defendants' transaction data was material to a reasonable investor.

b. Mr. Graham's correlation analysis of revenues against transaction data contradicts fundamental statistical principles. First, he confuses correlation with causation, which renders his entire analysis meaningless. Second, even accepting the validity of a correlation analysis for demonstrating a predictive relationship between these two variables, he should have considered the correlation between the transaction data and stock price returns. When I examine the relationship between transaction data and stock price returns, the correlation found by Mr. Graham disappears. Therefore, Mr. Graham's correlation analysis neither proves a predictive relationship between transaction data and revenues, nor does it establish by an economically reliable methodology that the transaction data would have been material to a reasonable investor.

c. Mr. Graham's regression analysis demonstrating the predictive power of the transaction data for revenue growth is flawed. He fails to account for the effect of the transaction data on changes in the stock price after adjusting for market risk. Once I correct for this major flaw, I find no evidence that the transaction data had any significant explanatory power for stock returns. Thus, once again, Mr. Graham's regression analysis does not establish by an economically reliable methodology that the transaction data would have been material to a reasonable investor.

4

d.  Mr. Graham's conclusion that the Defendants realized extraordinary trading profits between 2012 and 2014 is flawed. First, he confounds his analysis of profits with ex-post information instead of assessing on an ex-ante basis whether the Defendants' transaction data could have predicted future returns. Second, he includes trading gains realized after the companies' public revenues announcements which would not have been tainted by the Defendants' alleged information advantage. Therefore, his calculation of these trading profits and attribution to tainted stocks is simply wrong.

e.  The report by Dr. Cain is speculative at best and relies entirely on the results of the Graham Report. Therefore, his entire analysis is built on a flawed and unreliable premise that a correlation exists between revenues and the transaction data. Further, Dr. Cain's analysis overstates trading profits to the Defendants from trading in tainted stocks. Thus, his measure of ill-gotten gains is biased and incorrect.

8.  In sum, Mr. Graham's entire opinion (and, as a result, Dr. Cain's opinion as well) rests on the following causal chain:

- The ability to predict revenues is most material to reasonable investors;

- There is a statistically significant correlation between the Defendants' transaction data and revenues;

- There is a statistically significant relationship between changes in the Defendants' transaction data and changes in revenues, after controlling for analyst expectations;

- The Defendants' transaction data thus allowed them to predict both revenues and future revenue growth; and

5

- Therefore, a reasonable investor would have considered the Defendants' transaction data to be material.

9. If any one step of this chain is incorrect, then the entire chain of logic fails. In this report, I demonstrate that each step is flawed, which refutes Mr. Graham's conclusion that the Defendants' transaction data was material to reasonable investors.

10. I now explain in more detail the basis for each of the opinions listed above.

## V.   MR. GRAHAM CONSIDERS ONLY REVENUE DATA TO BE MATERIAL TO A REASONABLE INVESTOR

### A.   MR. GRAHAM FAILS TO CONSIDER THAT THE ABILITY TO PREDICT EARNINGS OR CASH FLOWS IS MORE RELEVANT THAN FORECASTING REVENUES

11. A reasonable investor assesses potential investments based on the total mix of available information. This includes an assessment of the investment's risks and its potential rewards. One of the most important factors for a reasonable investor to consider when examining financial statements is a company's ability to generate sufficient earnings or cash flows. The value of a company's stock is based on its future, not historical, cash flow, i.e., the market value is a forward-looking, not a backward-looking number. Consequently, current revenues are only informative to the extent they change the mix of information regarding future cash flows. Similarly, historical growth rates and revenues matter only to a reasonable investor insofar they affect expected future cash flows.

12. There is substantial evidence both in the academic literature and from practitioners that reasonable investors are most concerned with predicting company earnings and/or cash flows rather than revenues. The standard discounted cash flow model used to value public companies is based on projected free cash flows for a given firm, not forecasted revenues. As stated by Brealey, Myers and Allen in their leading corporate finance textbook, "only

6

cash flow is relevant" to making investment decisions.[2]  Ultimately, what is most important to the health of a firm and a potential investor is the firm's ability to generate enough revenues to cover its expenses, i.e., to generate positive earnings and steady cash flows. Since earnings and cash flows are a much more direct value driver compared to revenues, they are used far more frequently in practice when constructing multiples to value companies.  It is relatively rare to value a company using a revenues-based multiple unless the company has highly volatile or negative earnings.

13.   Mr. Graham cites several papers supporting his reliance on revenues as the key metric considered by reasonable investors. However, these cites are taken out of context and misinterpreted.  For example, Mr. Graham cites a survey by Graham, Harvey and Rajgopal (2005)[3] demonstrating that, after earnings, a group of 401 financial executives identified revenues as the second most important firm performance measure.  By contrast, the paper actually reveals that earnings are overwhelmingly the favorite financial metric of outsiders, with 159 of the respondents ranking it as the number one metric, relative to only 36 top ranks each for revenues and operating cash flow.[4]  Therefore, revenues clearly lag earnings in terms of perceived importance by CFOs.

---

[2]   Brealey, Richard, Stewart Myers and Franklin Allen, Principles of Corporate Finance, 11th Edition, New York:  McGraw-Hill/Irwin (2013), Chapter 6, p. 131.

[3]   Graham, John R., Campbell R. Harvey and Shiva Rajgopal, "The Economic Implications of Corporate Financial Reporting," *Journal of Accounting and Economics*, Vol. 40 (December 2005) pp. 3-73.

[4]   Graham, Harvey and Rajgopal (2005), *op. cit.,* September 13, 2004 version, p. 8.

7

14.   In sum, based on my understanding that Mr. Graham only focused on revenue, which is not a measure of cash flow, it is highly unlikely in my opinion that the sales transaction data obtained by the Defendants was material to a reasonable investor.

### B.   MR. GRAHAM FAILS TO CONNECT HIS ANALYSIS TO UNDERLYING STOCK PRICE MOVEMENTS

15.   Mr. Graham's correlation analysis only considers the correlation between quarterly company transaction data and actual reported revenues, not stock price returns, which would be more relevant to investors considering buying or selling securities in those companies.

16.   There is substantial evidence in the earnings response and wider academic literature to support the use of market returns as the most important indicator of information content. For example, Beaver et al (2008)[5] analyze the impact of analysts' earnings forecast errors and forecast revisions on stock prices, and conclude that, since these factors have significant effects on abnormal stock returns, they convey significant information content. Other empirical studies of the market impact of earnings surprises use the same model.[6]

---

[5]   Beaver, William, Bradford Cornell, Wayne R. Landsman, and Stephen R. Stubben, "The Impact of Analysts' Forecast Errors and Forecast Revisions on Stock Prices," *Journal of Business Finance & Accounting*, Vol. 35 (June/July 2008) pp. 709-740.

[6]   See, for e.g., Cornell, Bradford and Wayne R. Landsman, "Security Price Response to Quarterly Earnings Announcements and Analysts' Forecast Revisions," *The Accounting Review*, Vol. LXIV, No. 4 (October 1989) pp. 680-692.

17.   In addition, Mr. Graham cites Rees and Sivaramakrishnan (2007),[7] who study the effect of meeting or beating revenue forecasts on the association between quarterly returns and earnings forecast errors.  Specifically, Mr. Graham cites the authors' statement that "[n]ext to earnings, revenues forecasts are perhaps the most widely followed performance metric by analysts." [8]  However, this quote is taken out of context. The authors are not using the ability to predict revenues as an indicator of material information content. Rather, they measure the joint impact of meeting earnings and revenue forecasts on abnormal returns. Therefore, the context for their statement above is the explanatory power of revenue forecasts for abnormal returns. This contradicts Mr. Graham's approach which reverses the standard methodology entirely and examines the impact of the Defendants' transaction data on revenues instead. This makes no economic sense.

18.   Finally, Mr. Graham cites Fairfield, Ramnath and Yohn (2009)[9] who state that "sales growth…is the fundamental driver of firm growth." [10]  This statement is irrelevant to his analysis, however, since he purports to examine the market impact of the Defendants' transaction data, and market impact is not proxied by firm growth but, rather, by impact on actual traded market prices. Therefore, this cite does not support Mr. Graham's framework

---

[7]   Rees, Lynn and K. Sivaramakrishnan, "The Effect of Meeting or Beating Revenue Forecasts on the Association between Quarterly Returns and Earnings Forecast Errors," *Contemporary Accounting Research*, Vol. 24, No. 1 (Spring 2007) pp. 259-290.

[8]   Rees and Sivaramakrishnan (2007), *op. cit.,* p. 259.

[9]   Fairfield, Patricia, M., Sundaresh Ramnath, and Teri Lombardi Yohn, "Do Industry-Level Analyses Improve Forecasts of Financial Performance?" *Journal of Accounting Research*, Vol. 47, No. 1 (March 2009) pp. 147-178.

[10]   Fairfield, Ramnath, and Yohn, (2009), *op. cit.,* p. 149.

0212

of testing the relationship between transaction data and revenues. Mr. Graham should instead have examined the impact of transaction data on market returns.

## VI.   MR. GRAHAM'S CORRELATION ANALYSIS DOES NOT ESTABLISH BY AN ECONOMICALLY RELIABLE METHODOLOGY THAT THE TRANSACTION DATA WAS MATERIAL TO A REASONABLE INVESTOR

### A.   MR. GRAHAM'S INTERPRETATION OF HIS CORRELATION RESULTS CONTRADICTS FUNDAMENTAL STATISTICAL PRINCIPLES

19.   Mr. Graham asserts that, for 132 companies, the transaction data the Defendants obtained are highly correlated with company reported revenues and these correlations are statistically significant at the 95% confidence level. In addition, since the quarterly transaction data are available earlier than when the company publicly announces its quarterly revenues, he concludes that the transaction data are predictive of company reported quarterly revenues.[11]

20.   Mr. Graham's interpretation of his correlation results violates a basic principle in statistics. Mr. Graham claims to find a correlation or association between two variables over time. From this alleged relationship, he concludes that it is possible to predict quarterly aggregate revenues.  However, confusing correlation with causation is an elementary fallacy in the field of Statistics. The fact that two variables behave similarly in a data set does not mean that one of them is causing the movement of the other. Further, merely observing trends in data does not provide any logical or statistical basis for a conclusion about what causes or explains those trends.

---

[11]   Graham Report, p. 19.

21. Mr. Graham's own report cites several well-known, reputable statistics references that warn against jumping to such inappropriate conclusions. For example, the "Reference Guide on Multiple Regression" notes that "in interpreting the results of a multiple regression analysis, it is important to distinguish between correlation and causality."[12]   Even introductory econometrics textbooks state that "unless causality can be established," an association between two variables is "rarely compelling."[13]

22. In fact, Mr. Graham's correlation analysis—even if it were reliable—can at most illustrate how quarterly revenue data and quarterly sales data aggregated from the transaction database evolved over time.  Concluding that this pattern was fully caused by access to the database, however, cannot possibly be justified by the statistical analysis Mr. Graham presents.

23. Under customary statistical procedures, Mr. Graham should also have investigated and ruled out other possible causes of the correlation he observed before attributing them to allegedly material information that a reasonable investor would consider. The generally accepted practice in the field of statistics is that, when it is not possible directly to establish causality, an investigator should explore and evaluate various hypotheses and determine which of them are consistent with the observed patterns in the data.

---

[12]   Rubinfeld, Daniel L., "Reference Guide on Multiple Regressions," Reference Manual on Scientific Evidence, 3rd Edition, Federal Judicial Center (2011) at p. 183.

[13]   Wooldridge, Jeffrey M., *Introductory Econometrics: A Modern Approach*, 4th Edition, South Western, Cengage Learning (2009) at p. 12.

0214

24.  In sum, Mr. Graham supposedly found a high and statistically significant correlation between quarterly revenues and transaction data. His expansive speculation about what this correlation implies has no roots in scientific principles and is therefore unreliable.

### B.   MR. GRAHAM'S FINDINGS OF STATISTICALLY SIGNIFICANT CORRELATION BETWEEN AGGREGATE REVENUES AND TRANSACTION DATA DISAPPEAR WHEN STOCK RETURNS ARE USED INSTEAD

25.  Mr. Graham presents a chart for Walmart[14] and 20 other companies[15] that suggest a high, statistically significant correlation between quarterly company revenues and the transaction data.  My Exhibit 1 instead displays the correlation between Walmart's quarterly revenues and abnormal price returns,[16] between April 2009 and July 2013, the same period presented by Mr. Graham in his chart.  My exhibit shows that, while Mr. Graham finds a 0.95 (and statistically significant) correlation between Walmart's quarterly revenues and its transaction data, I find a -0.20 correlation between its quarterly revenues and abnormal returns. Exhibits 2 to 4 show further, respectively, that Walmart had only a 0.15 correlation between quarterly changes in its revenues and abnormal returns, a -0.33 correlation between its quarterly transaction data and returns, and a -0.17 correlation between changes in its transaction data and abnormal returns over the same period.

26.  Exhibit 5 next compares, for the 21 companies selected by Mr. Graham in his Exhibit E (including Walmart), the statistical significance of the correlation between their quarterly revenues and transaction data as calculated by Mr. Graham, against the correlations I run

---

[14]  Graham Report, p. 14.

[15]  Graham Report, Exhibit E.

[16]  The abnormal return for a given revenue announcement date t is the price return for day t relative to day t-1 minus the corresponding return on the S&P 500 Total Return Index.

between their quarterly revenues and abnormal price returns from 2009 to 2014. This shows that, while Mr. Graham finds statistically significant correlations between quarterly revenues and transaction data for 20 of these 21 companies, only 2 of these companies display a significant correlation at the 5% level between revenues and abnormal returns. I obtain the same result when I correlate changes in quarterly revenues with abnormal returns instead, presented in the last three columns of Exhibit 5.

27. Exhibit 6 analogously compares Mr. Graham's results for these 21 companies against the correlations I run between their quarterly transaction data and abnormal returns from 2009 to 2014. I find that none of these companies display a significant correlation at the 5% level between quarterly transaction data or changes in transaction data and abnormal returns.

28. Exhibit 7 extends my analysis to the full set of 226[17] companies for which the Defendants allegedly obtained transaction data. It shows that, while Mr. Graham finds statistically significant correlations between revenues and transaction data for 132 of these firms, only 10 (17) companies display a significant correlation between quarterly revenues (changes in quarterly revenues) and abnormal returns from 2009 to 2014. Further, only 8 (2) companies have a significant correlation between quarterly transaction data (changes in quarterly transaction data) and abnormal returns over the same period.

29. These results are also displayed graphically in Exhibits 8 through 11. Exhibit 8 illustrates that, of the 132 companies that display significant correlations between quarterly revenues

---

[17] These are all the companies listed as "tainted" tickers in the Graham Report, Exhibit B. I find available data for my correlations for a sub-sample of these 226 firms, as displayed in column [1] of this exhibit.

and transaction data (as illustrated in Mr. Graham's Exhibit F), only 4 of those have a statistically significant correlation between quarterly revenues and returns. Exhibit 9 demonstrates similarly that only 6 of the 132 companies have a statistically significant correlation between changes in quarterly revenues and returns from 2009 to 2014. Exhibits 10 and 11 show that, respectively, only 7 (2) of the 131 companies I have found with available data for these calculations have a statistically significant correlation between quarterly transaction data (changes in quarterly transaction data) and abnormal returns from 2009 to 2014.

30.    Overall, these results demonstrate a lack of a significant relationship between the transaction data and returns, a more relevant proxy for the market impact of information. Therefore, Mr. Graham's correlation analysis neither proves a predictive relationship between transaction data and aggregate revenues, nor does it establish by an economically reliable methodology that the transaction data was material to a reasonable investor.

## VII.    MR. GRAHAM'S REGRESSION ANALYSIS IS FUNDAMENTALLY FLAWED BECAUSE IT FAILS TO CONSIDER THE INCREMENTAL EXPLANATORY POWER OF THE DEFENDANTS' TRANSACTION DATA FOR ABNORMAL STOCK RETURNS

31.    Mr. Graham's regression analysis[18] purports to demonstrate a predictive relationship between the Defendant's transaction data and revenue surprises, after controlling for the information content of analyst forecasts. However, his regression analysis is unreliable at best, misleading at worst, and does not support his conclusions. I list the major flaws in his model below:

---

[18]    Graham Report, p. 22.

a. Mr. Graham's regression analysis uses yearly changes in revenues per company-quarter as the dependent (or left-hand-side) variable. However, the vast majority of academic papers examining the impact of company-specific information use abnormal stock price returns as the dependent variable in their models.[19]   Therefore, Mr. Graham's regression results do not have any implications for the materiality of the transaction data.

b. Mr. Graham's regression analysis does not account for any time or fixed effects. It is standard in the literature to include these effects when investigating the impact of information, for example, earnings or revenues forecasts, on the market.[20]

c. Finally, Mr. Graham's regression analysis does not control for any market, industry, or company-specific factors that may affect the relationship between the transaction data and revenue growth. For example, companies in different businesses like Walmart and the substantially more upscale retailer Coach may have very different patterns of credit card transaction data due to the differences in their customer demographics and associated modes of payment. Similarly, I would expect companies with different sizes and/or cost structures to display varying relationships between the transaction data and revenues. In addition, macroeconomic trends or changes in the economy could have

---

[19]   See, for e.g., Asquith, Paul, Michael B. Mikhail, and Andrea S. Au, "Information Content of Equity Analyst Reports," MIT Sloan Management, Working Paper 4264-02 (November 2003), and Beaver et al (2008), *op. cit*.

[20]   See, for e.g., Beaver et al (2008), *op. cit*. The standard is to model year fixed effects and/or industry fixed effects.

0218

disproportionate effects on the Capital One transaction data and its relationship with aggregate revenues across companies. However, Mr. Graham does not adjust for any such variables that could impact the inferred relationship between transaction data and revenues or revenue growth. Therefore, his regression results are highly unreliable.

## VIII.   THERE IS NO EVIDENCE THAT THE DEFENDANTS' TRANSACTION DATA REFLECTED ANY ADDITIONAL INFORMATION BEYOND THAT ALREADY CAPTURED IN THE MARKET

32.   The Defendants' alleged revenues prediction strategy based on the transaction data was to forecast revenues for a particular company for a given quarter as the transaction total for that quarter scaled by the "composite capture rate." This composite capture rate is equal to the one-year-lagged ratio of quarterly transaction data to company's quarterly revenues adjusted for the year-on-year growth in the capture rate.[21] This alleged prediction strategy is thus based on current and historical transaction data and historical company revenues, the latter of which would have been publically available to the market.

33.   I have been provided data by the SEC, which apparently includes all input files used by Mr. Graham for his analysis. These include the DONE files which Mr. Graham used to assemble his database of transaction data across all companies.[22] I note several major issues with this raw data, however, which are summarized below:

---

[21] Graham Report, Exhibit D.

[22] Graham Report, pp. 10-12, and Exhibits C-D. I note that Mr. Graham also relied upon five RevEst files to construct his database of transaction data (Graham Report, pp. 11-12 and footnote 6). These files do not provide transaction data in the same format and across the same range of dates, however, as in the DONE files corresponding to each company. Therefore, I restrict my analysis to the set of DONE files which I am able to match with specific companies.

a.  I identified the DONE files for 143 companies based on the ticker in their file names. However, in several of these files, the historical revenues data provided for a given company did not match the actual reported revenues. Exhibit 12 illustrates an example of this major data discrepancy for Target, which had actual reported revenues in its 10-Qs of over 20 times the revenues listed in its DONE file. There is no evidence that Mr. Graham corrected for this issue in his analysis.

b.  Second, there are several DONE files in which the historical revenues data provided for a given company not only did not match with actual reported revenues but in fact corresponded with the revenues for another company. Even more importantly, the same issue arises with the reported transaction data in these files. Exhibit 13 illustrates an example of this error for Walmart, Target and TJX.  In particular, the quarterly transaction data reported in the DONE files for Target and TJX are identical, and the revenues listed for all three companies are identical from March 2009 to October 2010 and match Walmart's reported revenues during this time period. There is no evidence that Mr. Graham corrected for this major data error either in his analysis, yielding his estimates of transaction data for his regression and correlation analyses highly unreliable.

c.  Third, in many DONE files, the reported composite capture rate that was used to construct the Defendants' revenues forecasts for a given quarter did not reconcile with the implied value based on the calculations presented in Mr. Graham's Exhibit D.  Exhibit 14 provides an example of this for Casual Male

17

Retail Group, where the composite capture rate reported in the DONE file as of January 2012 is equal to 2.3%, compared to an implied value from the aforementioned calculation of only 0.6%. Once again, Mr. Graham does not acknowledge or account for this issue, implying that his analyses based upon the Defendants' revenues forecasts are potentially incorrect.

   d. There are only 50 out of the 143 aforementioned companies with reliable revenue data in the DONE files, after accounting for the data issues described above. The remaining 93 companies all list revenues in their DONE files that do not match with any revenues from Bloomberg (as reported in quarterly and annual SEC filings).

34. I next examine for the 143 companies their actual reported revenues across all fiscal quarters from December 2009 to January 2015,[23] and compare these with the corresponding analyst revenues and earnings forecasts,[24] the reported transaction data in the DONE files[25] and the Defendants' own revenues forecasts based on this transaction data.[26] Finally, I compute the price returns relative to market, or abnormal returns on the revenues announcement dates for all companies.

---

[23] Actual revenues are downloaded from Bloomberg as reported in quarterly and annual SEC filings.

[24] Analyst forecasts are compiled from BEst estimates on Bloomberg.

[25] In each DONE file I relied upon the monthly dollar amounts of transaction data (in a column titled "trxn_amt").

[26] Transaction data in the DONE files across companies are matched with the corresponding fiscal quarter. If a company does not have any announcement dates reported in Bloomberg during the relevant time period and also does not have any listed revenues in the DONE file that match actual reported figures, I exclude all such companies from the sample. There are 6 such companies in my sample of 143, bringing my final sample down to 137 firms.

35.  Exhibit 15 illustrates the difference between the Defendants' revenues forecast based on their transaction data (as presented by Mr. Graham in his Exhibit E) and the analyst revenues forecast as of Q2 2013 for Bebe. The plot on the left shows that the Defendants forecasted approximately $125 million in revenues for Bebe for this quarter versus almost $134 million forecasted by analysts. This suggests that the Defendants were bearish on this stock relative to the market and would enter into a strategy to sell it. The right-hand-side plot compares the analyst forecast against the actual revenues that were released for Bebe for this quarter. This shows that actual revenues came in at almost $136 million, higher than both the corresponding analyst and Defendants' forecasts. In addition, the abnormal price return for Bebe on the revenues announcement date was a positive 0.73%.  Therefore, upon release of the actual revenues figures, the Defendants' trading strategy would have changed, since the company performed better than expected, and it would thus benefit them to long the stock. This is just one example where the Defendants' trading strategy based on their revenues forecasts would have changed once actual revenues were released. Further, in this example, the analyst revenue projections were closer to the actual figures than the Defendants' forecasts, implying that the latter had no incremental explanatory power for returns.

36.  I now explore this issue more rigorously using a statistical analysis. First, I implement Mr. Graham's regression model on my sample between Q4 2009 and Q4 2014. This is displayed in the first column of Exhibit 16.  These results are qualitatively the same as Mr. Graham. In other words, using Mr. Graham's methodologically flawed regression model, the results suggest a significant relationship between change in revenues and analyst

expectations, and between change in revenues and growth in transaction data.  Therefore, this supports the robustness of my sample and model.

37.  Next, I correct for Mr. Graham's aforementioned major methodological error, which is to use revenue growth as his dependent variable instead of abnormal price returns.  The second column of Exhibit 16 displays the results of regressing abnormal price returns[27] on Mr. Graham's two independent variables. These results show that when abnormal returns are used instead as the dependent variable, then  growth in transaction data does not have any significant explanatory power and neither do analyst expectations, since these are already reflected in the market. These results contradict Mr. Graham's findings completely and demonstrate that his methodology and conclusions are not economically reliable.

38.  Finally, I take the same regression as displayed in the second column of Exhibit 16 but substitute out Mr. Graham's growth in transactions data variable for the yearly change in the Defendants' revenues forecast based on the transaction data ("Transaction Data Forecast"). This variable is designed to capture the incremental explanatory power of the Defendants' revenues forecasts using both the transaction data and their capture rate calculations across companies and quarters.  The results of this regression are displayed in the third column of Exhibit 16.  It shows that the transaction data forecast variable does not have any significant incremental explanatory power for abnormal returns, and neither, once

---

[27]   I measure abnormal returns for company i on each announcement date t as the price return from day t-1 to day t minus the return on the S&P 500 total return index from day t-1 to day t. This method effectively generates risk-adjusted abnormal returns relative to the market assuming all companies have a beta of one on the market index. See MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35 (March 1997)  pp. 13-39 at pp. 18-19. If the announcement is after the close of market on announcement day t, the price and market returns are calculated from day t to day t+1.

again, do analyst expectations. All these results still hold when restricting my model to only those announcements between February 2012 and January 2015 (the dates between which the Defendants allegedly accessed the transaction database), displayed in Exhibit 17.

39. In sum, Mr. Graham's regression analysis does not establish by an economically reliable methodology that the transaction data would have been material to a reasonable investor beyond the mix of information already available in the market.

## IX.   MR. GRAHAM CONFOUNDS HIS ANALYSIS OF THE DEFENDANTS' TRADING PROFITS WITH EX-POST INFORMATION AND ERRONEOUSLY INCLUDES GAINS GENERATED AFTER REVENUE ANNOUNCEMENTS

40. Mr. Graham analyzes the Defendants' trading profits from their brokerage accounts from January 2012 to December 2014. He concludes that, since each Defendant's initial balance grew dramatically during this time period, yielding returns that were hundreds of times greater than corresponding returns on the market and industry index as well as far greater than the corresponding returns of top-performing hedge funds, the Defendants' investment returns were extraordinary.[28] He further considers what portion of these trading profits was attributable to trades in tainted stocks using a database provided by Dr. Cain, and concludes that the tainted trades constituted the vast majority of gains to the Defendants.[29]

41. Mr. Graham's calculations of returns earned by the Defendants are based on the entire increase in their account balances from January 2012 to December 2014 and are presented on an ex-post basis. In other words, Mr. Graham examines the Defendants' returns with the benefit of hindsight and concludes that, since these returns were relatively high, this

---

[28]   Graham Report, p. 28 and Exhibits G-H.
[29]   Graham Report, p. 29.

indicates they must have been trading on material information. However, this analysis is confounded by ex-post information, namely the actual realization of profits after the Defendants traded on the transaction data.   On the contrary, to assess whether the Defendants' information was material one has to determine on an *ex-ante* basis whether their transaction data could predict future returns. My regression analysis above demonstrates that this was not the case.  Thus, Mr. Graham's interpretation of his results is fundamentally flawed.

42.  Further, in comparing the Defendants' returns to various benchmarks, Mr. Graham assumes that the entirety of these returns was generated by the Defendants' information advantage. This approach is also incorrect. The Defendants allegedly used the transaction data to forecast revenues and trade on stocks ahead of their actual revenues announcements. Thus, after the public release of a given company's revenues and earnings information, there would no longer be any informational advantage to the Defendants, and any post-announcement returns from trading in this company's stock would no longer be "tainted". As a result, all such post-announcement returns should be excluded from Mr. Graham's calculations across companies. This is not what Mr. Graham does, however. In fact, Mr. Graham's approach contradicts that of Dr. Cain, who only calculates trading profits to the Defendants through earnings announcement dates specifically to avoid the issue of including post-announcement profits.[30]  Thus, Mr. Graham's approach is simply wrong.  In addition, Dr. Cain's own estimates of trading profits through earnings announcement dates

---

[30]  Cain Report, p. 6 and Exhibit C.

for the tainted stocks and tainted stocks with "statistical significance" are overstated as well. I explain this further in the following section.

43. Finally, Mr. Graham compares the Defendants' returns to those of hedge funds in reaching his conclusion that the former were extraordinary. However, this is an apples-to-oranges comparison given that the Defendants had far less capital at stake than the typical hedge fund investor who would face strict requirements on their net worth, for example. Therefore, Mr. Graham's comparisons and resulting conclusions are meaningless.

## X.    DR. CAIN'S ANALYSIS IS BUILT ON A FLAWED PREMISE THAT A CORRELATION EXISTS BETWEEN REVENUES AND THE TRANSACTION DATA

44. Dr. Cain's analysis is based entirely on Mr. Graham's flawed premise that a correlation and thus predictive relationship exists between the transaction data and aggregate revenues. In particular, Dr. Cain calculates trading profits for the Defendants through earnings announcement dates from February 2012 to January 2015, and focuses on the subset of 132 "tainted companies" that exhibit statistically significant correlations according to Mr. Graham.[31]   As I have explained above, however, Mr. Graham's correlation analysis demonstrates no reliable evidence of the materiality of the transaction data.  Therefore, Dr. Cain's findings based on the set of 132 "tainted companies with statistical significance" are wholly unreliable. If Dr. Cain instead calculated the trading profits through earnings announcements for the subset of tainted companies with significant correlation between

---

[31]   Cain Report, Exhibit D, Panel B.

transaction data and returns, he would only produce an insubstantial estimate of "ill-gotten gains."

45.     Dr. Cain also bases his calculation of the Defendants' profits on the assumption that their stock and option purchases and sales occurred on a first-in-first-out ("FIFO") accounting basis over time. Dr. Cain does not explain why he makes this assumption. He could have used the alternative accounting basis, last-in-first-out ("LIFO') since the LIFO method accounts for gains that might have accrued due to inflation of stock prices over a given period.[32]   In fact, the PSLRA majority view is that securities fraud losses should be calculated using only the LIFO method.[33]   Dr. Cain's use of the FIFO method may thus understate the cost basis and overstate corresponding profits to the Defendants if the stock prices of any of the "tainted" companies rose during the examined period.

## XI.     DR. CAIN'S CALCULATIONS OVERSTATE ILL-GOTTEN GAINS TO THE DEFENDANTS

46.     Dr. Cain presents in Exhibit C of his report his calculation of the Defendants' trading profits through earnings announcement dates for the tainted and non-tainted companies. He states that he calculated these "ill-gotten gains" by summing the trading profits through the announcement date across a given company earnings announcement.  If this sum is positive for a given Defendant around a given earnings announcement, he included profits from

---

[32]   See, for e.g., United States District Court, S.D. New York, In re eSpeed, Inc. Securities Litigation, No. 05 Civ. 2091 (SAS) July 13, 2005, p. 2.

[33]   United States District Court, N.D. Illinois, Eastern Division, 2005 WL 3299144 (N.D.I11) *Hill v. The Tribune Company et al.*, October 13, 2005, p. 4.

0227

these trades in the third column of Exhibit C; otherwise he excluded these profits from the trading profits calculation.[34]

47.  This methodology is completely unfounded. It does not make sense to exclude trades that generated a total loss around a given earnings announcement; on the contrary, the only way to capture the Defendants' net trading profits accurately would be to include all trades for each earnings announcement, regardless of whether they generated total losses or profits. Any other method would skew the total calculated profits. Dr. Cain attempts to justify his approach by providing an illustrative example where a trader has three open trades of a given stock through an earnings announcement date and two of those trades earn profits ($100 and $200 respectively) while one generates a loss ($50). He states that since he takes the sum of the net profit on those trades ($250) he is correctly offsetting the gains with losses. However, this is only a partial offset. This is because, if the total profits across these three trades in the illustrative example were instead equal to -$250, (or, in other words, they generated a total loss of $250), Dr. Cain would not include any of this total loss in his trading profits calculation. This is clearly incorrect. Dr. Cain's methodology thus overstates the ill-gotten gains accruing to the Defendants.

## XII.  CONCLUSION

48.  In summary, it is my opinion that Mr. Graham offers no scientific basis for his conclusions about the predictive relationship between quarterly transaction data, revenues and revenue changes.   Instead, Mr. Graham's conclusions depend critically upon his unsupported

---

[34]  Cain Report, p. 6.

expectations and assumptions.  Mr. Graham assumes erroneously that the ability to predict revenues is material to reasonable investors. He also violates a basic principle in Statistics by confusing correlation with causation and fails to investigate and account for alternate explanations for his findings. Finally, Mr. Graham's analysis and opinions are further compromised by a number of highly questionable decisions and oversights in implementing his regression analysis and calculation of the Defendants' investment returns.  Overall, I find that Mr. Graham's analyses do not establish by an economically reliable methodology that the Defendants' transaction data were material to a reasonable investor beyond the mix of information already reflected in the market.

49.   It is also my opinion that Dr. Cain's report suffers from shortcomings that render it unreliable for assessing ill-gotten gains. Specifically, Dr. Cain's analysis is deficient because he relies on the flawed and unscientific analysis by Mr. Graham. Moreover, he uses assumptions that bias his results by producing inflated ill-gotten gains.

50.   This concludes my report.

**Appendix A**
**TORBEN VOETMANN, Ph.D.**
Principal

San Francisco, CA                    +1.415.217.1000                    Torben.Voetmann@brattle.com

**Dr. Voetmann** work on cases that involve complex economic and financial issues involving debt, equity, and derivative securities. He is a Principal in The Brattle Group's San Francisco office and an adjunct professor at the University of San Francisco's School of Management. He is an expert in financial econometrics (i.e., the application of statistical methods within an economic framework), securities (equity, debt, preferred, and derivatives), capital markets, and market efficiency and materiality in securities fraud and misrepresentation cases. Dr. Voetmann has testified and consulted on securities matters and valuation disputes related to accounting, corporate finance, capital markets, financial institutions, insider trading, and internal investigations (including performing financial and economic analyses of "big data").

Dr. Voetmann has also testified and consulted on valuation issues related to mergers and acquisitions, appraisal actions, and other disputes involving valuation of private and public companies, illiquidity securities, employee stock options, and minority interests. He has securities experience concerning Rule 10b-5 and Section 11 and 12 class actions, including those involving options and other derivative securities. Dr. Voetmann has worked over the last fifteen years on numerous securities class action cases involving alleged misrepresentations and omissions, including *In re Xcelera Securities Litigation*, *In re Apollo Securities Litigation*, and *Munoz v. China Expert Technology, Inc.*

Dr. Voetmann has published articles on economic and financial topics in peer-reviewed journals, including the *Journal of Corporate Finance*, *Review of Finance*, and the *European Journal of Finance*, and authored a chapter on event studies in a widely cited graduate textbook on financial modeling.

## EDUCATION

Ph.D., Finance, Copenhagen Business School, 2000
MS, Finance, Aarhus School of Business, 1993
BBA, Aarhus School of Business, 1991

## TEACHING EXPERIENCE

*University of San Francisco (2013 - )*
- MBA – 6019: Managerial Finance
- MBA – 6204: Capital Market and Investment Banking
- MSFA – 714: Corporate Finance



*The Wharton School, University of Pennsylvania (1998 – 2004)*
- Undergraduate – FNCE 100: Corporate Finance (Honors Section)
- Undergraduate – FNCE 207: Corporate Valuation (formerly Security Analysis)
- MBA – FNCE 601: Corporate Finance
- MBA – FNCE 728: Corporate Valuation (formerly Security Analysis)
- MBA – FNCE 899: Independent Study Project in Finance

*New York Institute of Finance, NYC (2001 – 2004)*
- Financial Modeling in Excel and Security Analysis
- Business Valuation

*Financial Modeling World, Australia (2002)*
- Executive – Financial Modeling for Corporate Finance

*Copenhagen Business School (1999 – 2000)*
- Graduate – Seminar in Finance


## RESEARCH PUBLISHED IN ACADEMIC JOURNALS

"Returns to Acquirers of Public and Subsidiary Targets," with Jeffrey Jaffe, Jan Jindra, and David Pedersen, *Journal of Corporate Finance*, 2015, Volume 31, pp. 246-270.

"Skill Differences in Corporate Acquisitions," with Jeffrey Jaffe and David Pedersen, *Journal of Corporate Finance*, 2013, Volume 23, pp. 166-181.

"Discussion of the Pre and Post-Tax Discount Rates and Cash Flows: A Technical Note," with Jan Jindra, *Journal of Applied Research in Accounting and Finance (JARAF),* 2010, Volume 5, No. 1, pp. 16–20, 2010.

"A New Approach for Interpreting Long-Run Returns, Applied to IPO and SEP Stocks," with Jan Bo Jakobsen, *Annals of Economics and Finance*, 2005, Volume 6, pp. 337-363.

"Top executive turnovers: Separating decision and control rights," with Robert Neumann, *Managerial and Decision Economics*, 2005, Volume 26, pp. 25-37.

"Demand Curves for European Stocks Slopes Down Too: Evidence from Float Capitalization Index Weights in Dow Jones STOXX 50," with Robert Neumann, *Review of Finance*, 2003, Volume 7, pp. 437-457.

"Does Ownership Matter in the Presence of Strict Anti-Activism Legislation?  Evidence from Equity Transactions in Denmark," with Robert Neumann, *International Review of Financial Analysis*, 2003, pp. 157-171.



"Post-Acquisition Performance in the Short and Long Run: Evidence from the Copenhagen Stock Exchange 1993 – 1997," with Jan Jakobsen, *European Journal of Finance*, 2003, Volume 9, pp. 323-342.

"Free Float Index Weights of KFX – Experiences from the Dow Jones Europe STOXX Index," with Robert Neumann, *Finans/Invest*, May 2001, pp. 23-27.

"The Performance of Danish Bidding Firms," with Jan Jakobsen, Finans/Invest, December 2000, pp. 10-13.

"CEO Turnovers and Corporate Governance," with Robert Neumann, Finans/Invest, December 1999, pp. 20-23.

"Are the Stock Markets Integrated or Segmented?" *Finans/Invest*, April 1992, pp. 23-25.


## OTHER PUBLISHED RESEARCH AND ARTICLES

"Delaware Appraisal Case Reaffirms Valuation Premium for S Corporations," with Yvette Austin Smith and David McKnight, *Deal Points – The Newsletter of the Mergers and Acquisitions Committee*, Volume 20, Fall 2015.

"Event Studies," with Simon Benninga, Chapter in *Financial Modeling*, 2008, 3rd Edition; 2014 4th Edition.

"Key Complexities In High-Frequency Trading Litigation," with Zach Ziliak, Pavitra Kumar, *Law360*, June 2014.

"Rural Metro Redefines Investment Banks' Role In M&A," with Yvette Austin Smith, *Law360*, March 2014.

"Avoiding Pitfalls in the Litigation of Business Valuation," with Gary Stahlberg, Ioannis Gkatzimas, and Bryan Plotts, in PLI Course Handbook, *Basics of Accounting for Lawyers 2013: What Every Practicing Lawyer Needs to Know*, Chapter 7, pp. 181-213.

"Institutionelle og strategiske investorers betydning: resultater fra ¶29 meddelelser," with Robert Neumann, *Finansielle splinter*, 2000, pp. 65-71.


## RESEARCH UNDER REVIEW AND WORKING PAPERS

"Private Class Action Litigation and Cross-Listing: The Chinese Reverse Mergers and IPOs," with Jan Jindra and Ralph A. Walkling, October 2014.  Revise and Resubmit to *Quarterly Journal of Finance*.



"Changes in the Bid-Ask Components Around Earnings Announcements: Evidence from the Copenhagen Stock Exchange," First draft May 1999.  Last revised October 1999.


## ACADEMIC HONORS AND AWARDS

The Dean's Office of the Wharton School officially recognized my teaching efforts for the course Security Analysis (Corporate Valuation) in the fall of 2000 and Corporate Finance in the Spring of 2001.

The article "Skill Differences in Corporate Acquisitions," with Jeffrey Jaffe and David Pedersen, *Journal of Corporate Finance*, 2013, Volume 23, pp.166-181 was awarded the 2014 NJBIA Bright Idea Award by the Stillman School of Business at Seton Hall University and the NJPRO Foundation, the public policy research affiliated of the New Jersey Business and Industry Association (NJBIA). The paper was identified as one of the top 10 manuscripts from over 216 publications.


## CONFERENCE (ACCEPTED PAPERS)

Financial Management Association, "Skills in Corporate Acquisitions," October 2009, Reno, Nevada.

Eastern Finance Association Conference, "Mergers and Persistence: A Test of Differential Skill in Corporate Finance," May 2009, Washington, D.C.

Mid-Atlantic Research Conference in Finance (MARC), "Mergers and Persistence: A Test of Differential Skill in Corporate Finance," March 2009, Philadelphia, Pennsylvania.

Financial Management Association "Implementing Float Capitalization Index Weights – Price and Volume Effects, October 2002, San Antonio, Texas.

European Financial Management Association "Implementing Float Capitalization Index Weights – Price and Volume Effects," June 2002, London, United Kingdom.

Financial Management Association, "Implementing Float Capitalization Index Weights – Price and Volume Effects," June 2002, Copenhagen, Denmark.

Financial Management Association, "Volatility-Adjusted Performance: An Alternative Approach to Interpret Long-Run Returns," October 2001, Toronto, Canada.

Financial Management Association International, "Does Ownership Matter in the Presence of Strict Anti-Activism Legislation?  Evidence from Equity Transactions in Denmark," June 2001, Paris, France.



4

European Financial Management Association, "Volatility-Adjusted Performance: An Alternative Approach to Interpret Long-Run Returns," June 2000, Athens, Greece.

Financial Management Association International, "Volatility-Adjusted Performance: An Alternative Approach to Interpret Long-Run Returns," June 2000, Edinburgh, Scotland.

European Finance Association Annual Meeting, "CEO Turnover and Corporate Governance: Evidence from the Copenhagen Stock Exchange," August 1999, Helsinki, Finland.

Workshop on Corporate Finance, "Volatility-Adjusted Performance: An Alternative Approach to Interpret Long-Run Returns," Copenhagen, May 1999, Copenhagen, Denmark.

Financial Management Association International, "Post-Acquisition Performance in the Short and Long Run: Evidence from the Copenhagen Stock Exchange 1993-1997," June 1998, Barcelona, Spain.

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2013 – Present | Principal, The Brattle Group |
| 2012 – 2013 | Managing Director, Finance Scholars Group |
| 2002 – 2012 | Principal, Cornerstone Research |

### Managerial Expertise

- Directed consulting services with teams of up to thirty or more consultants
- Managed case involving multiple stakeholders, including multiple clients, experts, and lawyers
- Directed client relationships and the production of case deliverables under tight deadlines
- Developed consulting fee estimates and work plans for multi-million dollar projects

### Expertise in Financial Econometrics

- Consulted, as an expert, and extensive experience with the event study methodology and damages estimation in securities litigations. Addressed non-standard issues that have arisen in assessment of materiality, including:
  - Isolating the value of information announcements when there are confounding announcements and/or events;
  - Estimating the value of relevant information that is revealed gradually;
  - General issues of materiality and price inflation when markets are potentially information inefficient;



o Estimating materiality through event study when model structure is changing. e.g., volatility of abnormal return is changing, as happened during the recent financial crisis;

o Event studies with securities that are thinly traded;

o Developing event-studies using high-frequency data to measure price impact;

o Establishing causality and issues that arise for damages estimations; and,

o Appropriate inflation ribbon estimates when continuous disclosure obligations are not met and the impact of concealment is changing.

## Expertise in Finance

- Estimated fair market valuation of various businesses under different assumptions. Developed and modeled pro forma financial statements (profit and loss statements, balance sheets, and cash flow statements), costs, and profits over multiple years.

- Assessed reasonableness of, and modified, financial forecasts in light of market and industry conditions, including trend analysis.

- Estimated fair value of various businesses under different assumptions and in different industries.

- Assessed illiquidity and private company discounts, and lack of marketability in valuation of private and public companies.

- Reviewed accounting, financial, and competitive position of acquired companies to assess reasonableness of acquisition prices. Applied various valuation methods, including discounted cash flows (DCF), earnings multiples, comparables, and ratio analysis.

## SELECTED CONSULTING EXPERIENCE
## Securities

- Testified and consulted on numerous cases related to class certification issues, loss causation, and damages. Analyzed the reaction of the defendant's stock price to information disclosures in 10b-5 and Section 11 and 12 classes.

- Consulted on materiality, loss causation, and damages in securities cases involving stocks, bonds, mutual funds, mortgage-backed and asset-backed securities. Assessed economic losses and loss causation for companies and investors in a range of industries, including banking, finance, real estate, oil and gas, software, media and telecommunications, retail, pharmaceuticals, biotechnology and transportation.



- Consulted on the market impact of short sales and investigated possible insider trading in various settings. Managed insider trading case through trial.

### Valuation and Mergers & Acquisitions

- Consulted on valuation analyses of hedge funds, high-technology companies (including start-up ventures), international companies, and real estate ventures in a range of contexts, including breach of contract, mergers and acquisitions, initial public offerings, and employee compensation; and employee stock options.
- Consulted for a private company on appraisal matter and assessment of fair value. Analyzed valuation approaches such as DCF and multiples. Favorable trial verdict by Delaware vice-chancellor.
- Testified and consulted for private companies on valuation issues in several industries.
- Consulted and engaged as an expert to value an illiquidity private company.
- Consulted on valuing the liquidity of a small foreign company trading over the counter.

### Asset Management, Hedge Funds and Private Equity

- Consulted for large asset management firm to analyze the impact of errors in an algorithmic trading strategy. Performed valuation of equity and bonds on customer accounts.
- Consulted for several financial institutions to investigate the consistency of regulatory reporting of data by financial institutions, evaluated profitability and risk of investment strategies of hedge funds, and addressed damages.
- Consulted for private equity firms to analyzed investment and financing strategies, competition, structure of funds, drivers of value, and compensation issues.
- Consulted for partners of hedge funds to perform valuation of venture capital management companies. Analyzed investment strategies, performance, and valuation of portfolio companies of venture capital funds.

### Risk Analysis/Financial Modeling

- Consulted for large financial institution to analyzed hedging strategies by counterparties of total return swap contracts, analyzed the sensitivity of asset-backed securities values to interest rates, valued cash flows from management of pension fund assets using Monte Carlo techniques, summarized risk characteristics of a portfolio of derivative securities, and assessed risk characteristics of reference obligations in a credit default swap.



**EXPERT WITNESS EXPERIENCE**

- *United States of America v. Wells Fargo Bank. N.A.  and Kurt Lofrano*, Case No. 12 Civ. 7527 (JMF). Report June 2015, Deposition September 2015.

- *Long, et al. v. Morgan Stanley Trust, N.A.,* Case No. 13-CV-3624. Report March, 2014.

- *In the Matter of the Arbitration of Tom Patterson v. GEICO.* Report March, 2014. Deposition February 2015. Arbitration March 2015.

- *Charles P. Haggarty and Gina M. Haggarty et al. v. Wells Fargo Bank, N.A.,* Case No. 3:10-cv-02416-CRB. Declaration August, 2012.

- *Munoz v. China Expert Technology, Inc*., Case No. 07-CV-10531 (AKH)(S.D.N.Y.). Report, February, 2012. Deposition, March 2012.

**PROFESSIONAL EDUCATION, CUSTOMIZED COURSE OFFERINGS, AND OTHER ACTIVITIES**

- Designed, developed, and instructed an Executive course titled "Financial Modeling for Corporate Finance" for Financial Modeling World, Australia, 2002.

- Designed, developed, and instructed an Executive course title "Financial Modeling in Excel and Security Analysis" for FT New York Institute of Finance, 2001-2002.

- Valuation consultant on the development of the web-based course "Business Valuation" for FT New York Institute of Finance, 2001.

- Referee for *Journal of Empirical Corporate Finance* and *International Review of Financial Analysis*

**PROFESSIONAL AFFILIATIONS**

- American Bar Association (non-lawyer member)
- Bar Association of San Francisco
- Western Finance Association



## Appendix B

## Documents Relied Upon by Torben Voetmann

| Document Title, Bates Number | Document Date |
|---|---|

**Legal Pleadings**

*SEC v. Bonan Huang, et al.,* Defendant Bonan Huang's Supplemental Answers to Plaintiff's Second Set of Interrogatories — September 9, 2015

*SEC v. Bonan Huang, et al.,* Defendant Nan Huang's Supplemental Answers to Plaintiff's Second Set of Interrogatories — September 9, 2015

*SEC v. Bonan Huang, Nan Huang,* Complaint for Violations of the Federal Securities Laws — January 21, 2015

United States District Court, N.D. Illinois, Eastern Division, 2005 WL 3299144 (N.D.I11) *Hill v. The Tribune Company et al.* — October 13, 2005

United States District Court, S.D. New York, In re eSpeed, Inc. Securities Litigation, No. 05 Civ. 2091 (SAS) — July 13, 2005

**Expert Reports**

Expert Report of Stephen Graham, with Exhibits — September 18, 2015

Expert Report of Matthew D. Cain, Ph.D., with Exhibits — September 18, 2015

**Produced Documents**

SEC-CAIN-EPROD-000000001-9; SEC-GRAHAM-EPROD-000000001-496

**Academic Articles & Public Press**

Cornell, Bradford and Wayne R. Landsman, "Security Price Response to Quarterly Earnings Announcements and Analysts' Forecast Revisions," *The Accounting Review*, Vol. LXIV, No. 4 (October 1989)

MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35 (March 1997)

Asquith, Paul, Michael B. Mikhail, and Andrea S. Au, "Information Content of Equity Analyst Reports," MIT Sloan Management, Working Paper 4264-02 (November 2003)

Graham, John R., Campbell R. Harvey and Shiva Rajgopal, "The Economic Implications of Corporate Financial Reporting," *Journal of Accounting and Economics*, Vol. 40 (December 2005)

Rees, Lynn and K. Sivaramakrishnan, "The Effect of Meeting or Beating Revenue Forecasts on the Association between Quarterly Returns and Earnings Forecast Errors," *Contemporary Accounting Research*, Vol. 24, No. 1 (Spring 2007)

Beaver, William, Bradford Cornell, Wayne R. Landsman, and Stephen R. Stubben, "The Impact of Analysts' Forecast Errors and Forecast Revisions on Stock Prices," *Journal of Business Finance & Accounting*, Vol. 35 (June/July 2008)

Fairfield, Patricia, M., Sundaresh Ramnath, and Teri Lombardi Yohn, "Do Industry-Level Analyses Improve Forecasts of Financial Performance?" *Journal of Accounting Research*, Vol. 47, No. 1 (March 2009)

Wooldridge, Jeffrey M., *Introductory Econometrics: A Modern Approach,* 4th Edition, South Western, Cengage Learning (2009)

Rubinfeld, Daniel L., "Reference Guide on Multiple Regressions," Reference Manual on Scientific Evidence, 3rd Edition, Federal Judicial Center (2011)

Brealey, Richard, Stewart Myers and Franklin Allen, *Principles of Corporate Finance*, 11th Edition, New York:  McGraw-Hill/Irwin (2013)

Any other documents specifically cited in the report, but not listed in this appendix.





Source: Bloomberg LP.
Note: Abnormal Returns are calculated as Price Return - SPXT Index Return. The SPXT Index is the S&P 500 Total Return Index.

0240



**Exhibit 2**
**Walmart ("WMT")**
**Change in Revenues and Abnormal Returns**

Source: Bloomberg LP.
Note: Abnormal Returns are calculated as Price Return - SPXT Index Return. The SPXT Index is the S&P 500 Total Return Index. Change in Revenues are calculated as $Revenue_{q1, t}$ / $Revenue_{q1, t-1}$ for a given quarter and year t.

0241



**Exhibit 3**
**Walmart ("WMT")**
**Capital One Transaction Amounts and Abnormal Returns**

Source: Bloomberg LP; DONE file ("EPROD-000000403").
Note: Abnormal Returns are calculated as Price Return - SPXT Index Return. The SPXT Index is the S&P 500 Total Return Index. Quarterly Capital One Transaction Amounts are sourced from the DONE file.

0242



**Exhibit 4**
**Walmart ("WMT")**
**Change in Capital One Transaction Amounts and Abnormal Returns**

Source: Bloomberg LP; DONE file ("EPROD-000000403").
Note: Abnormal Returns are calculated as Price Return - SPXT Index Return. The SPXT Index is the S&P 500 Total Return Index. Quarterly Capital One Transaction Amounts are sourced from the DONE file. Change in Capital One Transaction Amounts is calculated as Transactions$_{q1, t}$ / Transactions$_{q1, t-1}$ for a given quarter and year t.

0243

**Exhibit 5**
**Comparison of Correlations for Select Companies (Walmart and Graham Exhibit E)**
**Q1 2009 to Q4 2014**

| | | Graham Correlations | Voetmann Correlations | | | | | |
| | | Revenues to | | | | Change in Revenues to | | |
| Ticker | Company Name | Cap One Txn Amt | # Observations | Revenues to Abnormal Returns | P-Value | # Observations | Change in Revenues to Abnormal Returns | P-Value |
| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] |
| AAP | ADVANCE AUTO PARTS INC | * | 24 | -0.2582 | 0.2231 | 24 | -0.0897 | 0.6767 |
| ACOM | ANCESTRY COM INC | * | 12 | 0.1892 | 0.5560 | 8 | -0.5714 | 0.1390 |
| BEBE | BEBE STORES INC | | 24 | 0.4462 * | 0.0288 | 24 | -0.0376 | 0.8617 |
| BIG | BIG LOTS INC | * | 24 | 0.2148 | 0.3136 | 24 | -0.4862 * | 0.0160 |
| BWLD | BUFFALO WILD WINGS INC | * | 24 | 0.0598 | 0.7813 | 24 | 0.0280 | 0.8967 |
| COH | COACH INC | * | 24 | -0.3707 | 0.0746 | 24 | 0.2206 | 0.3002 |
| DTG | DOLLAR THRIFTY AUTOMOTIVE GRP I | * | . | . | . | . | . | . |
| FB | FACEBOOK INC | * | 11 | 0.3059 | 0.3603 | 8 | -0.4229 | 0.2965 |
| GES | GUESS INC | * | 24 | -0.0196 | 0.9277 | 24 | 0.2971 | 0.1586 |
| GMAN | GORDMANS STORES INC | * | 15 | 0.1456 | 0.6047 | 11 | 0.1186 | 0.7284 |
| GNC | G N C HOLDINGS INC | * | 16 | -0.2437 | 0.3630 | 13 | -0.0923 | 0.7643 |
| M | MACYS INC | * | 24 | 0.2864 | 0.1748 | 24 | 0.1843 | 0.3887 |
| PETS | PETMED EXPRESS INC | * | 24 | -0.0507 | 0.8142 | 24 | 0.3523 | 0.0914 |
| PLCE | CHILDRENS PLACE INC | * | 24 | -0.2803 | 0.1846 | 24 | 0.4949 * | 0.0139 |
| RH | RESTORATION HARDWARE HLDGS INC | * | 6 | -0.3948 | 0.4385 | 2 | -1.0000 | 1.0000 |
| SBUX | STARBUCKS CORP | * | 24 | 0.3632 | 0.0811 | 24 | 0.4018 | 0.0516 |
| SCVL | SHOE CARNIVAL INC IN | * | 24 | -0.4779 * | 0.0182 | 24 | -0.1787 | 0.4035 |
| SIX | SIX FLAGS ENTERTAINMENT CORP | * | 19 | -0.2784 | 0.2485 | 15 | 0.4434 | 0.0978 |
| TXRH | TEXAS ROADHOUSE INC | * | 24 | 0.0669 | 0.7561 | 24 | 0.0725 | 0.7363 |
| URBN | URBAN OUTFITTERS INC | * | 24 | 0.0032 | 0.9883 | 24 | -0.0100 | 0.9630 |
| WMT | WAL MART STORES INC | * | 24 | -0.1162 | 0.5886 | 24 | -0.0671 | 0.7553 |
| **Number of Companies with Statistically Significant Correlations:** | | 20 | | 2 | | | 2 | |

Source: Bloomberg LP; Expert Report of Stephen Graham dated Sept. 18, 2015.

Note: The Bloomberg fields PX_LAST and SALES_REV_TURN were used to retrieve data for closing price and revenues, respectively. The number of observations and correlation estimates were subject to data availability from Bloomberg.

* indicates statistical significance of correlations at the 5% level.

[1]  Tickers in Graham Report, p. 14 and Exhibit E.

[2]  Company name of each ticker.

[3]  Indicates statistically significant correlations as reported in Graham Report, Exhibit B.

[4]  Number of observations for each ticker when calculating correlations between Revenues and Abnormal Returns.

[5]  Correlations between Revenues and Abnormal Returns. Abnormal Returns are calculated as Price Return - SPXT Index Return. The SPXT Index is the S&P 500 Total Return Index.

[6]  P-value for correlations shown in [5].

[7]  Number of observations for each ticker when calculating correlations between Change in Revenues and Abnormal Returns.

[8]  Correlations between Change in Revenues and Abnormal Returns. Abnormal Returns are calculated as Price Return - SPXT Index Return. The SPXT Index is the S&P 500 Total Return Index. Change in Quarterly Revenues is calculated as Quarterly Revenue$_{q1,\,t}$ / Quarterly Revenue$_{q1,\,t-1}$ for a given quarter t and year t.

[9]  P-value for correlations shown in [8].

**Exhibit 6**
**Comparison of Correlations for Select Companies (Walmart and Graham Exhibit E)**
**Q1 2009 to Q4 2014**

| | | Graham Correlations | Voetmann Correlations | | | | | |
| | | | | Capital One | | | Change in Capital One | |
| Ticker | Company Name | Revenues to Cap One Txn Amt | # Observations | Transaction Amounts to Abnormal Returns | P-Value | # Observations | Transaction Amounts to Abnormal Returns | P-Value |
| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] |
| AAP | ADVANCE AUTO PARTS INC | * | 16 | -0.2907 | 0.2747 | 12 | -0.3555 | 0.2568 |
| ACOM | ANCESTRY COM INC | * | 9 | -0.1868 | 0.6303 | 9 | 0.1091 | 0.7799 |
| BEBE | BEBE STORES INC | | 15 | 0.3398 | 0.2153 | 11 | 0.2353 | 0.4860 |
| BIG | BIG LOTS INC | * | 13 | -0.0994 | 0.7467 | 9 | -0.1908 | 0.6229 |
| BWLD | BUFFALO WILD WINGS INC | * | 14 | -0.2798 | 0.3326 | 10 | 0.0564 | 0.8770 |
| COH | COACH INC | * | 15 | -0.1083 | 0.7009 | 11 | 0.0880 | 0.7969 |
| DTG | DOLLAR THRIFTY AUTOMOTIVE GRP I | * | . | . | . | . | . | . |
| FB | FACEBOOK INC | * | 7 | 0.1388 | 0.7666 | 7 | -0.6354 | 0.1252 |
| GES | GUESS INC | * | 13 | -0.0080 | 0.9793 | 9 | -0.5674 | 0.1110 |
| GMAN | GORDMANS STORES INC | * | 8 | 0.3399 | 0.4101 | 8 | 0.2862 | 0.4920 |
| GNC | G N C HOLDINGS INC | * | 13 | -0.3507 | 0.2401 | 13 | -0.0158 | 0.9593 |
| M | MACYS INC | * | . | . | . | . | . | . |
| PETS | PETMED EXPRESS INC | * | 15 | -0.1856 | 0.5077 | 11 | 0.0932 | 0.7852 |
| PLCE | CHILDRENS PLACE INC | * | 12 | 0.3226 | 0.3064 | 8 | 0.3808 | 0.3520 |
| RH | RESTORATION HARDWARE HLDGS INC | * | . | . | . | . | . | . |
| SBUX | STARBUCKS CORP | * | 14 | -0.1871 | 0.5218 | 10 | 0.3985 | 0.2540 |
| SCVL | SHOE CARNIVAL INC IN | * | 13 | -0.3890 | 0.1889 | 9 | -0.0957 | 0.8065 |
| SIX | SIX FLAGS ENTERTAINMENT CORP | * | 13 | -0.2346 | 0.4404 | 13 | 0.3249 | 0.2788 |
| TXRH | TEXAS ROADHOUSE INC | * | 14 | -0.2626 | 0.3645 | 10 | -0.0847 | 0.8159 |
| URBN | URBAN OUTFITTERS INC | * | 15 | -0.0657 | 0.8159 | 10 | -0.0901 | 0.8045 |
| WMT | WAL MART STORES INC | * | 18 | -0.3256 | 0.1873 | 14 | -0.1652 | 0.5724 |
| **Number of Companies with Statistically Significant Correlations:** | | 20 | | 0 | | | 0 | |

Source: Bloomberg LP; Expert Report of Stephen Graham dated Sept. 18, 2015; DONE files.
Note: The Bloomberg field PX_LAST was used to retrieve data for closing price. The number of observations and correlation estimates were subject to data availability from Bloomberg and the DONE files.
* indicates statistical significance of correlations at the 5% level.
[1]   Tickers in Graham Report, p. 14 and Exhibit E.
[2]   Company name of each ticker.
[3]   Indicates statistically significant correlations as reported in Graham Report, Exhibit B.
[4]   Number of observations for each ticker when calculating correlations between Capital One Transaction Amounts and Abnormal Returns.
[5]   Correlations between Capital One Transaction Amounts and Abnormal Returns. Abnormal Returns are calculated as Price Return - SPXT Index Return. The SPXT Index is the S&P 500 Total Return Index.
[6]   P-value for correlations shown in [5].
[7]   Number of observations for each ticker when calculating correlations between Change in Capital One Transaction Amounts and Abnormal Returns.
[8]   Correlations between Change in Capital One Transaction Amounts and Abnormal Returns. Abnormal Returns are calculated as Price Return - SPXT Index Return. The SPXT Index is the S&P 500 Total Return Index. Change in Capital One Transaction Amounts is calculated as Transactions$_{q, t}$ / Transactions$_{q, t-1}$ for a given quarter and year t.
[9]   P-value for correlations shown in [8].

0245

**Exhibit 7**
**Summary of Correlations for 226 Companies**
**Q1 2009 to Q4 2014**

| Description | Number of Companies for which Correlation was Calculated [1] | Number of Companies with Statistically Significant Correlations [2] | Percentage of Significant Companies [3] |
|---|---|---|---|
| Graham - Correlation of Revenues to Transaction Amount | 226 | 132 | 58.41% |
| Voetmann - Correlation of Revenues to Abnormal Returns | 212 | 10 | 4.72% |
| Voetmann - Correlation of Change in Revenues to Abnormal Returns | 204 | 17 | 8.33% |
| Voetmann - Correlation of Capital One Transaction Amounts to Abnormal Returns | 131 | 8 | 6.11% |
| Voetmann - Correlation of Change in Capital One Transaction Amounts to Abnormal Returns | 131 | 2 | 1.53% |

Source: Bloomberg LP; Expert Report of Stephen Graham dated Sept. 18, 2015; DONE files.
Note: The Bloomberg fields PX_LAST and SALES_REV_TURN were used to retrieve data for closing price and revenues, respectively. The number of observations and correlation estimates were subject to data availability from Bloomberg and the DONE files.
[1]  Number of companies for which correlation was calculated.
[2]  Number of companies with statistically significant correlations at the 5% level.
[3]   = [2] / [1].

0246

**Exhibit 8**

**Correlation of  Revenues to Abnormal Returns for 132 Companies in Graham Exhibit F**

**4 Significant Companies**

**Q1 2009 to Q4 2014**



Source: Bloomberg LP; Expert Report of Stephen Graham dated Sept. 18, 2015, Exhibit F.

Note: Abnormal Returns are calculated as Price Return - SPXT Index Return. The SPXT Index is the S&P 500 Total Return Index.

Statistical significance is measured at the 5% level.

**Exhibit 9**

**Correlation of Change in Revenues to Abnormal Returns for 132 Companies in Graham Exhibit F**
**6 Significant Companies**
**Q1 2009 to Q4 2014**



Source: Bloomberg LP; Expert Report of Stephen Graham dated Sept. 18, 2015, Exhibit F.
Note: Abnormal Returns are calculated as Price Return - SPXT Index Return.  The SPXT Index is the S&P 500 Total Return Index.  Change in Revenues is calculated as $Revenue_{q1,t}$ / $Revenue_{q1,t-1}$ for a given quarter and year t. Statistical significance is measured at the 5% level.

**Exhibit 10**
**Correlation of Capital One Transaction Amounts to Abnormal Returns for 131 Companies**
**7 Significant Companies**
**Q1 2009 to Q4 2014**



Source: Bloomberg LP; DONE files.
Note: Abnormal Returns are calculated as Price Return - SPXT Index Return. The SPXT Index is the S&P 500 Total Return Index. Quarterly Capital One Transaction Amounts are sourced from the DONE files. Statistical significance is measured at the 5% level.

**Exhibit 11**
**Correlation of Change in Capital One Transaction Amounts to Abnormal Returns for 131 Companies**
**2 Significant Companies**
**Q1 2009 to Q4 2014**



Source: Bloomberg LP; DONE files.
Note: Abnormal Returns are calculated as Price Return - SPXT Index Return. The SPXT Index is the S&P 500 Total Return Index. Quarterly Capital One Transaction Amounts are sourced from the DONE files. Change in Capital One Transaction Amounts is calculated as Transactions$_{q1\,t}$ / Transactions$_{q1,\,t-1}$ for a given quarter and year t. Statistical significance is measured at the 5% level.

0250

# EXHIBIT 12

# TO BE FILED UNDER SEAL

# EXHIBIT 13

# TO BE FILED UNDER SEAL

# EXHIBIT 14

# TO BE FILED UNDER SEAL

**Exhibit 15**

**Comparison of Revenues Forecasts for Bebe for Q2 2013**



Source: Bloomberg LP; Expert Report of Stephen Graham dated Sept. 18, 2015, Exhibit E.
Note: Abnormal Returns are calculated as Price Return - SPXT Index Return. The SPXT Index is the S&P 500 Total Return Index.

## Exhibit 16
## Regression Results with Available Data between Q4 2009 to Q4 2014

| | | Graham Regression Model | Corrected - Independent Variable: Abnormal Returns | |
| --- | --- | --- | --- | --- |
| | | | [1] | [2] |
| [A] | Intercept | -0.029212 | -0.0120105 | -0.0114517 |
| | | (-1.68) | (-0.79) | (-0.52) |
| [B] | Analyst Expectations | 0.9429844 | 0.0006139 | 0.0131924 |
| | | (60.06) | (0.05) | (0.64) |
| [C] | Growth in Capital One Transactions | 0.0898492 | 0.0119338 | |
| | | (6.61) | (1.02) | |
| [D] | Transaction Data Forecast | | | -0.0017629 |
| | | | | (-0.49) |
| [E] | Number of Observations | 1,044 | 998 | 495 |
| [F] | Adjusted R-squared | 0.8308 | -0.0007 | -0.0031 |

Source: Bloomberg LP; DONE files; Expert Report of Stephen Graham dated Sept. 18, 2015.

Note:

Regressions are based on data availability from Q4 2009 to Q4 2014.

Regression model does not include fixed effects as per Graham Report, p. 22. T-statistics are in parentheses.

Abnormal Returns are calculated as Price Return - SPXT Index Return. The SPXT Index is the S&P 500 Total Return Index.

[1] Regression for the independent variable Abnormal Returns on Analyst Expectations and Growth in Capital One Transactions.

[2] Regression for the independent variable Abnormal Returns on Analyst Expectations and Transaction Data Forecast.

[B] Analyst Expectations is calculated as Analyst Revenue Forecast$_{q1, t}$ / Reported Sales$_{q1, t-1}$ for a given quarter and year t.

[C] Growth in Capital One Transactions is calculated as Transactions$_{q1, t}$ / Transactions$_{q1, t-1}$ for a given quarter and year t.

[D] Transaction Data Forecast are calculated as Defendants' Revenues Forecast$_{q1, t}$/Defendants' Revenue Forecast$_{q1, t-1}$ for a given quarter and year t.

## Exhibit 17
## Regression Results with Earnings Announcements between February 16, 2012 to January 31, 2015

| | | Graham Regression Model | Corrected - Independent Variable: Abnormal Returns | |
| --- | --- | --- | --- | --- |
| | | | [1] | [2] |
| [A] | Intercept | -0.120088 | -0.0036848 | -0.0051464 |
| | | (-7.20) | (-0.14) | (-0.18) |
| [B] | Analyst Expectations | 1.076936 | -0.0154967 | 0.0073814 |
| | | (61.56) | (-0.62) | (0.28) |
| [C] | Growth in Capital One Transactions | 0.0357766 | 0.0210694 | |
| | | (2.13) | (0.78) | |
| [D] | Transaction Data Forecast | | | -0.0009324 |
| | | | | (-0.24) |
| [E] | Number of Observations | 370 | 349 | 303 |
| [F] | Adjusted R-squared | 0.9507 | -0.0039 | -0.0063 |

Source: Bloomberg LP; DONE files; Expert Report of Stephen Graham dated Sept. 18, 2015.
Note:
Regressions are based on data availability for announcement dates from February 16, 2012 to January 31, 2015 (inclusive).
Regression model does not include fixed effects as per Graham Report, p. 22. T-statistics are in parentheses.
Abnormal Returns are calculated as Price Return - SPXT Index Return. The SPXT Index is the S&P 500 Total Return Index.
[1] Regression for the independent variable Abnormal Returns on Analyst Expectations and Growth in Capital One Transactions.
[2] Regression for the independent variable Abnormal Returns on Analyst Expectations and Transaction Data Forecast.
[B] Analyst Expectations is calculated as Analyst Revenue Forecast$_{q1, t}$ / Reported Sales$_{q1, t}$ for a given quarter and year t.
[C] Growth in Capital One Transactions is calculated as Transactions$_{q1, t}$ / Transactions$_{q1, t-1}$ for a given quarter and year t.
[D] Transaction Data Forecast are calculated as Defendants' Revenues Forecast$_{q1, t}$/Defendants' Revenue Forecast$_{q1, t-1}$ for a given quarter and year t.

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF PENNSYLVANIA

3

4    - - - - - - - - - - - - - -

5    SECURITIES AND EXCHANGE      )

6    COMMISSION,                  )

7            Plaintiff,           )  CASE NO.

8    vs.                          )  2:15-CV-00269-MAK

9    BONAN HUANG, et al.,         )

10           Defendants.          )

11   - - - - - - - - - - - - - -

12

13

14

15      VIDEOTAPED DEPOSITION OF TORBEN VOETMANN

16            FRIDAY, OCTOBER 16, 2015

17

18

19

20

21           BEHMKE REPORTING AND VIDEO SERVICES, INC.

22                      BY: SHARI COHEN, RPR

23                   160 SPEAR STREET, SUITE 300

24            SAN FRANCISCO, CALIFORNIA  94105

25                         (415) 597-5600

1

2

3

4

5

6

7

8

9        Videotaped Deposition of TORBEN VOETMANN at

10   Securities and Exchange Commission, 200 Vesey Street,

11   New York, New York commencing at 10:07 A.M., FRIDAY,

12   OCTOBER 16, 2015 before Shari Cohen, Registered

13   Professional Reporter pursuant to Notice of Videotaped

14   Deposition.

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFF:
 3       U.S. SECURITIES AND EXCHANGE COMMISSION
 4       BY:  CHRISTOPHER KELLY, ATTORNEY AT LAW
 5            DAVID L. AXELROD, ATTORNEY AT LAW
 6       1617 JFK Boulevard, Suite 520
 7       Philadelphia, Pennsylvania 19103
 8       Telephone:  (215) 861-9625
 9       Email:  axelrodd@sec.gov
10               kellyc@sec.gov
11
12   FOR DEFENDANT:
13       MORVILLO LLP
14       BY:  JASON SOMENSATTO, ATTORNEY AT LAW
15            EUGENE INGOGLIA, ATTORNEY AT LAW
16       One World Financial Center, 27th Floor
17       New York, New York  10281
18       Telephone:  (212) 796-6341
19       Email:  eingoglia@morvillolaw.com
20
21   ALSO PRESENT:
22       CHYHE BECKER
23       DANIEL SALEMI, VIDEOGRAPHER
24
25
```

```
1                        INDEX

2    FRIDAY, OCTOBER 16, 2015

3    TORBEN VOETMANN                              Page

4        Examination by MR. KELLY                   7

5        Examination by MR. SOMENSATTO            215

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        EXHIBITS

 2                     TORBEN VOETMANN

 3    Number              Description                  Page

 4    Exhibit 2     Notice of Deposition of

 5                  Defendants' Expert - 2 pages         9

 6    Exhibit 3     Document - 15 pages                 36

 7    Exhibit 4     Expert Rebuttal Report of

 8                  Torben Voetmann - 55 pages          42

 9    Exhibit 5     Document - 2 pages                  70

10    Exhibit 6     Complaint - 20 pages                85

11    Exhibit 7     Expert Report of Stephen

12                  Graham - 56 pages                   89

13    Exhibit 8     Expert Report of Matthew Cain

14                  - 18 pages                          89

15    Exhibit 9     Article Entitled The Impact

16                  of Analysts' Forecast Errors

17                  and Forecast Revisions on

18                  Stock Prices - 61 pages            168

19    Exhibit 10    Article Entitled The Impact

20                  of Analysts' Forecast Errors

21                  and Forecast Revisions on

22                  Stock Prices                       168

23

24

25
```

```
 1              P R O C E E D I N G S

 2              THE VIDEOGRAPHER: Here begins DVD number

 3      one in the deposition of Dr. Torben Voetmann in

 4      the matter of Securities and Exchange

 5      Commission versus Bonan Huang, et al. in the

 6      United States District Court for the Eastern

 7      District of Pennsylvania, case number

 8      2:15-cv-00269-MAK.

 9              Today's date is October 16, 2015.  The

10      time on the video monitor is 10:07 a.m.  The

11      video operator today is Dan Salemi, Behmke

12      Reporting And Video Services, Inc., 116 Spear

13      Street, Suite 300, San Francisco, California.

14              This video deposition is taking place at

15      200 Vesey Street, Suite 400, New York, New York

16      and was noticed by Christopher R. Kelly of U.S.

17      Securities and Exchange Commission.

18              Counsel please voice identify yourselves

19      and state whom you represent.

20              MR. KELLY: My name is Christopher R.

21      Kelly. I represent the plaintiff the Securities

22      and Exchange Commission in this action and with

23      me today are my colleagues David L. Axelrod and

24      Chyhe Becker.

25              MR. SOMENSATTO: My name is Jason
```

1            Somensatto from the law firm of Morvillo, LLP
2            representing the defendants and here with me is
3            Eugene Ingoglia from our firm.
4                    THE VIDEOGRAPHER: The court reporter
5            today is Shari Cohen certified shorthand
6            reporter with Behmke Reporting and Video
7            Services, Inc.  Will the court reporter please
8            swear in the witness.
9    T O R B E N    V O E T M A N N, called as a witness,
10           having been duly sworn by the Notary
11           Public, was examined and testified as
12           follows:
13    EXAMINATION BY
14    MR. KELLY:
15           Q.    Good morning, Dr. Voetmann.  Before we
16    get started, I just want to go over a couple of ground
17    rules. I understand you've been deposed before so this
18    should sound familiar.  As you know, there's a court
19    reporter here that's taking down your testimony
20    stenographically. If you could please when you answer
21    my questions do so verbally so that we have a complete
22    record.
23                 Similarly, when I ask you a question,
24    please try to let me finish my question before you
25    answer and I'll do the same. I will try to let you

1    finish your answer before I ask my next question; is

2    that okay?

3         A.    Sounds good.

4         Q.    To the extent you don't understand a

5    question of mine, please ask me to rephrase it or

6    otherwise explain what's causing you the confusion.

7    To the extent you answer my question, I'll take that

8    to understand that you understood the question as

9    asked; is that fair?

10        A.    That's fair.

11        Q.    Finally, this is not an endurance test.

12   To the extent you would like to take a break, I'll do

13   what I can to accommodate that request.  The only

14   issue is if there is a question pending I'll ask you

15   to finish that and then we can talk about whether it

16   makes sense to take a break at that point in time; is

17   that fair?

18        A.    That's good.

19        Q.    Could you please state your name for the

20   record?

21        A.    My name is Torben Voetmann.

22        Q.    What's your date of birth?

23        A.    March 2, '68.

24        Q.    Home address?

25        A.    110 Fernwood Drive, San Francisco,

1   California 94127.

2        Q.   Dr. Voetmann, how did you become engaged

3   to work on this matter?

4        A.   I was contacted by counsel for

5   defendants.

6        Q.   Approximately when was that?

7        A.   Approximately a month ago.

8        Q.   Prior to being engaged to work on this

9   matter, did you know either of the defendants in this

10  case?

11       A.   I did not.

12       Q.   Prior to being engaged to work on this

13  matter, did you know any of the defense counsel?

14       A.   I did not.

15            MR. KELLY: Let's mark this as Exhibit 2.

16            (Exhibit 2, Notice of Deposition of

17       Defendants' Expert, marked for Identification.)

18       Q.   Dr. Voetmann, you have been designated

19  to serve as an expert in this case by defendants; is

20  that correct?

21       A.   Yes.

22       Q.   You're appearing today for a deposition,

23  is that also true?

24       A.   Correct.

25       Q.   Is this the Notice of Deposition under

1    which you are appearing for a deposition today?

2          A.    I believe it is.

3          Q.    Dr. Voetmann, what did you do to prepare

4    for today's deposition?

5          A.    I reviewed my report that I had submitted

6    in this case and I reviewed the reports by Mr. Graham

7    and Dr. Cain and I met with counsel.

8          Q.    Other than the three reports you

9    identified, did you review any other documents in

10   preparing for your testimony here today?

11         A.    I looked at some of the additional

12   documents that I had cited and relied on.

13         Q.    Those documents you refer to, those are

14   the documents set forth in Appendix B in your report?

15         A.    That's correct.

16         Q.    Approximately how long did you meet with

17   counsel to prepare for today's deposition?

18         A.    We met yesterday about five hours, five

19   or six hours.

20         Q.    Apart from that five hour meeting

21   yesterday, did you spend any other time with either

22   talking with or meeting with defense counsel to

23   prepare for today's deposition?

24         A.    No, I did not.

25         Q.    Specifically who did you meet with

1   yesterday?

2       A.    I met with Jason and Gene.

3       Q.    Without going into specific

4   communications with defense counsel, could you

5   describe what you did yesterday?

6       A.    We did a couple of things. We walked

7   through my report and we also looked at some

8   commercials from Capital One and American Express and

9   then we just discussed my report and my opinions.

10      Q.    When you say you looked at commercials,

11  are you talking about television commercials or you're

12  talking about --

13      A.    I believe they were television

14  commercials of Capital One and American Express.

15      Q.    Why did you do that?

16      A.    I'm not quite sure.  I think this is a

17  case that involves as I understand it Capital One

18  credit card credit transactions so I want to

19  understand the Capital One credit card.

20      Q.    How many commercials did you watch

21  yesterday?

22      A.    Just a couple.

23      Q.    I think I understood your testimony, but

24  those were television commercials or different type of

25  advertisement?

1        A.    It was on YouTube, but I believe they are

2   television commercials.

3        Q.    Had you seen those commercials prior to

4   seeing them with defense counsel?

5        A.    The Capital One I had seen before on

6   television, but the American Express I had not seen

7   before.

8        Q.    Did anything about those commercials

9   strike you as relevant to this matter?

10       A.    Not in particular other than

11  understanding the company in which the data at issue

12  in this case was Capital One, but other than that, no.

13       Q.    Are those commercials at all relevant to

14  the opinions you are offering in this case?

15       A.    No.

16       Q.    So Dr. Voetmann, what's your definition

17  of materiality?

18            MR. SOMENSATTO: Objection to form.  You

19       can answer.

20       A.    My definition of materiality is to

21  measure if certain information would cause a

22  statistically significant price change or price

23  impact.

24       Q.    So under your definition of materiality,

25  there would need to be a statistically significant

```
 1  effect on the price of a security in order for
 2  information to be material?
 3       A.    Correct.
 4       Q.    Dr. Voetmann, is that legally the
 5  definition of materiality in Securities and Exchange
 6  Commission insider trading cases?
 7                 MR. SOMENSATTO: Objection to form.
 8       A.    I'm not sure of the legal statute or the
 9  legal definition.  My definition is used based on my
10  understanding of the analysis that is done to
11  determine whether certain information was causing a
12  price impact.
13       Q.    Dr. Voetmann, is a piece of information
14  material if it alters the total mix of information in
15  the market place?
16       A.    Potentially, but one would have to
17  examine the total mix of information to determine
18  whether that piece of information is relevant and
19  carry any weight on impact.
20       Q.    How do you go about doing that?
21       A.    Depends on the circumstances of the
22  analysis you are trying to undertake.
23       Q.    How would you if you were trying to
24  determine whether a particular piece of information is
25  material, how would you analyze that?
```

1          A.    It's a very broad question, but if I

2     think about the report I put forward here in this

3     case, the analysis I have undertaken is to determine

4     whether or not the information that defendants had

5     from Capital One could be statistically connected to a

6     price impact on the securities in which they had this

7     information so the type of analysis I put forward in

8     my report is the type of analysis I would undertake to

9     determine materiality.

10         Q.    So let me ask you, Dr. Voetmann, is

11    revenue information included within the total mix of

12    information to investors?

13         A.    I think revenue would be a part of the

14    total mix of information that may be relevant to an

15    investor.

16         Q.    What other aspects are there in the total

17    mix of information to investors?

18         A.    Right so if I understand your question

19    you're asking me what are some of the other factors or

20    I don't understand your question?

21         Q.    Let me rephrase it.  Based on your

22    understanding, what types of information do investors

23    look to when determining whether or not to make an

24    investment?

25              MR. SOMENSATTO: Objection to form.

1          A.    It very much depends on the type of

2    investment they are looking at, but if you're talking

3    in general terms just looking at investing in a

4    security, just to mention some factors, what investor

5    might look at is, you know, earnings, cash flows,

6    different definitions of factors that might impact

7    cash flows as well as other risk factors for the

8    security that they are looking at.

9          Q.    So you mentioned earnings.  How do

10   companies make money?

11              MR. SOMENSATTO: Objection to form.

12         A.    It's a very broad question.  Are you

13   talking about net income, are you talking about cash

14   flows or what do you mean by making money?

15         Q.    Let's focus on earnings. What are the

16   components of earnings?

17         A.    So the general definition of earnings is

18   to think about earnings from a net income perspective.

19   Earnings is revenues net of expenses net of other

20   costs like financing costs and depreciations and so

21   you have a measure of earnings, operating income and

22   then you have taxes and after taxes you have earnings

23   or net income.

24         Q.    What are the components of cash flow?

25         A.    So the components of cash flow includes

1    earnings, but in addition to that there's other

2    components you have to factor in such as working

3    capital and non cash items such as depreciation,

4    amortization as well as investments and capital

5    expenditures.

6           Q.    Let me make sure I understand your

7    testimony.  Does depreciation appear in a company's

8    cash flow when it reports cash flows?

9           A.    So we have to be careful about

10   definitions. Are you talking about the cash flow

11   statement or you're just talking about cash flows that

12   a company generates in general?

13          Q.    Dr. Voetmann, you had testified that

14   depreciation was a component of cash flow?

15          A.    Yes.

16          Q.    I'm just trying to understand how

17   depreciation effects cash flows within a company?

18          A.    Okay.  So, for example, depreciation is

19   an accounting measure of the use of an asset so it's

20   not a real cash expense so in order to determine the

21   true cash flow of a company, you would add back

22   depreciations.

23          Q.    You had defined -- withdrawn.  Dr.

24   Voetmann, what causes stock prices to go either up or

25   down?

1             MR. SOMENSATTO: Objection to form.  You

2        may answer.

3        A.    Again, it's a very broad question.  There

4   could be a host of factors that may make a company's

5   stock price go up and down so you have to examine all

6   those different factors to determine what may impact

7   the company's stock price to go up and down.

8        Q.    Can you please identify a few of those

9   factors for us?

10       A.    Sure.  So what comes to mind as an

11  example of something that might be disclosed to the

12  market, for example, if a company announces that they

13  had improved their profit margins, in other words,

14  they might have improved their management of expenses

15  and the market might view that as a profitable

16  increase in their cash flows, hence they would -- I

17  would expect the price to go up.

18       Q.    What if a company releases its quarterly

19  revenue information and it just says our revenue for

20  this quarter is X, how would you expect that to effect

21  the price of the stock?

22       A.    In order to measure an impact on the

23  stock, my expectation is that you would compare that

24  release of earnings X to a, for example, consensus

25  estimate by analysts and if they are in line with

1    expectations of analysts, I would have an expectation

2    that there may not be a price response.

3             If on the other hand, they surprise the

4    market by improving earnings above expectations, you

5    might see a positive price impact likewise if they are

6    less than expectations, you might see a decline in

7    price impact.

8         Q.   What if the company releases information

9    that its quarterly revenues increased as compared with

10   the prior quarter, would you expect that to result in

11   an increase in the company's price?

12        A.   Not necessarily.

13        Q.   Why is that?

14        A.   Because you have to look at whether the

15   market understood why it increased in their revenues

16   from one quarter to the next and the market may have

17   already factored in that increase.

18        Q.   What if the company releases news that's

19   it's quarterly revenues increased as compared to the

20   same quarter the prior year, you know, would you

21   expect that to influence the company's stock price?

22        A.   Not necessarily.  Again, you have to look

23   at whether or not the market has actually already

24   factored that information into the price.

25        Q.   If I had asked a series of questions with

 1   respect to whether or not the revenues decreased

 2   rather than increased, would your answers be the same?

 3        A.    Yes.

 4        Q.    So Dr. Voetmann, let's assume that you

 5   received non public information as to what a company

 6   has not yet reported revenues were for a given quarter

 7   that happened to be consistent with analyst

 8   expectations.  Is it your testimony that a reasonable

 9   investor would not like to know that information in

10   making a decision to buy or sell a security?

11             MR. SOMENSATTO: Objection to form.

12        A.    Are you asking a broad question or you're

13   asking specifically to this case?

14        Q.    I'm asking a broad question.

15        A.    Okay.  So sorry, can you rephrase or

16   repeat the question?

17             MR. KELLY: Can you read it back.

18             (Record read.)

19             MR. SOMENSATTO: Same objection.

20        A.    If the question is whether this

21   information non public is in line with the analyst

22   expectations, in other words, define that as similar

23   to analyst expectations, identical, I would expect

24   that that's already built into the market price

25   because the market is already aware of an expectation

```
 1    of what earnings might be released so it's not clear
 2    whether or not that would be material information for
 3    a reasonable investor.
 4         Q.    You say it's not clear whether it would
 5    be reasonable.  Are you saying that you can't
 6    determine one way or the whether that's material or
 7    are you saying that because the information is
 8    consistent with analyst expectations, you would not
 9    expect a stock price movement and therefore the
10    information is not material?
11                   MR. SOMENSATTO: Object to form.
12         A.    What I'm saying is you could undertake an
13    analysis similar to what I have done in this case as I
14    explained in my report where you try to quantify the
15    marginal information that comes out of this non public
16    information and then determine whether that
17    information is value relevant for an investor and if
18    you look at the case here and the analysis I have done
19    here in particular for the data at issue in this case
20    with the Capital One data, this was not value relevant
21    for the price impact and therefore not material to an
22    investor.
23         Q.    When you say value relevant, Dr.
24    Voetmann, are you saying that it needs to effect the
25    price of the stock or are you saying that it's not
```

1  valuable to the investor to know that information?

2      A.   I'm saying that when you look at the

3  total mix of information, you have to determine

4  whether that piece of information gets any weight such

5  that it would cause a change in the stock price.

6      Q.   So let's just go back to -- I'm not sure

7  you answered my initial question.  Let me reframe the

8  question slightly.  Let's assume that you're good

9  friends with a CFO at a company and that CFO has

10  access to not yet released revenue information on the

11  company and let's also assume for the time being that

12  there are not any legal implications to this.

13          If that friend of yours, this CFO, gives

14  you a call and says a day before revenue information

15  is announced for a year, I know you're interested in

16  my company, I know you're considering buying

17  securities or selling securities in the company, let

18  me tell you that the analyst expectations of what our

19  revenue will be is spot on.  You know that no one else

20  knows this, but what they are expecting is in fact

21  true and that's what we are going to report tomorrow.

22          Is that information that you as an

23  investor would like to know?

24          MR. SOMENSATTO: Objection to form.

25      A.   I think it's fair to say that -- well,

1    two things.  One it's not clear, first of all, whether

2    that information would make a price impact or price

3    change because you had access to that information.

4    That said, I think any reasonable investor or any

5    investor would take any information they could get on

6    their hands in your hypothetical if it's legal to

7    obtain this kind of information, any investor would

8    take any information they could get their hands on to

9    evaluate the value of a company or a security.

10                They would then look at the total mix of

11   information and determine which factor or which piece

12   of information have more weight and it's not clear if

13   I'm getting information about revenues that is exactly

14   in line with expectations that that information would

15   carry much weight on whether or not I would purchase

16   that security.

17          Q.    So let me factor out the price impact

18   piece.  I understand that that's important to your

19   analysis.  I'm asking you as an investor deciding

20   whether or not to make an investment decision.

21                MR. SOMENSATTO: Objection to form.

22                MR. KELLY: I haven't finished my

23        question yet.

24          Q.    So you as an investor would you like to

25   know advanced information -- withdrawn.  I didn't

1  define advanced.  If you look back at my hypothetical,

2  would you as an investor like to have access to the

3  information directly from the CFO calling you and

4  telling you non public information about what that

5  company's revenue is going to be?

6              MR. SOMENSATTO: Objection to form.

7       A.   As I think I answered, as an investor I

8  would like to get my hands on any information I could

9  get my hands on and I would evaluate that information

10  to see if it's relevant as I'm making my buy or sell

11  decision.

12       Q.   Dr. Voetmann, the not yet reported

13  revenue information is in fact a piece of information

14  that would be relevant; is that correct?

15       A.   I didn't say it was relevant, I said it's

16  information I would get my hands on and information I

17  might evaluate, but I would have to determine whether

18  it's a relevant piece of information that drives my

19  decision to buy or sell a security.

20       Q.   Let me ask you this, Dr. Voetmann. In

21  that same conversation the CFO told you he's about to

22  have a McDonald's cheeseburger.  You had said an

23  investor would like to know any piece of information.

24  Is the not yet reported revenue information more

25  relevant than the fact that the CFO is about to have a

1  McDonald's cheeseburger?

2          MR. SOMENSATTO: Objection to form.

3      A.    Again, it's a hypothetical. If we are

4  talking about buying McDonald's, maybe that

5  information is relevant, I'm not sure, but again, I

6  would take all information into consideration and the

7  fact that the CFO ordered a cheeseburger may not be

8  relevant and I would discard the information as not

9  relevant.

10     Q.    So, Dr. Voetmann, let me make sure I

11 understand your answer. Is it your testimony that it's

12 possible that one purchase of a McDonald's

13 cheeseburger may be relevant to an investor

14 considering whether or not to invest in McDonald's?

15         MR. SOMENSATTO: Objection to form.

16     A.    It's a hypothetical we are talking about.

17 My statement was as an investor I would consider all

18 information I had available to me as I'm judging and

19 deciding what's relevant on deciding what security I

20 buy or sell.

21     Q.    I think we can move on for now.  Might

22 revisit this topic.  Actually let me -- I have got a

23 couple of hypotheticals.  So, Dr. Voetmann, grounding

24 your definition of materiality and stock price

25 movement so let's assume for the time being that you

1   receive non public information that a company's not

2   yet reported revenues were triple what analysts were

3   expecting for a quarter.  Let's further assume that

4   when the revenue figure was announced publicly, the

5   stock price did not move.

6              Is it your testimony that the non public

7   information that a company's revenues were tripled

8   analyst expectations is not the type of information

9   that a reasonable investor would like to know in

10  making a decision to buy or sell a security because

11  upon release the price of the security did not move?

12             MR. SOMENSATTO: Objection to form.

13       A.    In this case let me make sure I

14  understand the question correctly.  You're saying that

15  the revenue non publicly was triple consensus and

16  there is no price impact?

17       Q.    Correct.

18       A.    This is a good example of the analysis

19  one needs to undertake to understand what factor in

20  the host of factors that impacts a security is

21  relevant so it could be you are dealing with a company

22  where revenue is not really what drives the company,

23  but there are other factors that maybe have bigger

24  impacts on cash flows so if you are tripling revenues,

25  but it has no cash flow impact, it may not be

1    surprising that the price did not move in this

2    hypothetical so again you have to really disentangle

3    the information and determine based on the total mix

4    of information what factor is the drive to stock price

5    and if I could connect this to this case, you know, I

6    have seen no evidence in the analysis done by Mr.

7    Graham where he attempts to try to explain what

8    factors actually drive the stock price or connecting

9    the transaction data from Capital One to the stock

10   price movements.

11        Q.    So, Dr. Voetmann, in your answer you

12   indicated that the earnings of certain companies are

13   driven by different factors.  What types of companies

14   -- withdrawn.

15             For what types of companies does revenue

16   drive the profitability of those companies?

17             MR. SOMENSATTO: Objection to form.

18        A.    It's not a question I directly have

19   analyzed in this case, but you can think of companies

20   where revenue might be more important than others, for

21   example, it's possible when you look at technology

22   companies where their investments are so large that

23   they have no cash flow, they might have negative cash

24   flows that revenue is a more important factor.  Again,

25   it's a question I have not examined here.

```
 1            Q.    Let's think about have you heard of the
 2    company Chipotle?
 3            A.    Yes.
 4            Q.    What is that company?
 5            A.    It's where I get my burritos on a regular
 6    basis.
 7            Q.    So how does Chipotle make their money?
 8                  MR. SOMENSATTO: Objection to form.
 9            Q.    Withdrawn.  How does Chipotle as a
10    company make its money?
11                  MR. SOMENSATTO: Objection to form.
12            A.    The way I see it, it's a restaurant chain
13    of sort that sells high end fast food Mexican food and
14    so by selling food they make money.
15            Q.    So Chipotle makes money through its
16    sales?
17            A.    It's part of how they make money, yes.
18            Q.    How else does Chipotle make money?
19                  MR. SOMENSATTO: Objection to form.
20            A.    I haven't analyzed Chipotle specifically,
21    but in general terms Chipotle may increase its cash
22    flow through the way it's able to run its business and
23    finance its business.
24            Q.    Do you know as a fact that they do that
25    or you're just speculating?
```

1        A.    Like I said, it's not a question I've

2   analyzed specifically for today.

3        Q.    As you sit here today, the primary way

4   that Chipotle makes its money is through sales,

5   correct?

6             MR. SOMENSATTO: Objection to form.

7        A.    I said it's one of the ways it makes

8   money, but it's not unreasonable to believe that it's

9   also making money or cash flows through the way it's

10  running their business as well as financing its

11  business.

12       Q.    What other ways as you sit here today can

13  you that Chipotle makes its money through sales?

14            MR. SOMENSATTO: Objection to form.

15       A.    I just stated the way it runs its

16  business, the way it's managing it's day-to-day

17  business. By that I mean how it manages expenses, how

18  it manages its capital investments as well as the way

19  it's financing its business.

20       Q.    Do you know the way in which Chipotle

21  does any of those things as you sit here today?

22            MR. SOMENSATTO: Objection to form.

23       A.    No, it's not a question I've analyzed for

24  this case here today.

25       Q.    So let's assume that you receive non

1  public information that a company has not yet reported

2  revenues were tripled for what an analyst expected for

3  a given quarter and let's further assume that when the

4  revenue figure was publicly announced the stock price

5  did not move and let's also assume that the same time

6  of revenue figure was publicly announced the company

7  announced that it was incurring costs in closing down

8  an unprofitable line of business.

9          Is the non public information that a

10  company's revenues were tripled an analyst's

11  expectations the type of information an investor would

12  like to know to make a decision to buy or sell the

13  security?

14          MR. SOMENSATTO: Objection to form.

15      A.   I believe I stated earlier an investor

16  would examine all that information and determine what

17  is relevant as it's putting its weight on what

18  decision to buy or sell a security.  In your

19  hypothetical, you have tripling the revenue above

20  consensus which might mean you expect a price

21  increase, but if I heard you correctly, you also have

22  a closure of some business.

23      Q.   A closure of an unprofitable line of

24  business?

25      A.   Unprofitable line of business so an

1   investor would have to examine both of those factors

2   to understand what might impact one's decision to buy

3   or sell that security.

4        Q.    So to try to close this out, a lot of my

5   -- let's go back to my hypothetical about the CFO who

6   you're friends with who knows about the company's non

7   public revenue figures and is happy to share that with

8   you.  As an investor, do you want to know that

9   information?

10           MR. SOMENSATTO: Objection to form.

11        A.    I think any investor would want to know

12   all the information they could get access to, but that

13   doesn't mean that information is material or relevant

14   as they are making their decision on buying and

15   selling.  In your hypothetical from before, there is

16   legal information so having access to it I would still

17   evaluate as a rational and reasonable investor whether

18   or not this is material information for me to base my

19   decision to buy or sell a security.

20        Q.    So I mean frankly I don't think you

21   answered my question.  It's a yes or no question.

22   Would you like to have from -- you got direct access

23   to the CFO. Would you like to know and be able to

24   assess whether or not to buy a security in a given

25   company based on its not reported actual revenue

1  information?

2           MR. SOMENSATTO: Objection to form.

3       A.    I don't know that you could answer yes or

4  no to that.  As an investor, I would want all

5  information I could get access to, but I would still

6  evaluate all that information before I make a decision

7  whether to buy or sell a security.

8       Q.    Let me ask you this, Dr. Voetmann.  If

9  you don't have access to that information, you can't

10  analyze it, correct?

11      A.    If I didn't have access to the non public

12  information that the CFO has, I would not be able to

13  analyze it.

14      Q.    All else being equal, it's better to have

15  more information than less, correct?

16           MR. SOMENSATTO: Objection to form.

17      A.    You want all the information you could

18  have access to, but just having more information by

19  itself doesn't mean you are in a position to make a

20  better decision or making the right decision to

21  whether you want to buy or sell a security.  You still

22  want to bring it back and analyze whether that

23  information in fact has any relevance and as I have

24  seen in this case when I look at the analysis done by

25  Mr. Graham, he's not attempted to connect the

```
 1   transaction data to price impacts so he's not
 2   established whether there's a statistically
 3   significant relationship between the two when in fact
 4   this information was material to a reasonable
 5   investor.
 6        Q.    It is true though, Dr. Voetmann, that
 7   without knowing the not yet reported revenue
 8   information, you can't determine whether or not you
 9   want to make a purchase or sale of that security based
10   on that information?
11             MR. SOMENSATTO: Objection to form.
12        A.    I can still without knowing that
13   information I could still evaluate any other public
14   available information to make a decision whether I
15   want to buy or sell the security and have an
16   understanding of what drives that security whether I
17   would buy it or sell it.
18        Q.    But in that total mix of information, you
19   are not including the not yet reported actual revenue
20   information that no other investor has access to,
21   correct?
22        A.    In your hypothetical I didn't include it,
23   but even if I had included it, it may be such a small
24   piece of the total mix of information and one would
25   have to examine whether that marginal information
```

1  would be relevant.

2       Q.   So your testimony is one would have to

3  examine.  Would you like to be able to do that

4  analysis or would you rather shut your eyes and say

5  CFO, don't tell me the information, I'm better off not

6  knowing it?

7            MR. SOMENSATTO: Objection to form.

8       A.   Again, it's a hypothetical.  In this

9  hypothetical I would take any information I could get

10  my hands on and evaluate. Any investor would consider

11  all information that's available to them as they are

12  making their decision, but if you are a reasonable

13  investor, you would understand how to contextualize

14  the information to the extent of what's relevant and

15  what's not relevant and understand what information to

16  put weight on as you're making your decision whether

17  you want to buy or sell that security.

18       Q.   Dr. Voetmann, what's an event study?

19       A.   An event study is a study where you

20  attempt to measure a price -- one form of event study

21  is a study where you attempt to measure the price

22  impact on new information released to the market.

23       Q.   How do you perform an event study?

24       A.   There's a number of different ways you

25  can perform an event study.  Traditionally you perform

1  an event study by comparing the actual price impact

2  price return to the expected return to information

3  that's being released.

4          Q.    Under what conditions are event studies

5  most useful?

6                MR. SOMENSATTO: Objection to form.

7          A.    So event studies as I've used it in the

8  past and as I understand event studies, it's

9  methodology where you attempt to measure kind of an

10 ex-post analysis where you are looking at information

11 that was released to the market and you want to try to

12 understand whether that information caused a material

13 price change or not so in this case you're looking at

14 information that was released and you're comparing

15 that information to what the expectation was and you

16 can then determine whether or not the information

17 released caused a significant price change.

18         Q.    Dr. Voetmann, what are confounding

19 events?

20         A.    So confounding events is when you have an

21 event, for example, an earnings announcement, but the

22 earnings announcement also includes other pieces of

23 information other than earnings so you have multiple

24 pieces of information in the announcement.

25         Q.    Are event studies most useful by

```
 1   eliminating confounding events?
 2              MR. SOMENSATTO: Objection to form.
 3        A.    Not necessarily.  Event studies is to
 4   measure the price impact.  Depending on the purpose of
 5   the event study and what you are trying to accomplish,
 6   you may need to control for confounding events and
 7   this is a good example of when I examined Mr. Graham's
 8   analysis when he measured the return on the
 9   investments he had as far as I could tell in his study
10   done no attempt to control for confounding factors.
11        Q.    Did Mr. Graham perform an event study?
12        A.    He didn't perform a classical event
13   study.  In fact, I don't think he performed an event
14   study, but he did include in his analysis a measure of
15   returns earned by defendants, but he did not control
16   whether those returns that were earned were due to
17   confounding information or whether those returns were
18   only and purely driven by the marginal information
19   from Capital One transaction data.
20        Q.    Dr. Voetmann, is it your testimony that
21   Mr. Graham should have done an event study to
22   determine how much profit the defendants made in this
23   case?
24              MR. SOMENSATTO: Objection to form.
25        A.    That's not my testimony. As I've
```

1   explained in my report, I believe that Mr. Graham have

2   ignored a number of confounding factors in his attempt

3   to determine whether or not the marginal value from

4   the Capital One transaction data was relevant so he's

5   not been able to establish whether the transaction

6   data caused a statistically significant price impact.

7          Q.   Dr. Voetmann, did Mr. Graham at all

8   analyze whether or not the Capital One transaction

9   data caused a stock price movement at all?

10          A.    In his correlation and regression

11   analysis he in my opinion failed to analyze that.  He

12   did not include anything related to the stock price

13   impact as such that he was unable to establish whether

14   a reasonable investor would make a buy and sell

15   decision based on this information. In his last piece

16   of his analysis, he attempted to show the realized

17   return that the defendant earned and what I'm stating

18   here is that in that analysis when he is stating what

19   they earned, he's not controlling for whether those

20   earnings are caused by as you pointed out confounding

21   factors or whether it's caused by the marginal revenue

22   data that the defendants had access to.

23                  MR. KELLY: Please mark this as Exhibit

24          3.

25                  (Exhibit 3, Document, marked for

1        Identification.)

2        A.    I notice have Exhibit 2 and 3, but was

3  there an Exhibit 1?

4        Q.    Exhibit 1 is a different deposition.

5        A.    Okay.

6        Q.    Dr. Voetmann, could you please identify

7  this document?

8        A.    It's a chapter 17A from a book.  I don't

9  -- the title is on the last page, it's Litigation

10  Service Handbook from 2002 I believe.

11        Q.    Have you seen this document before?

12        A.    I know I have seen the Litigation Service

13  Handbook before.  I possibly have seen this chapter as

14  well.

15        Q.    Please turn to page 9?

16        A.    Okay.

17        Q.    I'll turn your attention to the top of

18  page 9 where it says an event study in this context

19  proves most useful under the following three

20  conditions.  There's two conditions and then the third

21  condition is the parties can unambiguously identify

22  the event in question with one or more announcements

23  that a relatively certain timing in the event

24  announcements do not contain a great deal of value

25  relevant information unrelated to the issue in

1  question. Such unrelated information is commonly

2  called confounding events, for example, a firm might

3  announce a change in dividend policy concurrently with

4  an earnings release.

5            A study that focuses on earnings release

6  will have difficulty separating the earnings effects

7  from that of the shift in dividend policy.  Do you see

8  that?

9        A.    Yes.

10        Q.    Do you agree with that text?

11            MR. SOMENSATTO: Objection to form.

12        A.    I have no reason to disagree with this

13  text.

14        Q.    Do you agree with it though?

15            MR. SOMENSATTO: Objection to form.

16            MR. INGOGLIA: You can take a minute to

17        read it.

18        A.    I'm not sure of the context.  I have no

19  reason not to agree with this.

20        Q.    Just to confirm, Dr. Voetmann --

21        A.    I agree.

22        Q.    You agree with the condition?

23        A.    I agree with this.

24        Q.    So just a question -- just a follow up to

25  what we were talking about a little earlier, Dr.

```
 1   Voetmann, is the only way an investor can determine
 2   whether or not information is relevant to conduct an
 3   after the fact analysis to determine whether there's
 4   any statistically significant movement of that
 5   company's stock price?
 6                MR. SOMENSATTO: Objection to form.
 7        A.   Can you repeat that?
 8        Q.   So let me repeat that.  Is the only way
 9   an investor could determine whether or not information
10   is relevant to his or her investment decision to
11   conduct an after the fact statistical analysis to
12   determine whether or not a release of such information
13   publicly causes a change in the stock price of that
14   company?
15                MR. SOMENSATTO: Objection to form.
16        A.   So to answer that question let me set it
17   up so in order to understand whether information such
18   as the Capital One transaction data should carry any
19   weight, as a reasonable investor I would and in this
20   case I studied hundreds of observations where I had
21   access to this data and one can then determine by
22   looking at whether or not by running a regression
23   whether or not that information that was not publicly
24   disclosed is related to the price response when the
25   information is disclosed so in that setting which is
```

1   not an event study as described in this chapter which

2   is different, but here when you are simply looking at

3   doing an analysis of whether that information is

4   relevant, I think you would have to as a reasonable

5   investor to understand how to put weight on that

6   information and as my analysis have shown historically

7   and through the data presented by the SEC, there is no

8   statistically significant relationship between the

9   information, the marginal information that defendants

10   had access to and the price responses when the market

11   learned about the actual sales.

12          Q.   So I think this is sort of a general

13   question.  We'll have time to talk about your report

14   later today, we'll get to that soon I'm sure, but

15   let's put aside the specifics of this case.  I'm

16   trying to figure out generally how a reasonable

17   investor needs to evaluate whether information is

18   material or not so with that I'd ask the court

19   reporter to read back the question and if I can just

20   get your answer to the question as asked.

21              (Record read.)

22              MR. SOMENSATTO: Objection, asked and

23          answered.

24          A.   I think it's fair to argue that it's my

25   opinion that one would perform an analysis similar to

1    what I have done in general terms in order to

2    understand whether certain information is value

3    relevant. You would conduct a study where you examine

4    the type of information you're looking at and you're

5    examining how the market responds when that sort of

6    information is released to the market.

7          Q.    Have you ever set forth this position in

8    any peer reviewed academic journal?

9          A.    Personally?

10          Q.    Yes, personally?

11          A.    Pretty much in all my academic studies

12    I've set forth this position.

13          Q.    Can you please identify to the best of

14    your recollection which publications specifically set

15    forth this proposition?

16          A.    Sure, if I have my resume I could tell

17    you more specifically, but if you look at my list of

18    publications almost every single one involves some

19    form of event study where we analyze in a number of

20    publications I analyze the price response to

21    announcements of acquisitions and so you're looking at

22    how the market responded to acquisitions in this post

23    setting response to acquisitions.  I've also studied

24    earnings announcements and how the market responded to

25    that.  I can't recall all my publications as I sit

1    here right now, but the majority of all my

2    publications have in one form or another involved an

3    event study which is following exactly the methodology

4    as described here in this chapter as I explained and

5    measuring the return the way you asked the question.

6                    MR. KELLY: Could you please mark this as

7          Exhibit 4.

8                    (Exhibit 4, Expert Rebuttal Report of

9          Torben Voetmann, marked for Identification.)

10          Q.    Dr. Voetmann, you have been handed what's

11    been marked as Exhibit 4.  Can you please identify

12    this document?

13          A.    It's the report I filed in this case.

14          Q.    So I wanted to help you be able to answer

15    my prior question.  This now contains your CV; is that

16    correct?

17          A.    It should.  Yes, it does.

18          Q.    Dr. Voetmann, could you please identify

19    those publications that set forth the proposition that

20    in order for an investor to determine whether

21    information is relevant to a decision to buy or

22    purchase securities that investor would need to

23    conduct an after the fact analysis to determine

24    whether the stock price moved upon the release of that

25    information?

1          A.    Sure, so I'm looking at page two of my
2    resume and I'm looking at the subtitle research
3    published in academic journals. The first one Returns
4    to Acquirers of Public and Subsidiary Targets, in here
5    we are measuring using an event study how acquirer's
6    price changed when they announced an acquisition of
7    public and subsidiary targets.
8              In the second article Skill Differences
9    in Corporate Acquisitions, I also did an event study
10   that measures the return when a company announces
11   acquisitions.
12             If you skip the next one, the third one
13   is A New Approach to Interpreting Long-Run Returns,
14   Applied to IPO and SEP Stocks, here I did a study also
15   an event study measuring how the market responded to
16   learning about IP0s and SEP stocks.
17             The fifth article Top Executive Turnover
18   is also an event study approach where we are looking
19   at how the market responded to the announcement of CEO
20   either being fired falsely or voluntary.
21             The next one is Demand Curves for
22   European Stocks Slopes Down Too is also an event study
23   about changes in the Dow Jones STOXX 50 index and how
24   the market responded to learning about changes in
25   composition of an index.

```
 1              I can keep going.  All these are articles
 2    that in one form or another is testing whether certain
 3    information is connected to a price response.
 4              Q.    I understand that, but I want to make
 5    sure I understand your testimony. Are you testifying
 6    that each one of these articles set forth the
 7    proposition that in order for a typical investor to
 8    know whether or not information is relevant to his or
 9    her investment decision, that that investor needs to
10    do an after the fact statistical analysis to determine
11    the price reaction of that security when the
12    information is released?
13                   MR. SOMENSATTO: Objection to form, asked
14         and answered.
15              A.    What I'm stating is as my opinion that a
16    reasonable investor would understand by having
17    examined historical events would be able to understand
18    how certain information might influence a price
19    response so all these studies that I just cited are
20    historical -- are studies that a reasonable investor
21    would be able to understand and evaluate when they are
22    look at the total mix of information whether they
23    think they want to buy or sell a security so I believe
24    it's fair for me to argue and say that it is my
25    opinion that a reasonable investor would again when
```

1  they are contextualizing the information relevant to

2  them in valuing the total mix of information, they

3  understand this type of research, they might

4  understand information beyond this research and

5  evaluate whether they want to buy or sell a security.

6        Q.    Did you say in any of these articles that

7  in order for investors to really determine what

8  information is relevant and useful and what

9  information isn't that they are required to do a

10  statistical analysis?

11              MR. SOMENSATTO: Objection to form, asked

12        and answered.

13        A.    Are you asking in these published papers?

14        Q.    Yes, in your published papers?

15        A.    I'm not talking in any of these papers

16  about a reasonable investor decision to buy or sell a

17  security. I'm examining information and how the market

18  responds to that information.

19        Q.    So in any of these papers that you

20  referred to earlier, are you talking about what an

21  investor needs to do to determine whether or not when

22  he or she is making decisions, you know, what

23  information they should be relying on and what

24  information they should not be relying on?

25              MR. SOMENSATTO: Objection to form, asked

1        and answered.

2        A.    I'm providing information about how the

3   market responds when certain types of information is

4   disclosed to the market and so a reasonable investor

5   may look at these studies when they are evaluating in

6   the future similar type of information being disclosed

7   to the market to understand how the market may respond

8   to that.

9              MR. KELLY: Let's take a brief break.

10             THE VIDEOGRAPHER: We are now off the

11        record at 11:06 a.m., October 16, 2015.

12             (Recess taken.)

13             THE VIDEOGRAPHER: This is tape two of

14        the deposition of Dr. Torben Voetmann. We are

15        now on the record at 11:18 a.m., October 16,

16        2015.

17        Q.    Welcome back, Dr. Voetmann.

18        A.    Thank you.

19        Q.    So Dr. Voetmann, earlier you were

20   testifying that your test for materiality involves

21   analysis of whether the stock price of a company moves

22   when that information is released to the market; do

23   you remember that testimony?

24             MR. SOMENSATTO: Objection to form. You

25        can answer.

1        A.    Yes.

2        Q.    How would you analyze whether information

3    is material with respect to a privately held company?

4        A.    Let me see if I understand the question.

5    You're asking me if I learned information about a

6    privately held company, how would I measure the impact

7    on that company?

8        Q.    Well, no, not how would you measure the

9    impact.  If you were to try to analyze whether or not

10   information regarding a company that was privately

11   held so there were not publicly traded securities

12   whose value would react to changes in the market

13   place, how would you go about evaluating whether or

14   not that information regarding the privately held

15   company was material?

16       A.    So if I was asked to evaluate

17   developments of that information in a privately held

18   company, I would perform a similar analysis.  I

19   wouldn't have access to market prices from observable

20   movements, but what I would be able to do depending on

21   the facts and circumstances of your question and the

22   company, but what you could do is you could analyze

23   and value the privately held company and then

24   determine whether that information would change your

25   evaluation of that company.

1        Q.    How would you go about doing an

2    evaluation of that company?

3        A.    So if I had access to collected

4    information about the company and I was able to, for

5    example, either look at estimating its cash flows and

6    I learned some information about revenues or expenses

7    or some sort of information, I could do an analysis to

8    see how that might effect the cash flows and hence the

9    value of the company.

10       Q.    So let's just follow up on that. Assume

11   that you got some revenue information about the

12   privately held company.  How would you use that

13   information to analyze whether or not it would effect

14   the value of the company?

15            MR. SOMENSATTO: Objection to form.

16       A.    I would presumably have built a valuation

17   model for that company and I would be able to

18   determine either through additional information that I

19   learned how that would impact my evaluation of that

20   business and that company.

21       Q.    So what type of model would you be using;

22   would it be a discounted cash flow type of valuation

23   model or a different type of model?

24            MR. SOMENSATTO: Objection to form.

25       A.    It could be a discounted cash flow model.

1  It could also be a multiples approach or some other

2  deviation of a discounted cash flow model.

3       Q.    If you would use a discounted cash flow

4  model, how would you analyze the effect of new revenue

5  information on the evaluation of that company?

6       A.    So assuming I had a discounted cash flow

7  model built, what I would be able to do is if I change

8  my expectation to forecasted revenues, for example, in

9  your question, I could see whether that additional

10  information on revenue, how that may or may not impact

11  the cash flows and ultimately the discounted value of

12  those cash flows.

13       Q.    Let's say, for instance, you learned that

14  revenue was going to exceed estimates by 50 percent.

15  How would that information be reflected in your

16  revised discounted cash flow model?

17            MR. SOMENSATTO: Objection to form.

18       A.    There is a lot of unknown in the

19  question, but if you just isolate and say revenue goes

20  up by 50 percent one year or every year or still

21  within some time period, one would then have to

22  reassess what's the impact on expenses, what's the

23  impact on its capital investments, what's the impact

24  on any factor that influences cash flows and then

25  assess the value of the company to determine whether

 1   or not that increase in revenue ultimately reflected

 2   or how much if any it changed the value of the

 3   privately held company or private company.

 4          Q.    You had testified earlier about generally

 5   that investors would like to have access to all sorts

 6   of information in order to determine whether or not

 7   that information is relevant to their decision to buy

 8   or sell a security.  Do you generally recall that

 9   testimony?

10          A.    Yes.

11          Q.    So can you please describe what analysis

12   a reasonable investor would do with the information

13   that's available to them to determine whether or not

14   what information is relevant and what information is

15   not relevant for their investment decisions?

16                MR. SOMENSATTO: Objection to form.

17          A.    In my opinion a reasonable investor would

18   examine the total mix of information.  It would

19   identify the factors that they deem relevant for

20   making a decision whether to buy or sell a security

21   and how they would evaluate each of those factors may

22   depend on the security they are looking at.  For some

23   securities, some information may be more relevant than

24   other securities.

25                In my opinion, the investor would

1    contextualize the content of each factor and determine

2    what they believe would be relevant in whether or not

3    they would buy or sell that security.

4         Q.    Are earnings relevant to an investor in

5    deciding whether or not to buy a security?

6         A.    Like revenue, earnings is another factor

7    that an investor would examine and determine whether

8    there's any weight on it in order to buy or sell a

9    security so yes, I would consider that one of the

10   factors in the total mix of information.

11        Q.    Let's take a step back. I think there's

12   two questions. There is the bucket of information and

13   there is the question of whether the information about

14   that bucket would be material information.  Let's just

15   initially focus on the bucket.  Earnings information,

16   period, is that something investors look at?

17             MR. SOMENSATTO: Objection to form.

18        A.    I think it's fair to say that an investor

19   would consider earnings for any company.

20        Q.    Cash flow information, is that something

21   investors look at?

22             MR. SOMENSATTO: Objection to form.

23        A.    It's another factor that an investor

24   would consider.

25        Q.    Revenue information, is that something

1    investors look at?

2                    MR. SOMENSATTO: Objection to form.

3         A.    It's also a factor they would consider,

4    but like earnings and cash flows, they would consider

5    all these factors.

6         Q.    Revenues are a component of earnings,

7    correct?

8         A.    I would probably say earnings is a

9    component of revenue, but you start at revenue and you

10   work your way down to earnings.

11        Q.    So if you were to write out an equation

12   of what earnings was, revenue would be one of the

13   factors that determines what earnings equals; is that

14   correct?

15                    MR. SOMENSATTO: Objection to form.

16        A.    Well, it might be a little simplistic.

17   You could write out an equation and say what's the

18   relationship between earnings and revenue or what's

19   the relationship between revenue and earnings so yes,

20   you have to connect the two.

21        Q.    If you were to try to categorize what

22   goes into earnings, different variables, what would it

23   be, earnings equals what?

24                    MR. SOMENSATTO: Objection to form.

25        A.    At a very high level earnings is equal to

1    revenue less expenses at the very basic form, but

2    there's other factors that one would consider such as

3    taxes.

4          Q.    So perhaps this is just diction; revenue

5    minus expenses equals earnings; is that correct?

6                MR. SOMENSATTO: Objection to form.

7          A.    In a very simplistic form, yes.

8          Q.    You would not categorize revenue as a

9    component of earnings in that regard?

10               MR. SOMENSATTO: Objection to form.

11         A.    They all connected so you can write

12   earnings, you know, is expenses plus revenue so plus

13   -- earnings is revenue minus expenses or you could say

14   earnings plus expenses is revenue.  You could move

15   them around the way you want.  It's a very simple

16   simplistic way of looking at it, but they are a

17   component of each other.

18         Q.    When the CEO wants to know from the CFO

19   what the earnings number is, as a mathematical fashion

20   does the company take revenue and subtract expenses?

21               MR. SOMENSATTO: Objection.

22         Q.    Or does it calculate it in some other

23   way?

24               MR. SOMENSATTO: Objection to form.

25         A.    If I understood the question if a CFO is

1  looking at earnings or the CEO is looking at earnings,

2  I believe they would consider looking at the income

3  statement and the income statement would be starting

4  with revenues and subtracting out various types of

5  costs and expenses to get to a level of earnings.

6      Q.   If you were to write an equation for cash

7  flow, can you please spell that out for me?

8          MR. SOMENSATTO: Objection to form.

9      A.   So cash flow starts with earnings and you

10 add back non cash items and you also account for after

11 tax financing costs to get to a measure of cash flow.

12     Q.   Just so I understand, you subtract after

13 tax financing costs?

14     A.   Yes, as well as changes in capital

15 expenditures.

16     Q.   So, Dr. Voetmann, you have taken algebra,

17 right?

18     A.   I believe I have, yes.

19     Q.   So in your equation for cash flow, you

20 can easily substitute revenue minus expenses for

21 earnings; is that right?

22     A.   Yeah, no, that's mathematically correct.

23     Q.   So revenues is also a component in cash

24 flow; is that correct?

25          MR. SOMENSATTO: Objection to form.

1     A.    It is also a component to the extent that
2 you choose to measure earnings by simply taking
3 revenue less expenses.
4     Q.    Dr. Voetmann, that's how you choose to
5 measure earnings, correct?
6          MR. SOMENSATTO: Objection to form.
7     A.    I'm not sure -- I choose to measure cash
8 flows as starting with earnings, but from a conceptual
9 standpoint it really is indifferent whether you start
10 with earnings or some other measure.  You are deriving
11 the right cash flows, you can derive the correct cash
12 flows the way you're approaching it or the way I'm
13 approaching it.
14     Q.    Your definition of earnings is revenue
15 minus expenses; is that correct?
16     A.    As I stated at a very high level
17 conceptually that's correct.
18     Q.    Dr. Voetmann, you use the term abnormal
19 returns in your report. What are abnormal returns?
20     A.    Abnormal returns is when you measure the
21 price impact, but accounting for any movements in the
22 market or industry.
23     Q.    Is the term abnormal returns associated
24 with event studies?
25     A.    Yes.

1          Q.    Can you calculate abnormal returns
2    without doing an event study?
3          A.    I mean you can measure abnormal returns,
4    but whether or not you are conducting an event study
5    might be two different things.
6          Q.    Have you ever heard of the term abnormal
7    returns used outside of the event study context?
8          A.    I'm trying to think.  The traditional
9    definition of abnormal returns is an event study
10   measure, but I have seen the use of abnormal returns
11   that's not necessarily focusing on an event study the
12   way I have done it, for example, in the public papers
13   I've published so I think the answer would be yes, I
14   have seen it outside of event studies.
15         Q.    Could you please identify what articles
16   or journals have set forth conclusions -- withdrawn.
17   Can you identify for me any publications that refer to
18   abnormal returns outside of the context of an event
19   study?
20              MR. SOMENSATTO: Objection to form.
21         A.    So what I'm recalling right now and I'm
22   not recalling perfectly here as something I can
23   provide, but in the accounting literature there's a
24   number of studies that's done where they are trying to
25   measure abnormal returns in a setting like earnings

1    response models.  There is also a terminology called I

2    refer to as a BBHL model.  There's a number of

3    techniques that in the accounting literature where

4    they are using what I consider an abnormal return, but

5    it may not be in the setting of an event study, but

6    they are still measuring the return on a company net

7    of market and industry or some sort of accounting for

8    market movements.

9         Q.    Can you identify the papers you just

10   referred to?

11        A.    As I sit here right now I cannot give you

12   the titles of those papers.

13        Q.    In those papers did they specifically use

14   the term abnormal returns?

15        A.    Actually if I may refer to my Exhibit 4.

16        Q.    Feel free to.

17        A.    I think an example might be the article

18   that I cited on my Appendix B, there's an article

19   cited by Beaver, Cornell, Landsman and Stubben, The

20   Impact of Analysts Forecast Errors and Forecast

21   Revisions on Stock Prices in the Journal of Business

22   Finance and Accounting.  I consider that a finance and

23   accounting paper where they are using I believe the

24   abnormal term term to analyzing the impact of forecast

25   errors, but as I sit here right now I can't recall.  I

 1   don't believe that they are referring to it as an
 2   convenient study, but a study measuring the impacts on
 3   forecast errors from analysts so that's an example and
 4   there's a number of examples like that where they are
 5   using abnormal returns, but it may not be in the
 6   classic sense of an event study, but I would have to
 7   read the paper again.  I don't recall the paper as I
 8   sit here right now.
 9           Q.    Just to make sure I understand your
10   testimony, Dr. Voetmann, you're testifying that the
11   Beaver Cornell Landsman article entitled The Impact of
12   Analysts' Forecast Errors and Forecast Revisions on
13   Stock Prices refers to abnormal returns without doing
14   an event study?
15               MR. SOMENSATTO: Objection to form.
16           A.    What I'm saying is I don't recall the
17   entirety of that article right now, but it's my
18   understanding that they are measuring abnormal
19   returns, but they are not conducting an event study if
20   you are referring to an event study the way you refer
21   to Exhibit 3, chapter 17A so there might be some gray
22   areas of what constitutes an event study, but they are
23   using certainly the terminology of abnormal returns
24   and in fact the paper cited by Graham as well in his
25   report because I'm also citing the Fairfield paper

 1   right below the Beaver paper as well as the Asquith
 2   paper and the Rees paper, these are all accounting
 3   related papers measuring earning surprises and
 4   studying those and they are using the phrase abnormal
 5   returns in their study as well.  Whether that
 6   constitutes an event study, I'm not quite sure, but
 7   again these are papers that I cite and Graham cited as
 8   well that uses abnormal returns.
 9        Q.    Apart from the articles you just
10   referenced, are there any other publications that
11   you're aware of that use the term abnormal returns
12   outside of the event study context?
13        A.    As I think I said earlier, there is a
14   number of papers in this field that I'm aware of in
15   the field of accounting where they are using abnormal
16   returns when they are looking at how accounting
17   variables effects or have value relevance.  I can't
18   cite all these papers right now, but I believe there's
19   a number of papers there that uses the term abnormal
20   return.
21        Q.    Can you identify any other examples that
22   you have not already identified?
23             MR. SOMENSATTO: Objection to form, asked
24        and answered.
25        A.    As I sit here right now, I don't think I

```
 1   can recall any.  Event studies is probably the most --
 2   one of the most commonly used techniques financial
 3   economists are using when studying how information may
 4   impact securities.
 5          Q.    Dr. Voetmann, please turn your attention
 6   to Exhibit 4?
 7          A.    Yes.
 8          Q.    Does your report contain a complete
 9   statement of all opinions you will express and the
10   basis and reasons for them?
11                MR. SOMENSATTO: Objection to form.
12          A.    I believe it does.
13          Q.    Does your report contain any exhibits
14   that will be used to summarize or support your
15   opinions?
16          A.    Maybe you have to educate me in what
17   context you mean.  These exhibits that I've included
18   in my report summarizes my opinion.
19          Q.    Are there any exhibits that you will use
20   to summarize or support your opinions that are not set
21   forth in your report?
22                MR. SOMENSATTO: Objection to form.
23          A.    As I sit here right now, I have not
24   developed or prepared any additional exhibits that may
25   or could be used to summarize my opinion.
```

1          Q.    Please turn to Appendix A?

2          A.    Sure.

3          Q.    Is Appendix A complete and accurate as

4    you sit here today?  Let me withdraw that first.  What

5    is Appendix A?

6          A.    It's a copy of my resume.

7          Q.    Is Appendix A complete and accurate as

8    you sit here today?

9          A.    I believe it is.

10         Q.    Does Appendix A include your

11   qualifications including a list of all publications

12   you authored in the previous ten years?

13         A.    I believe it does.

14         Q.    In any of your publications have you

15   written about revenues?

16         A.    I believe I have.

17         Q.    Can you please identify which

18   publications you have written about revenues in?

19         A.    Some of these papers go back a while so I

20   have to recall.  To the extent it's very possible that

21   in the -- if you look at page 2, the Discussion of the

22   Pre and Post-Tax Discount Rates, we did some examples

23   of simple cash flows that may have referred to

24   revenues, but it may not.  I can't recall it right now

25   if revenue was there, but that would be one paper that

1   possibly included revenue discussion, but it was

2   focused on cash flows.  Another paper or publication I

3   have done is if you look at page 3, Delaware Appraisal

4   Case Reaffirms Valuation Premium for S Corporations,

5   we did some work here and published on how taxation of

6   S Corp.'s impacted the value and we built a DCF model

7   for that so that would have likely included revenues

8   as well.

9           It's possible in the Avoiding Pitfalls in

10  the Litigation of Business Valuation this is further

11  down on page 3 that we also addressed some concerns

12  about revenues or included discussion of revenues so

13  in terms of publications, those are publications that

14  may include revenues, but in addition to that, I have

15  taught grad and undergraduate programs for over ten

16  years and that all addresses revenue at great length.

17      Q.   In the three publications that you just

18  referenced, do you recall what specifically you wrote

19  about revenue?

20      A.   I don't recall that right now.  It was

21  not the focus of the publications.

22      Q.   In your academic work, what do you recall

23  saying about revenue to your classes?

24           MR. SOMENSATTO: Objection to form.

25      A.   That's a very broad question.  I don't

1   know if you want to narrow it or I can explain.

2        Q.    Let me start this way. When you first --

3   in which classes would you talk about revenue?

4        A.    If you look at page 1, these are MBA and

5   grad classes that I'm teaching currently.  In each of

6   those three; managerial finance, capital market and

7   investment banking and corporate finance, all three go

8   at great length into examining revenues, valuing

9   revenues, building DCFs, multiples that all derives

10  from including revenues.  If you go to page 2, I

11  taught a number of years at The Wharton School in

12  corporate finance and corporate valuation. All these

13  courses there as well involve extensive discussion of

14  revenues and valuation concepts and in addition to

15  that I taught some executive programs at New York

16  Institute of Finance and Financial Modeling World.

17  Both places was programs to executives about how to

18  build valuation models and again extensive discussion

19  about revenues.

20       Q.    What role do revenues play in evaluation

21  models?

22            MR. SOMENSATTO: Objection to form.

23       A.    Again, it's a broad question what role.

24  Are you thinking about a DCF, for example?

25       Q.    When you teach your students how to do an

 1   valuation model of a company, what type of model do
 2   you refer to typically?
 3          A.    So the first part of these programs is
 4   really for educating the students and teaching
 5   students about how you evaluate an income statement
 6   and a large part of that is to understand all the
 7   different line items of an income statement which
 8   typically starts with revenue and you work your way
 9   down through expenses to earnings.
10          Q.    In terms of your teaching experience, are
11   there any items listed on Appendix A in which you do
12   not discuss revenue?
13          A.    There is only one which actually
14   partially might touch on revenues as well.  I did an
15   independent study which was an independent study done
16   by a graduate student at Wharton on valuation of
17   football teams in the U.S. so it's been a while, a
18   long time ago.  I suspect it did cover of course how
19   they would generate revenue, but it was an independent
20   study so it was not a course where I taught the
21   student.  He had already taken the valuation course
22   that I taught so that was an independent study, but
23   that -- and the last one actually at Copenhagen
24   Business School I taught a seminar on finance which
25   was more about various topics of finance not specific

1    to revenue so those are the only two I can think of.

2              My core background is in corporate

3    finance and valuation.  My graduate work is in that

4    field and that naturally leads to a discussion of

5    among other things revenue.

6         Q.    Does Appendix A contain a list of all

7    other cases in which during the previous four years

8    you testified as an expert at trial or by deposition?

9         A.    Yes, page 8.

10        Q.    That first item United States of America

11   versus Wells Fargo Bank, N.A., can you please describe

12   the opinion offered in that case?

13             MR. SOMENSATTO: Objection to form.

14        A.    It's an on-going case so I'm not sure

15   what my role is if I'm allowed to talk about the

16   specifics of the case.  In general terms it was not

17   addressing revenues.

18        Q.    Is there a confidentiality order with

19   respect to your opinion in that case?

20        A.    That's why I'm hesitant because I believe

21   there was.

22        Q.    Obviously until we get certainty on that

23   I will not press further, but I think maybe there is a

24   way to get clarity during a break.  Were you

25   representing the United States of America or Wells

1   Fargo or one of the other defendants?

2        A.    Representing the United States of

3   America.

4        Q.    Was that the Department of Justice that

5   you were representing?

6        A.    Yes.

7        Q.    Is that a civil or criminal case?  It's

8   probably a civil case?

9        A.    Civil case.

10       Q.    There is no court.  What United States

11   Attorney's Office was it?

12       A.    Right here in the Southern District.

13       Q.    Can you please describe the opinion you

14   offered in the Long v Morgan Stanley Trust case?

15       A.    Sure. This was a case where I represented

16   the Long family.  This was a case involving a trust

17   that the Long family had established which included

18   securities of Manulife, a Canadian company and I think

19   John Hancock and my role was to re-evaluate the value

20   of the trust because there was an issue with whether

21   or not these securities specifically the Manulife

22   securities why they had suddenly disappeared from the

23   account statements that the Long family was receiving

24   so that was a dispute about the value of those

25   specific securities.

 1          Q.    Were the securities publicly traded?
 2          A.    Yes and that's the exact dispute.  It was
 3   an insurance company and in 2000 they went from a
 4   policyholder company to a public trading company so it
 5   was in that transition there was a -- for some reason
 6   the transition where you now had securities, those
 7   securities were not transmitted to the account
 8   statements and so the Long family didn't -- had to
 9   re-evaluate what was the value of the account or the
10   trust if we in fact had included those securities as
11   they went through from a policy company to a publicly
12   traded company.
13          Q.    In analyzing the value of the securities,
14   did you use revenue information at all?
15          A.    No.
16          Q.    The next matter, the Matter of the
17   Arbitration of Tom Patterson v GEICO, could you
18   describe the opinion you offered in that matter?
19          A.    Sure. This is a valuation of a tech
20   company founded and started by Tom Patterson and I was
21   asked to do a valuation of that tech company.
22          Q.    In doing that evaluation, did you use
23   revenue information?
24          A.    I considered revenue, the stock revenues
25   as well as other metrics for valuation.

1          Q.    Did you use a discounted cash flow model
2    or some other model?
3          A.    Some other model.
4          Q.    What type of model?
5          A.    It was a more multiples approach as a
6    tech company start up.
7          Q.    In the Charles P. Haggarty and Gina M.
8    Haggarty v Wells Fargo Bank matter, could you please
9    describe the opinion you offered in that matter?
10         A.    Sure. I offered an opinion on cost of
11   funds.  It was a short opinion on just how to read and
12   understanding the terminology of cost of funds.
13         Q.    When you say cost of funds, could you
14   please define that?
15         A.    Cost of funds related to mortgage backed
16   securities.
17         Q.    Could you provide a little more
18   information; is cost of funds a cost to borrow funds
19   or is it some other cost?
20         A.    It's the cost of borrowing funds so there
21   were some indices that measures the cost of borrowing
22   funds so it was just a short declaration on providing
23   some data on those indices on cost of funds.
24         Q.    Could you please describe the opinion
25   offered in the Munos v China Expert Technology case?

1          A.    Sure, so here I represented the China

2    Expert Technology and it was a securities class

3    action.  I was engaged to respond to a class

4    certification report.

5          Q.    Was the issue that was the subject of

6    your opinion whether or not the class should be

7    certified in that case?

8          A.    To some extent, yes.  My assignment was

9    to determine whether there was sufficient evidence to

10   suggest that the China Expert Technology company

11   whether its security was trading in an efficient

12   market so in that case I testified about event

13   studies.

14         Q.    I can assume, but did your opinion in

15   that case support the fact that the securities were

16   trading in an efficient market or refute that?

17         A.    I didn't come up with an affirmative

18   opinion.  I was responding to another expert's report

19   suggesting that it was trading in an efficient market.

20         Q.    Dr. Voetmann, please describe your

21   experience in insider trading cases?

22         A.    This is my first experience as an expert

23   witness filing a report as an expert witness in an

24   insider trading case.  During my about 15 years in

25   litigation consulting, I have consulted on a number of

1   insider trading cases or assisted colleagues of mine

2   working on insider trading cases.

3        Q.    Can you please identify the cases that

4   you are able to identify in which you have either

5   testified in your consulting experience in insider

6   trading cases?

7        A.    So I don't have any testifying

8   experience. There is nothing to identify there.  The

9   only one that comes to mind, I'm not sure I can

10  identify.  I guess I can find out at a break.

11       Q.    It's fair, but apart from that one that

12  you have questions about, there are no other cases in

13  which you consulted on insider trading cases?

14       A.    No other specific case comes to mind

15  where I can identify.

16            MR. KELLY: This is 5.

17            (Exhibit 5, Document, marked for

18       Identification.)

19       Q.    Dr. Voetmann, you have been handed what's

20  been marked as Exhibit 5.  Could you please identify

21  this document?

22       A.    It appears to be the bio that's on The

23  Brattle Group's website of me.

24       Q.    Dr. Voetmann, why is the bio on The

25  Brattle Group's website different than what's set

1  forth in your Exhibit A?

2         A.    Exhibit A is my resume and this is just a

3  bio summarizing my resume.

4         Q.    You see, Dr. Voetmann, there is a section

5  on your bio labeled information materiality on the

6  bottom of the first page and top of the second page,

7  do you see that?

8         A.    Yes.

9         Q.    You see your bio states event studies are

10  commonly used to evaluate the materiality of non

11  public information once it's disseminated into the

12  market.  You see that?

13         A.    Yes.

14         Q.    Do you agree with that statement?

15         A.    I wrote the statement so yes.

16         Q.    Dr. Voetmann, did you use event studies

17  in your report?

18         A.    In this report I'm using a form of event

19  study in that I'm measuring abnormal returns and I'm

20  doing a cross section regression across events to

21  identify whether the information in each of those

22  events whether you can conclude that the marginal

23  information from the Capital One transaction data and

24  the price impact would lead you to conclude there's a

25  significant relationship and based on my analysis

1    there is no statistically significant relationship
2    between the information that the defendant had access
3    to.
4           Q.   Sorry, I'm a little confused. I thought
5    you had and this will speak for itself, I'm not trying
6    to say what you testified to. I thought earlier you
7    had testified that you did not do an event study in
8    connection with the case so I'm just trying to do a
9    couple follow up questions to get an answer and try
10   and get some clarity here.
11              If you were to write about the analysis
12   that you did in this matter in a peer reviewed
13   academic journal, would you describe it as an event
14   study?
15          A.   I would and I don't think I testified
16   prior otherwise I misstated it that I didn't do an
17   event study. I said I didn't do a traditional event
18   study in the form that was explained in my published
19   articles.  It's an event study to the extent that we
20   are trying to measure insider information and trying
21   to observe whether or not when that information is
22   revealed to the market whether or not that leads to a
23   significant price change so in that setting I think
24   that still constitutes -- people would argue that that
25   still constitutes a form of an event study.

1        Q.    Who decides whether or not a study is an

2   event study or not?

3              MR. SOMENSATTO: Objection to form.

4        A.    I don't know if there is a body that

5   decides, but certainly when as an academic you are

6   publishing articles, it goes through a very rigorous

7   peer review process.

8        Q.    The type of analysis that you performed

9   in this case, are there any publications or articles

10  that you can point to in which you ran this analysis

11  and you described it as an event study?

12       A.    The publications that come close to what

13  I have done and are similar to what I have done among

14  others the Beaver article that I mentioned on my

15  Appendix B plus the articles that Mr. Graham cited in

16  his report as well.  All these articles that -- going

17  to Appendix B, all these articles that I cite from the

18  Cornell Bradford Landsman paper to the Asquith paper,

19  the Rees paper or the Beaver paper, the Fairfield

20  paper, all these papers the ones including the ones

21  that Graham cites are all using a framework similar to

22  what I have done and not a framework or the framework

23  that Mr. Graham put forward.

24       Q.    I think you misunderstood my question.

25  Dr. Voetmann, I was asking in terms of your

1   publications whether you used the methodology set
2   forth in your report and you described it as an event
3   study, has that happened?
4           A.    I have not published -- so the analysis
5   in this report is looking at revenue surprises and
6   study revenue surprises and if you had access to
7   revenue information would a revenue surprise cause a
8   price change and so if you had access to information
9   as an investor, would you consider that relevant
10  information.  The publications I have done are similar
11  in tenor, but they are not studies of revenue
12  surprises.  I have studied earning surprises and I
13  have studied disclosure of other relevant information
14  to the market such as acquisitions.
15          Q.    Let's put aside specifically the
16  variables you're studying because that's the beauty
17  about regression and statistics, right, you could pick
18  whatever variables you want to determine the
19  relationship with and run those tests, but so let's
20  just put that aside for a second.
21              In terms of the actual analysis that you
22  ran, has that been described as an event study in any
23  of your publications?
24              MR. SOMENSATTO: Objection to form, asked
25          and answered.

1          A.    I believe you can argue it has because

2     the framework in which I'm operating is a reliable

3     methodology that follows the standards that -- the

4     papers I just cited put forward.

5          Q.    Which articles describe the analysis as

6     set forth in your report as an event study?

7                    MR. SOMENSATTO: Objection to form.

8          A.    So again, I think we have to be careful

9     about defining what an event study is.  There are many

10    different types of event studies.  An event study to

11    me is a study of looking at specific information and

12    trying to determine whether that information is

13    relevant to an investor by whether or not they would

14    if they had this information would make the investment

15    decision and so what an event study can do is it can

16    see whether when the market learns about certain

17    pieces of information whether the price responds to it

18    and so what I have set forth here in my report is an

19    analogy to that. You are looking at revenue surprises.

20               There's a big difference between doing an

21    ex-post study versus an ex-anti study and what we are

22    looking at here what is the ex-anti information about

23    revenue surprises, in other words, if I had access to

24    the transaction data prior to the announcement would I

25    believe I could use that to make an investment

1    decision and when I look at what actually happened in

2    the market, how the market actually responds to it

3    similar to when you do an event study, there is no

4    statistically significant relationship between the

5    price response, price impact and the transaction data.

6          Q.    Dr. Voetmann, I think you lost track of

7    the question.  It's a pretty simple one and I'll

8    modify it slightly to try to take some ambiguity away.

9    What articles or publications have you used the

10   methodology as set forth in your report in this case

11   and you used the term "event study" to describe that

12   methodology?

13              MR. SOMENSATTO: Objection to form, asked

14        and answered.

15        A.    I might repeat myself, but the articles

16   that I cited as well as the articles cited by Graham,

17   all articles that are looking at surprises and

18   connecting revenue or earning surprises to price

19   responses so each of those articles are in effect

20   doing a similar study.  The difference is each of

21   these articles similar to me and my study is focusing

22   on does this information tell something about how the

23   market responds where Graham is not connecting those

24   dots, he's not connecting the information to a price

25   response, he's connecting the surprises to the actual

1    earnings which is a very different regression and a
2    very different study and not what you see in these
3    articles that I just cited.
4              MR. KELLY: Can you please read back the
5         question.  Please tries to listen to the
6         question.
7              (Record read.)
8         Q.   Please describe the articles and
9    methodologies that you have written that used the
10   methodology that you use in your report and describe
11   that methodology as an "event study"?
12        A.   Could you read it back?
13             (Record read.)
14        Q.   I don't think that's what I asked.
15   Dr. Voetmann, please identify the articles or
16   publications in which you've used the methodology set
17   forth in your report in this case and you describe
18   that methodology as a "event study"?
19        A.   So make sure I get the question right,
20   you are asking what articles I have published where I
21   have used this methodology or a similar methodology?
22        Q.   I'm asking about the articles that you've
23   published?
24        A.   That I've personally published so if I
25   look at my resume, Appendix A, page 2 so you need to

 1   break down my analysis in this report.  My analysis in

 2   this report is based on the abnormal returns and

 3   surprises in this case because we are addressing

 4   revenues so revenue surprises.  Except for one of the

 5   articles that I published in peer review journals, I'm

 6   also using abnormal returns.  Except for two.  I'm

 7   using abnormal returns as well and moreover in an

 8   unpublished working paper I examined earnings

 9   announcements so to that extent I'm looking at earning

10   surprises, granted it's not revenue surprises, but

11   earnings announcements so the study I put forward in

12   my report is looking at what is the relationship

13   between abnormal returns as I've used extensively in

14   my published articles relative to surprises around

15   earnings announcements and I've studied prior earnings

16   announcements before.

17             Again, just looking at what I've

18   published, but besides what I've published, I have

19   done many cases over the last 15 years as a consultant

20   involving research around surprises particularly

21   earning surprises.

22        Q.    Let's go back to Exhibit 5.  You see the

23   section on the second page entitled insider trading?

24        A.    I do.

25        Q.    You write that insider trading cases

1  remain a significant concern for public companies as

2  well as their executives, board members and other

3  insiders, do you see that?

4        A.    Yes.

5        Q.    Do you agree with that statement?

6        A.    Yes.

7        Q.    Do you think that -- withdrawn.  Why are

8  insider trading cases a significant concern for public

9  companies?

10       A.    I think anyone who runs a public company

11  would be concerned about employees that are using

12  inside information to trade and so I think just as a

13  general matter it's a concern if you engage in insider

14  trading.

15       Q.    Do you see in the next sentence it says

16  that as part of your cases you've analyzed patterns of

17  trading behavior?

18       A.    Yes.

19       Q.    Just generally how would the pattern of

20  trading behavior be indicative or not indicative of

21  insider trading?

22             MR. SOMENSATTO: Objection to form.

23       A.    So here I'm referring to a consulting --

24  an undisclosed consulting case, multiple cases

25  actually, where I've been engaged by a board to

```
 1   analyze -- it's a publicly traded company and its
 2   board asked me to analyze its company stock for
 3   trading behaviors around certain pieces of information
 4   so here's an example where the board was concerned
 5   about potentially that inside information might have
 6   leaked to the market and they wanted to see whether
 7   that information was observable in the market through
 8   the behavior of the trading that occurred.
 9        Q.    Could you just describe a little more in
10   detail so to the extent that the information was
11   shared with the market, would you expect there to be
12   trading around the dissemination of that information
13   or a change in trading -- withdrawn.
14              Let's take a step back and talk about
15   just generally right now what type of pattern would
16   you expect to see when material non public information
17   is shared with someone?
18              MR. SOMENSATTO: Objection to form.
19        A.    So it depends on what information has
20   been disclosed, non public information so in this
21   specific instance here the information the board
22   believed was material was highly relevant such that
23   one might consider that information to be important
24   enough that you might make purchase and sales
25   decisions around it so in that instance my analysis
```

1    was to see if we observe trading volume and price
2    changes around the potential release of that
3    information.  We didn't find any, but that's what we
4    looked at.
5         Q.    Just to follow up on that.  To the extent
6    you know information you shared from one person to
7    another and -- withdrawn.
8              Let's say that you know information was
9    obtained by one individual and shortly after obtaining
10   that information they trade on it.  Is that more
11   indicative of insider trading or less indicative of
12   insider trading?
13             MR. SOMENSATTO: Objection to form.
14        A.    I think you still have to do an analysis
15   to determine -- the first step is to determine whether
16   in fact they traded -- step back.  First you have to
17   evaluate whether the information that they obtained
18   was in fact relevant information that would lead one
19   to consider that they would change the price of a
20   security.
21             Second, one would have to evaluate
22   whether that individual looked at a host of other
23   factors to rule out whether they traded on that
24   specific information or traded on some other type of
25   information before one can ascertain whether they are

1  actually trading on what is in fact insider trading
2  based on the non public information.
3        Q.    Is someone trading on information --
4  withdrawn.  Let's do the reverse of that.  Let's just
5  say someone gains access to information and that
6  person doesn't trade on it.  Is that proof that the
7  information was not material non public information?
8            MR. SOMENSATTO: Objection to form.
9        A.    No, I don't think that's sufficient
10  information to make that conclusion.
11       Q.    Why is that?
12       A.    One would have to study and examine
13  whether or not an individual trades on it one would
14  still have to examine and study whether the
15  information was material. Just because you trade on it
16  or didn't trade on it is not sufficient to say that
17  it's material.
18       Q.    Just to follow up then you would submit
19  that there needs to be a study as to whether or not
20  the disclosure of that information would impact the
21  price of the stock; is that fair to say?
22       A.    Yeah, I would conduct a study to see
23  whether that information would be relevant or an
24  investor would put enough weight on it to make his or
25  her decision to buy a security and we observe a price

1    change.

2        Q.   Could you please turn to Appendix B of

3    your report?

4             MR. SOMENSATTO: Are we at a good place

5        for a break?

6             MR. KELLY: We can take a short break.  I

7        have got a lot to go so let's take a short

8        break now.

9             THE VIDEOGRAPHER: We are now off the

10       record at 12:20 p.m., October 16, 2015.

11            (Luncheon recess taken at 12:20 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              A F T E R N O O N   S E S S I O N
 2                   (Time Noted: 1:00 p.m.)
 3
 4   T O R B E N   V O E T M A N N, resumed and testified
 5        as follows:
 6
 7   CONTINUED EXAMINATION
 8   BY MR KELLY:
 9              THE VIDEOGRAPHER: This is tape three of
10        the deposition of Dr. Torben Voetmann.  We are
11        now on the record at 1:02 p.m., October 16,
12        2015.
13        Q.    Welcome back, Dr. Voetmann.
14        A.    Thank you.
15        Q.    Could you please turn to Appendix B of
16   your report.  Dr. Voetmann, is Appendix B complete and
17   accurate as you sit here today?
18        A.    I believe so based on the materials I've
19   been provided.
20        Q.    This lists the documents you relied upon
21   in forming your opinion.  Were there any documents
22   that you considered in forming your opinion that are
23   not listed in Appendix B?
24        A.    That's possible that the produced
25   documents in the middle of the page, there was a lot
```

1    of materials in those files and some of them were not

2    necessarily cited in my report or relied on to

3    generate the Capital One data.  I can't recall right

4    now every single document in that production, but

5    there's a number of documents in that production.

6            Q.    That's fair.  I think my question is

7    somewhat different though.  Are there any materials or

8    documents that you considered that are not listed on a

9    Appendix B?

10           A.    No, I don't believe so.

11                 MR. KELLY: Exhibit 6.

12                 (Exhibit 6, Complaint, marked for

13           Identification.)

14           Q.    Dr. Voetmann, you have been handed what's

15   been marked as Exhibit 6.  Could you please identify

16   this document?

17           A.    It's the Complaint for the case that I've

18   been provided.  It's at least the document seems to be

19   the same as what I was provided.

20           Q.    Can you please summarize the Commission's

21   allegations in this action?

22                 MR. SOMENSATTO: Objection to form.

23           A.    At a high level the allegation as I

24   understand it is the defendants Bon Huang and Nan

25   Huang committed insider trading by relying on

1    proprietary information from Capital One credit cards

2    transactions data for a number of companies and I

3    believe at a high level the allegation is that they

4    considered that information and made a number of

5    transactions or purchases and buy and sell

6    transactions in a number of publicly traded companies.

7         Q.    Do you know approximately how many

8    transactions they engaged in that are alleged to be

9    considered insider trading?

10              MR. SOMENSATTO: Objection to form.

11        A.    So I recall in the Cain and Graham report

12   they talk about a number of transactions and maybe in

13   here as well, but they traded a number of times in

14   approximately a couple of hundred publicly traded

15   companies.

16        Q.    Dr. Voetmann, is there any particular

17   portion of the Complaint that you relied upon in

18   forming your opinions?

19              MR. SOMENSATTO: Objection to form.

20        A.    No.  Well, I relied on the entire

21   Complaint, but what it really provided me for my

22   opinion which as described in paragraph one of my

23   report was to rebut and critique Mr. Graham's analysis

24   and Dr. Cain I used the Complaint to get an

25   understanding of the allegation and also get a little

1    background on the case.

2           Q.    You can put that exhibit to the side.

3    Dr. Voetmann, could you please identify all

4    communications you have had with defense counsel that

5    relate to compensation for your study or testimony?

6           A.    I've had a handful, maybe a couple of

7    conversations.  Initially when we get hired I explain

8    how The Brattle Group is compensated for my work and

9    we also had of course -- that may be the extent of it.

10   Might have been another exchange or two, but it was

11   just about that initial contact we had.

12          Q.    Was there any negotiation over the price

13   of your engagement in this matter?

14          A.    There was negotiation in terms of just

15   understanding the amount of work that's involved in

16   conducting a study in the limited time frame we had

17   available understanding the amount of time it takes to

18   conduct such study.

19          Q.    Any negotiation of The Brattle Group's

20   typical rates?

21          A.    No, we offered the same rate as we do any

22   other client on the hourly rate.

23          Q.    Can you please identify all

24   communications you've had with defense counsel that

25   identify facts or data that defense counsel provided

1   and that you considered in forming any opinions

2   expressed?

3        A.   It's very limited.  Counsel provided to

4   me if you look at the first page of Appendix B counsel

5   provided me with the produced documents or a zip file

6   whatever format it's coming in of the Cain and Graham

7   production so that was the exchange we had of data.

8   In addition to that, counsel provided me with the

9   legal pleadings as well as the expert report.  Other

10  than that, that's pretty much the extent of what they

11  provided and pretty much the extent of our discussion.

12  They just provided it to us and we did our analysis.

13       Q.   Could you please identify assumptions

14  that defense counsel provided and that you relied on

15  in forming your opinions?

16       A.   They didn't provide any assumptions.

17       Q.   Turn to paragraph 6 of your report,

18  please.  I see The Brattle Group is being compensated

19  for your work at an hourly rate of $550 an hour; is

20  that correct?

21       A.   That's my hourly rate, yes.

22       Q.   As of today, approximately how many hours

23  have you billed to this matter?

24       A.   I don't recall how many hours I billed as

25  of today.  I spent some time over the last couple of

```
 1    weeks on this case, but this has been a very short
 2    time frame.
 3          Q.    Did you spend more than ten hours working
 4    on this case?
 5          A.    I did.
 6          Q.    Did you spend more than 25 hours working
 7    on this case?
 8          A.    I did.  I probably did over a couple of
 9    weeks, yeah, more than 25.
10          Q.    Have you spent more than 50 hours working
11    on this case?
12          A.    That's probably the amount of time I
13    spent, but I would have to check.  That's not
14    unreasonable to believe it's in that -- approximately
15    that neighborhood.
16                MR. KELLY: Could you mark that Exhibit 7
17          and 8.
18                (Exhibit 7, Expert Report of Stephen
19          Graham, marked for Identification.)
20                (Exhibit 8, Expert Report of Matthew
21          Cain, marked for Identification.)
22          Q.    Dr. Voetmann, you have been handed what's
23    been marked as Exhibits 7 and 8.  Can you please
24    identify those documents?
25          A.    So Exhibit 7 is a report by Steven Graham
```

1    and Exhibit 8 is the report by Dr. Cain.

2         Q.    Approximately how much time did you spend

3    reviewing Mr. Graham's expert report?

4         A.    I can't recall a specific -- I didn't

5    count how many hours I spent reading these two

6    documents.  I received those two documents, I reviewed

7    them and I probably reviewed them a few times, a

8    number of times subsequent to first receiving them.

9         Q.    Prior to issuing your report, did you

10   review Mr. Graham's expert report for more than an

11   hour?

12        A.    For sure, yes.

13        Q.    More than five hours?

14        A.    Yes.  Like last night I reviewed it

15   again, I read it again.

16        Q.    Let's focus first on the amount of time

17   you spent reviewing Mr. Graham's report prior to

18   issuing your expert report.  Let's start here.  Prior

19   to issuing your report, did you review Mr. Graham's

20   expert report?

21        A.    Yes.

22        Q.    Approximately how much time did you spend

23   reviewing Mr. Graham's expert report prior to issuing

24   your report?

25        A.    A few hours.

1       Q.    Did you review Dr. Cain's expert report
2   prior to issuing your report?
3       A.    Yes.
4       Q.    Approximately how much time did you spend
5   reviewing Dr. Cain's report before issuing your
6   report?
7       A.    Less time.  A couple of hours.  A few
8   hours.
9       Q.    How much time did you spend doing any
10  econometric analysis on this matter?
11      A.    I spent some time doing that.  I
12  formulated the analysis and I also had assistance from
13  staff at The Brattle Group to help execute some of
14  those analyses.
15      Q.    Approximately how much time did you
16  personally spend doing analysis on this matter?
17      A.    Define analysis for me if you wouldn't
18  mind?
19      Q.    Let's first start by asking whether you
20  yourself crunched any numbers in connection with any
21  of the analyses set forth in the report?
22      A.    I did.
23      Q.    Approximately how much time did you
24  crunch those numbers?
25      A.    Five or ten hours maybe.

1      Q.    Let's put aside the specific time that
2  you spent personally crunching numbers.  Approximately
3  how much time did you oversee others who did the
4  analysis on your behalf?
5      A.    I worked closely with the team for a
6  number of hours or the two weeks in which we had
7  access to the data and I finished the report so
8  throughout that period we worked pretty much
9  throughout that whole period just on this case.
10     Q.    To try to understand your testimony, when
11 did you first -- when did The Brattle Group first get
12 engaged by defense counsel?
13     A.    I can't recall the exact date.  It was
14 shortly after if not on September 18th, right around
15 the time of the issuance of the report by Mr. Graham
16 and Dr. Cain.
17     Q.    Did you and your team work full-time on
18 this matter between the time you received the reports
19 from Mr. Graham and Dr. Cain and the time that you
20 issued your own report?
21     A.    No.
22          MR. SOMENSATTO: Objection to form.
23     A.    No.
24     Q.    That's fair.  I thought you said you did
25 so let's do it a different way.  Just going back to

1   what I asked before, apart from your crunching the

2   numbers, approximately how much time did you spend

3   overseeing others who worked on the analysis as set

4   forth in your report?

5         A.    I think it took if I recall correctly

6   took about a week or a number of days before we

7   actually received the production so that we could

8   start crunching the numbers to use your phrase and

9   that left us with about two weeks to crunch the

10  numbers and for me to draft the report and final

11  report.  During that two week report I was engaging

12  with my team every day on this case.

13        Q.    How much time did you spend personally

14  drafting the report?

15        A.    Well, I don't know the exact number of

16  hours, but I drafted the majority of the report.

17        Q.    Was it more than two hours drafting the

18  report?

19        A.    Yes.

20        Q.    More than ten hours drafting the report?

21        A.    It was probably ten hours in that range

22  at least.

23        Q.    Who else from The Brattle Group worked on

24  this matter?

25        A.    I had three people assisting me.  The

1  first one is Pavita Kumar.  The second one is
2  Catherine Marcello and Kirby, I'm blanking on her last
3  name, something like Leshore, but I would have to go
4  back and confirm the last name. She just started with
5  us.
6        Q.    Approximately how much have they billed
7  to this matter?
8        A.    There has been about two hours Catherine
9  and Kirby almost full-time on this matter.
10             MR. KELLY: Can you read back his answer.
11       A.    I meant two weeks. Catherine and Kirby
12  spent about two weeks. When we received the data after
13  about a week having been engaged, then they spent
14  about two weeks first crunching all the numbers and
15  getting the numbers lined up and processed from the
16  files that we received and that's where they spent
17  most of their time.
18       Q.    Approximately how much time did Pavita
19  Kumar spend?
20       A.    Probably half.
21       Q.    Approximately one week then?
22       A.    Approximately one week, yes, stretched
23  out over two weeks.
24       Q.    What are the billing rates for each of
25  these individuals?

1      A.    I don't recall.  I can give

2   approximations if that's helpful.

3      Q.    To the best of your recollection?

4      A.    Pavita is probably around 400 and

5   Catherine is probably around 350 and Kirby is probably

6   around 250.

7      Q.    Is any portion of your compensation from

8   The Brattle Group influenced by the firm's revenue on

9   the matters that you work on?

10      A.    Sorry, could you repeat that.

11         MR. KELLY: Could you read that back.

12           (Record read.)

13      A.    I'm not sure I fully understand the

14   question.  Brattle's revenue comes from all the

15   matters we work on and I get paid by The Brattle

16   Group.  I'm not paid based on compensation

17   specifically to this matter.

18      Q.    I understand that. I'm wondering if your

19   yearly compensation, if there is a component that is a

20   function whether mandatory or discretionary that

21   factors in the amount of money that the firm takes in

22   on the matters that you work on?

23      A.    Can I say it back to you to make sure I

24   understand it?

25      Q.    Certainly.

1          A.     Are you asking if my discretionary bonus

2    is a function of the specific cases I work on?

3          Q.     That could be -- that is one possible way

4    of interpreting it I suppose. Let's do it this way.

5    You have a flat salary and a discretionary bonus?

6          A.     That's my two components.

7          Q.     The only two components?

8          A.     Yes.

9          Q.     So presumably the flat salary is not

10   effected by the matters you work on, correct?

11         A.     Correct.

12         Q.     Is the discretionary bonus at all

13   influenced by the amount of revenue that the firm

14   takes in based on the matters that you worked on?

15         A.     I would like to know how they calculate

16   my discretionary bonus.  It's not a formulaic process

17   in which they determine the discretionary bonus.

18   There's a number of factors that goes in; both case

19   work, non billable work, your contribution to the firm

20   besides working on actual cases so I'm not -- I have

21   never seen or taken part in how they actually

22   determine that discretionary bonus so I don't know if

23   I can answer that -- honestly I don't know if I could

24   answer it precisely that that's what they do.

25         Q.     Could you please look at paragraph 7A of

1    your report?

2         A.    Okay.

3         Q.    You state in the first sentence of

4    paragraph 7A Mr. Graham's analysis rests on the

5    assumption that only revenue data is material to a

6    reasonable investor.  Can you please identify where in

7    Mr. Graham's report he makes this assumption?

8         A.    So sure, my read of Graham's analysis is

9    that the only factor that he considers when he's

10   attempting to establish whether the Capital One

11   transaction data is relevant to an investor is by

12   looking at revenue.  Throughout the entire report I

13   have not seen any evidence that Mr. Graham had

14   examined any other factor that an investor might

15   consider the total mix of information that might be

16   relevant so by implication Mr. Graham is asserting

17   that revenue is the only important factor for him to

18   establish whether that information is material to a

19   reasonable investor.

20        Q.    Does he say that in the report?

21             MR. SOMENSATTO: Objection to form.

22        A.    He doesn't directly state in his report.

23   He doesn't directly state that it's the only, but he

24   does state in paragraph 3 that he's been asked to

25   evaluate whether a reasonable investor would consider

1    this information, this information being revenue to be

2    important when making a decision to buy or sell in

3    those companies.

4           Q.   Mr. Graham doesn't state, however, that

5    he was asked to evaluate whether a reasonable investor

6    would only consider this information to be important,

7    correct?

8           A.   He has in this paragraph 3, no, he does

9    not state it's the only information, but as I reviewed

10   his report, it is the only information that he

11   considers.

12          Q.   Let's take a step back here for a second.

13   You're saying -- withdrawn.  You're testifying that

14   because the only information that Mr. Graham focused

15   on was revenue, that that necessarily means that he's

16   assuming that investors only care about revenue?

17          A.   Could you read that back?

18               (Record read.)

19          A.   That's not -- I'm not sure that's what

20   I'm testifying to.  What I'm saying is the premise for

21   his entire analysis is based on the assumption that he

22   can examine only revenue data to determine whether

23   that's material for a reasonable investor.

24          Q.   Does any portion of Mr. Graham's analysis

25   assume as a mathematical matter or economic matter

1    that revenue is the only factor that's relevant to an

2    investor's decision to buy or sell a security?

3              MR. SOMENSATTO: Objection to form.

4         A.   So Mr. Graham did at least two analyses.

5    He did three, but two that focus on revenue where he

6    focused on a correlation analysis and the second one

7    is regression analysis.  In both these analyses, Mr.

8    Graham is looking at revenue as the only factor to

9    consider when asserting or determining whether the

10   information about transaction data from Capital One

11   would be material to an investor.

12        Q.   Does Mr. Graham ever say that earnings

13   information is irrelevant to investors?

14        A.   He doesn't state -- you said earnings?

15   He cites a survey where he states that among the

16   survey of 401 financial advisors I think in the Graham

17   paper that earnings is the number one thing that they

18   focus on.  In addition, they focus on revenue and cash

19   flows and other cash flow measures so he's aware of

20   other factors, but he didn't include any of them in

21   his analysis for determining whether the transaction

22   data was material.

23        Q.   Mr. Graham does expressly acknowledge

24   that earnings is another piece of information that

25   investors care about, correct?

1          A.    He acknowledges that there are other
2    factors including earnings that an investor may
3    consider in the total mix of information.
4          Q.    Does Mr. Graham ever say that cash flow
5    is irrelevant to investors?
6          A.    He acknowledged that cash flow may be
7    relevant to investors, but again, as I was asked to
8    examine his analysis, he did not include any of these
9    factors in his analysis.
10         Q.    Did you include earnings in your
11   analysis?
12         A.    To some extent I did, yes.
13         Q.    What extent is that?
14         A.    Because the main difference and a key
15   difference between my analysis and Graham's analysis
16   is I'm looking at how the market responds to the
17   information about revenue and embedded in the stock
18   price and the stock price response is a measure of
19   composite of all these other factors including
20   earnings.
21         Q.    So are you testifying that the -- I'm a
22   little confused by what you're saying.  How many other
23   -- let me ask you this. Same question with respect to
24   cash flow. Do you include cash flow information in
25   your analyses?

1          A.     The answer is the same, yes.

2          Q.     So how many other factors are there that

3     are being reflected in the abnormal returns as set

4     forth in your report?

5          A.     So the abnormal return is a measure of

6     what an investor would consider relevant information

7     after making their buy and sell decisions so it

8     reflects how investors are evaluating the total mix of

9     information and thereby all the factors that they

10    could consider so it's embedded into the price of the

11    company hence the abnormal return.

12         Q.     Can you enumerate all the factors that

13    are influencing the abnormal price figures in your

14    analyses?  Let me revise that.

15              Dr. Voetmann, could you identify all of

16    the factors that are influencing the abnormal returns

17    as set forth in your analyses?

18         A.     I can't sit here -- as I sit here right

19    now and list all the factors that an investor may have

20    considered.  All the factors depends on the company,

21    the industry, the time period.  There is a lot of

22    elements that he goes into identifying at a given

23    point in time what information is relevant as you are

24    making a decision to buy or sell a security.

25         Q.     I think you misunderstood my question.  I

1  was focusing on not what information is relevant to

2  an investor, but what information is reflected in the

3  abnormal returns as set forth in your analyses.

4           MR. SOMENSATTO: Objection to form.

5           MR. KELLY: That wasn't a question.

6      Can you read back the question I asked?

7           MR. SOMENSATTO: I'll object to that

8        statement so go ahead.

9           MR. KELLY: I'm not sure you can object

10       to a statement.  It's just to try to clarify,

11       but can you re-ask the question that I asked

12       before.

13            (Record read.)

14     A.    As I sit here right now, I've not taken

15  that exercise of determining all the factors that may

16  influence the abnormal return.

17     Q.    Just as a corollary to that then, you

18  have no basis to state that the results of your

19  abnormal return analyses are indicative of the

20  material or non material nature of the revenue

21  information, correct?

22           MR. SOMENSATTO: Objection to form.

23     A.    No, I disagree with that.

24     Q.    Please explain?

25     A.    So again, what I have done in my analyses

1  as I explain in the report, I measured the relevance

2  of the revenue surprise as well as the surprise of the

3  transaction data and I have tested to see if that

4  information is statistically related to and

5  significant related to the abnormal return and the

6  answer there is no, it's not related, it's not

7  statistically related so, in other words, the marginal

8  benefit of having access to some information from

9  Capital One transaction data does not appear to

10  explain or help an investor to decide what security to

11  buy and sell.

12      Q.   You just testified a moment ago that the

13  effects of earnings are exhibited in the abnormal

14  returns in your analysis as set forth in your report,

15  correct?

16      A.   There are a lot of factors, yes, and

17  earnings is one of them.

18      Q.   How do you know that you are accurately

19  measuring the effect of revenue on abnormal returns

20  when there are a number of other factors that also

21  influence abnormal returns include earnings and cash

22  flow information?

23      A.   So the way the study is constructed it's

24  such that I'm measuring information that was non

25  public so it would not have been reflected in the

1   price and so when the information about revenues come

2   out, you expect the price to respond to that

3   information or not respond to that information and so

4   what you observe is that there is not a response to

5   that information.

6        Q.   At the same time the revenue information

7   comes out, is there other information that's also

8   being disseminated to the market?

9        A.   There is the -- that's possible that

10  there is other information being disseminated.

11       Q.   What dates were you using?  Were you

12  analyzing -- withdrawn.  Please identify to me the

13  examples on which only revenue data was released to

14  the market as opposed to -- withdrawn.

15            Can you please identify for me an example

16  in which the only information that was disseminated to

17  the market was revenue information?

18            MR. SOMENSATTO: Objection to form.

19       A.   So in my study I have constructed it in a

20  way that is correcting Mr. Graham's regression

21  analysis where he's only measuring like you were

22  stating the revenue that's released to the market as

23  his dependent variable against the information about

24  the surprise and the transaction data.  What I've

25  changed and what I've done to correct is to say well,

```
 1   the relevant information to determine when you want to
 2   connect the importance of revenue to whether an
 3   investor would make a buy and sell decision is to
 4   measure not what the revenue that was reported was,
 5   but how the market responds to the information that
 6   was released in those announcements and so that's the
 7   major change the difference between Graham's analysis
 8   and my analysis.  I'm focusing on the same earnings
 9   announcements that Mr. Graham is focused on.
10        Q.    So you're focusing on earnings
11   announcements, correct?
12        A.    Correct.
13        Q.    Is earnings information released in
14   connection with earnings announcements?
15        A.    Yes, an earnings announcement is a
16   release of earnings information.
17        Q.    So when you are trying to measure the
18   effect of revenue on the price of a stock, what did
19   you do to eliminate the effect of the earnings
20   information that was released simultaneously with the
21   revenue information?
22        A.    The two pieces of information I
23   intertwined so I didn't separate out that difference.
24   Both of that information is embedded in the abnormal
25   return.
```

1          Q.    I'm a little confused.  You had said at

2    some point in your report that Mr. Graham should have

3    been focused on earnings, not revenue; is that right?

4          A.    In my report I stated there was a number

5    of factors including earnings as other factors that

6    Graham could have focused on.

7          Q.    In response to my last question are you

8    saying that essentially you are taking earnings

9    information and revenue information as the same?

10               MR. SOMENSATTO: Objection to form.

11         A.    No, I think we have to step back and

12    think about what are we trying to analyze here.  We

13    are simply trying to ask the question if you had

14    before the earnings announcement access to the

15    consensus estimate of the analysts, if I know the

16    consensus estimate of the analyst and the market knows

17    the consensus estimate of the analyst, I would expect

18    there not to be a significant relationship between

19    that consensus estimate and the price response because

20    that consensus estimate is already embedded into the

21    price.

22               What we are adding into the mix is the

23    transaction data from Capital One and saying that

24    marginal additional information that's not known by

25    consensus estimate similar to the framework that

1   Graham has set it up, does that pick up any additional

2   information in the market and the answer is when you

3   look at how the market responds to when revenue is

4   announced in earnings announcements, there is no

5   additional benefit from having had access to the

6   transaction data. There's no statistical relationship

7   between the return and the transaction data.

8        Q.    So let's first start with the earnings

9   announcements.  How many other pieces of information

10  are announced at the same time a company announces

11  their earnings?

12              MR. SOMENSATTO: Objection to form.

13       A.    It's not an exercise or study I have

14  undertaken in this case.  I relied on the same

15  announcements that Mr. Graham relied on.

16       Q.    But you attempted to determine whether or

17  not the release of the revenue information had an

18  impact on the stock price, correct?

19       A.    Correct.

20       Q.    Mr. Graham didn't attempt to do that,

21  correct?

22       A.    Correct.

23       Q.    So in your attempt at determining the

24  effect of the revenue information in the stock price,

25  you also have a ton of other information the company's

1    earnings release that you didn't factor out, correct?

2         A.    Like Mr. Graham I did the same thing, I

3    didn't factor that out just like him.

4         Q.    Mr. Graham was not trying to calculate

5    the effect of a particular piece of information on the

6    stock price, correct?

7         A.    He was measuring the revenue -- stock

8    price, sorry.  No, he was not trying to measure the

9    impact on the stock price, correct.

10        Q.    You were?

11        A.    That's correct.

12        Q.    There is a ton of other information in

13   the company's earnings releases that could impact that

14   stock price and you did nothing to factor that out in

15   your analysis?

16        A.    I did not take into account any

17   additional information that might have been in these

18   earnings announcements.  I'm simply looking at a cross

19   sectional of hundreds of earnings announcements to see

20   if any of these cross sections their marginal benefit

21   of revenue would become statistically significant and

22   in that last sample of hundreds of earnings

23   announcements revenue is not a factor on a piece of

24   information that appears to explain the price

25   movement.

1          Q.     We talked about confounding events or
2    confounding variables earlier in today's deposition,
3    correct?
4          A.     Correct.
5          Q.     All that other information that you
6    didn't factor out of your analysis to determine its
7    impact in the stock price, those would be considered
8    confounding events, correct?
9          A.     Possibly.  What I did factor out was
10   abnormal returns, market movements so anything that
11   would occur that day in the market was factored out,
12   but any other company specific piece of information
13   was not factored out and just to clarify, in typical
14   event studies in the framework of an event study one
15   would not necessarily attempt in a cross sectional
16   study to try to disentangle company specific
17   information unless you are analyzing something
18   specific.
19         Q.     Would you say that you would want to
20   analyze something specific when you are trying to
21   determine whether or not revenue specifically causes a
22   change in stock price?
23                MR. SOMENSATTO: Objection to form.
24         A.     Was that a question?
25                MR. KELLY: Could you please repeat the

```
 1        question?
 2                (Record read.)
 3                MR. SOMENSATTO: Same objection.
 4        A.    I'm analyzing whether the marginal
 5   benefit of that information from transaction data from
 6   Capital One whether the incremental value of that
 7   above the analyst consensus would change the market's
 8   response to consensus information.
 9        Q.    So let's focus on that for a second.
10   Which one of your analyses focus on whether the
11   Capital One information reflects a change in consensus
12   revenue information?
13        A.    I'm not sure I follow the question.  If
14   you point me to a specific exhibit.
15        Q.    Let's do it this way.
16                MR. KELLY: Can you read the previous
17        answer.
18                (Record read.)
19        Q.    Where in your analysis do you compare the
20   Capital One information and compare that against the
21   consensus estimates and determine whether that has an
22   effect on stock price?
23        A.    Exhibit 16 on my report, sorry, Exhibit
24   16 on my report and 17, I specifically did two types
25   of regressions.  One regression is looking at the
```

1    surprise exactly the way that Graham set it up, but I
2    ran a second regression in the last column which takes
3    the difference between the consensus estimate and the
4    estimate of revenue by the Capital One transaction
5    data so that last regression in the last column
6    specifically measures the incremental value or in
7    other words the estimate that defendant had compared
8    to the estimate from consensus to see if their
9    estimate of revenue provided them with additional
10   information above and beyond what analyst consensus
11   was to see if that additional information would cause
12   a significant price response and as both Exhibit 16
13   and 17 shows, the incremental benefit of the estimate
14   above and beyond the consensus is not material, in
15   other words, the marginal benefit is not related to
16   the price response so, in other words, it's not clear
17   to me that having access to this marginal information
18   could lead me to make a decision about whether I would
19   buy or sell a security.
20        Q.    In either Exhibit 16 or 17 do you have as
21   an independent variable the change between consensus
22   estimates and the forecasted revenue from the Capital
23   One transaction data?
24        A.    Yes, I just explained in my previous
25   answer.  If you look at the last column on Exhibit 16

1   under the heading 2 and if you look at row D,

2   transaction data forecast, that measures exactly the

3   announcement by announcement, the estimate that the

4   defendant had constructed compared to the estimate or

5   consensus from analysts and it looks at that

6   difference to see if that incremental value from that

7   estimate would be material and what the result shows

8   across this last sample is that there's no

9   statistically significant relationship between this

10  incremental estimate to a consensus so, in other

11  words, to finish my answer, the last column there is

12  an alternative to the specification that Mr. Graham

13  performed.

14           THE VIDEOGRAPHER: We are now off the

15       record at 1:48 p.m., October 16, 2015.

16              (Recess taken.)

17           THE VIDEOGRAPHER: This is tape four of

18       the deposition of Dr. Torben Voetmann.  We are

19       now on the record at 1:57 p.m., October 16,

20       2015.

21       Q.   All right, welcome back, Dr. Voetmann.

22  Let's keep looking at Exhibit 16 and 17.  Dr.

23  Voetmann, before the break you identified the

24  transaction data forecast variable or D, item D in

25  Exhibit 16 and 17 as the variable that compared the

1    analyst consensus expectations with the forecast from

2    the Capital One transaction data; is that correct and

3    we are looking at Exhibit 16 and 17?

4         A.    Yes, so what I was stating is what I have

5    changed on Exhibit 16 what I changed in regression two

6    compared to regression one is instead of looking at

7    the surprise of the transaction data from Capital One

8    just as Graham had done I changed the measure to

9    estimating what defendant -- how defendant would have

10   estimated the revenue of the company that they are

11   looking at so that in effect this measure indeed

12   forecasted -- transaction data forecast is a measure

13   of the aggregate value of revenue predicted by the

14   methodology that defendant allegedly used so in effect

15   it's a measure of their prediction and I included in

16   there in B the consensus estimates prediction as well

17   so you have two prediction measures. You have the

18   prediction measure of the analyst and you have the

19   prediction measure of the defendants' measurement and

20   so that's what I stated before their prediction of the

21   actual revenues cannot explain the price response.

22        Q.    Dr. Voetmann, it sounds like you are

23   changing your testimony.  You had previously testified

24   that item D reflected the revenue surprise comparing

25   analyst expectations with the Capital One transaction

1  data.  Do you stand by that testimony?

2              MR. SOMENSATTO: Objection to form.

3       A.    I may have to correct my prior statement

4  because I was just reading more carefully the footnote

5  D.  It nonetheless doesn't change the result that I'm

6  measuring the prediction estimate of the defendants of

7  each company's aggregate revenue and so it's an

8  estimate of its surprise relative to the surprise of

9  analysts so when you sum B and D, you get a

10 differential.

11      Q.    As you set up your analysis though, B and

12 D are both independent variables, aren't they?

13      A.    Yes.

14      Q.    So you don't include as an independent

15 variable the change between the analyst consensus

16 expectations and Capital One's transactional

17 information prediction, correct?

18              MR. SOMENSATTO: Objection to form.

19      A.    I didn't include that in this exhibit,

20 correct.  I did analyze that change, but it didn't

21 change my results and it didn't change the result in

22 this exhibit.

23      Q.    When did you analyze those, that change?

24      A.    It's part of my underlying analysis that

25 I did.

1        Q.    Do you have any exhibits that reflect the
2    results showing whether or not the change --
3    withdrawn.  Are there any exhibits -- earlier today
4    you testified about when you would expect a stock
5    price to move, correct?
6                  MR. SOMENSATTO: Objection to form.
7        A.    We talked about that, yes.
8        Q.    You had testified that, you know, when a
9    company releases quarterly revenue information, you
10   would not expect the stock price to change unless that
11   information is a change from analyst consensus
12   expectations, correct?
13                 MR. SOMENSATTO: Objection to form.
14       A.    Correct.
15       Q.    So in any of your analyses did you
16   analyze whether the Capital One transactional data
17   compared with -- withdrawn.
18                 In any of your analyses, did you compare
19   whether or not the expected revenue surprise as
20   derived from comparing analyst expectations with the
21   Capital One transactional data result in a change in
22   stock price?
23       A.    Yes.
24       Q.    Please identify where in your report you
25   did that?

1         A.    I didn't include it in my report.  I was

2    responding directly to Mr. Graham's analysis and what

3    you see in Exhibit 16 and 17 is a direct response

4    using a similar measurement of surprise to the way he

5    defined surprise and so this shows to me that what he

6    considered a surprise is not statistically significant

7    related to the transaction data so I did not include

8    any alternative specification of the model since I was

9    responding to Graham's analysis.

10        Q.    So you are offering no opinions --

11   withdrawn.  Let's talk about the validity of the

12   analyses that you set forth here.  Let's start with

13   Exhibit 1.  What does Exhibit 1 show?

14        A.    Exhibit 1 shows the revenue of Walmart on

15   a quarterly basis.  It also shows the price responses

16   to the announcements of revenues.

17        Q.    So without knowing what the analyst

18   expectations were for revenue, you would have no way

19   to tell whether or not the stock price in a company

20   should go up or down in connection with the

21   announcement of that revenue, correct?

22        A.    No, that's not correct.

23        Q.    So let's look at October '09 on Exhibit

24   1.  Walmart releases 100,000 in millions of dollars,

25   is that 100 billion?

1        A.    Yes.

2        Q.    So October '09 Walmart releases news that

3   its revenue was $100 billion.  What should the stock

4   price do?

5        A.    Again, you would have to examine the

6   total mix of information and understand whether that

7   announcement was different than expectations or how it

8   was different from expectations so by looking at the

9   actual revenue itself, you can't draw a conclusion

10  whether the price should go up or down.

11       Q.    So the fact that the abnormal returns are

12  not at all correlated with revenues, that's to be

13  expected, correct?

14       A.    I'm not sure if it's to be expected.

15  What I'm reporting here is simply demonstrating that

16  if you want to understand the importance of reporting

17  revenues to what happens to market price of Walmart,

18  if you look at that correlation, there is no

19  correlation so the reporting of actual revenues

20  doesn't drive the stock price up or down by itself and

21  the question earlier about consensus, if the consensus

22  is known a week or two weeks before this announcement,

23  the expectation is that at least the information

24  content of the consensus is embedded in the price

25  already.

1          Q.    So to be fair, Exhibit 1 has no bearing

2   on whether or not the Capital One transactional

3   information at issue in this case -- so Exhibit 1 has

4   no bearing on whether or not the Capital One

5   transactional information at issue in this case would

6   be of a type of information that a reasonable investor

7   would like to know in buying or selling a security?

8               MR. SOMENSATTO: Objection to form.

9          A.    So Exhibit 1 is a direct response to

10  Graham's Exhibit 1 in which he compares the same

11  revenue that I'm plotting here with the transaction

12  data and this Exhibit 1 demonstrates clearly that

13  Graham's finding of a correlation disappears if you

14  were to just simply understand what a stipulation

15  between reporting sales and market response.

16         Q.    And without knowing any other additional

17  information, the fact is that just knowing that sales

18  reported and what that number is, you cannot predict

19  whether or not the stock price would go up or down,

20  correct?

21         A.    Based on Exhibit 1 this is not a

22  prediction, it's just comparing what the market did

23  and what was reported.

24         Q.    Let's look at Exhibit 2.  Why did you

25  include Exhibit 2 in this report?

 1          A.     I think Graham makes a mistake of looking

 2     at the sales of revenues in levels.  What might be

 3     more interesting to an investor is how sales are

 4     changing over time so this Exhibit 2 is changing the

 5     scale to looking at changes in revenue as opposed to

 6     the level of revenue and again, just simply looking at

 7     how sales are changing whether you notice an increase

 8     or decrease of Walmart sales against how the market

 9     responded to that knowledge, that information, again,

10     shows no significant correlation.

11          Q.     That's what you would expect for any

12     company, correct?

13               MR. SOMENSATTO: Objection to form.

14          A.     Not necessarily.  You might be able to

15     find circumstances or instances where a company's

16     sales change correlate with the abnormal return, but

17     at least for Walmart and for the majority of all the

18     companies which Graham supposedly finds a correlation,

19     there is no correlation when you do it in changes or

20     using abnormal returns.

21          Q.     Earlier this morning I specifically asked

22     you whether if a company releases news that quarterly

23     revenues increased as compared with the same quarter

24     the year before would the company stock price change

25     and you answered that by saying that essentially no,

1  what's relevant is whether or not the change in

2  quarterly revenues is a surprise as compared with

3  analyst expectations, correct?

4              MR. SOMENSATTO: Objection to form.

5       A.    I don't recall exactly what I answered to

6  your earlier question, but if I recall what I can

7  recall is we talked about whether knowing a change in

8  revenue would be sufficient information for you to

9  determine whether you expect a price change up or down

10 and if I recall correctly, I said there might not be

11 enough information to make that determination.

12      Q.    So if you look at Exhibit 2, that chart

13 bears it out that there's no expectation that a stock

14 price would go up and down when there's a change in

15 revenue, correct?

16      A.    So for Walmart as the highlighted example

17 that Graham chose, there is no correlation between

18 market learning about changes in sales revenues and

19 how it responds to that information.

20      Q.    That same logic as applied to Exhibits 1

21 and 2 also applies to Exhibits 3 and 4, correct, that

22 the absolute amounts of the Capital One transactions

23 or the changes in Capital One transaction amounts from

24 one year to the next has no predictive value to

25 determine whether or not a stock price would go up or

1  down, correct?

2          MR. SOMENSATTO: Objection to form.

3      A.    Correct.  I found again here that there's

4  no correlation between the data that defendant had

5  access to in the Capital One transaction amounts and

6  the change in the abnormal return whether he looked at

7  changes or level for Walmart.

8      Q.    How would you interpret the results in

9  Exhibits 1 through 4?

10          MR. SOMENSATTO: Objection to form.

11      A.    So as I explain in my report, my

12  interpretation of these results is what is -- this is

13  a critique or analysis to examine what Graham had done

14  in order for his analysis to confirm whether an

15  investor would buy or sell a security as he stated in

16  his paragraph 3 in his report.  He did the correlation

17  of revenue against revenue which to me is not a

18  surprise that you will find they are highly similar,

19  but what's really relevant for understanding the

20  question of whether you would buy or sell a security

21  is to look at revenue or changes in revenue relative

22  to the abnormal returns or returns of the security and

23  so Exhibits 1 through 4 demonstrate for Walmart that

24  there is no correlation between having access to the

25  revenue data or how that revenue is correlated to the

```
 1  price changes.
 2        Q.   But you never included as a part of your
 3  analysis whether or not the Capital One transactional
 4  data was predictive of a revenue surprise, did you?
 5        A.   I believe I did in Exhibit 16 and 17 as
 6  we just discussed.
 7        Q.   Focus on Exhibits 1 to 4, do Exhibits 1
 8  to 4 have anything to do with whether or not the
 9  Capital One transactional data is predictive of a
10  revenue surprise?
11        A.   In 1 to 4 I'm simply responding to
12  Graham's Exhibit 1 where he demonstrates a historical
13  correlation between the data sets, the data series and
14  I'm demonstrating that that correlation is
15  non-existent if you relate it to returns as opposed to
16  revenue against revenue.
17        Q.   You said Graham's Exhibit 1 I believe.
18  Which exhibit are you referring to?
19        A.   I apologize, it's in his report paragraph
20  46 on page 14.  It's the first chart I see he presents
21  in his report.
22        Q.   The chart at the bottom of page 14 of Mr.
23  Graham's report, Mr. Graham doesn't analyze the effect
24  of the revenue announcement on the stock price,
25  correct?
```

1        A.    Correct.

2        Q.    Isn't the point that Mr. Graham is making

3   here is that the Capital One transactional data is

4   correlated with and predictive of the actual not yet

5   reported revenue of the company?

6        A.    This chart itself is insufficient to

7   determine whether it's predictive. In my opinion what

8   he's doing is looking at historical transaction data

9   and he's noticing that the trend of that data is

10  similar to the aggregate data of Walmart.

11       Q.    What does the chart on the bottom of page

12  14 of Mr. Graham's report show?

13       A.    It shows that there is a trend of

14  transaction data amounts although at a scale of much

15  smaller total amounts, but the trend of those small

16  amounts are similar in trend to the total amounts of

17  Walmart's -- if I look at this exhibit, he has a typo

18  on the Y axis.  He says the transaction data from

19  Capital One is in billions, but I believe it's in

20  millions so he's saying half a million to a million is

21  similar to 120 billion.

22       Q.    Dr. Voetmann, do you dispute the accuracy

23  of the chart as set forth on page 14 of Mr. Graham's

24  report?

25            MR. SOMENSATTO: Objection to form.

1        A.    No, he's simply -- as he sourced it he's
2   just sourcing the data that was provided to him in the
3   DONE file and what he had downloaded for Walmart I
4   believe would have to be from Walmart the total
5   revenue data.  I don't think he -- I can't speak for
6   Mr. Graham, but I don't think he would have chosen to
7   use the sales data in the DONE files.
8             MR. KELLY: Could you read back the last
9        question and answer.
10            (Record read.)
11       A.    Can I clarify one thing in the answer?
12       Q.    Yeah.
13       A.    He wouldn't have used the total sales
14  data for the company in the DONE files, not the -- he
15  relied on the sales data from Capital One
16  transactions.
17       Q.    Could you please, Dr. Voetmann, describe
18  what's in Exhibit 5 of your report?
19       A.    Sure so Graham introduced after the
20  Walmart example he selected 20 additional examples
21  that he presented in Exhibit E and what I have done in
22  my Exhibit 5 I have compared the correlations that
23  Graham found to the correlations if you looked at the
24  sales data versus returns or the changes in sales data
25  versus returns.

 1          Q.    Is this a chart -- does Exhibit 5 reflect

 2     the correlation values with respect to the information

 3     that was set forth in Exhibits 1 to 4 as in regards to

 4     Walmart?

 5          A.    Not necessarily.  In Exhibits 1 to 4 I

 6     chose the exact date range that Graham used, however,

 7     in Exhibit 5 I'm using the date range he chose in his

 8     Exhibit E so I believe that's why you might see the

 9     correlation estimates are slightly different for

10     Walmart nonetheless it's not significant.

11          Q.    Let's go to Exhibit 7.

12          A.    Okay.

13          Q.    You see the first line is Graham

14     correlation of revenues to transaction amount.  It

15     sets forth his results.  I understand you might have

16     some objections to methodology, but let's just focus

17     on the math and whether the statistics tests were

18     performed properly.  Do you have any dispute with

19     respect to the way in which Mr. Graham performed the

20     analysis that's set forth or described on the first

21     line of Exhibit 7?

22               MR. SOMENSATTO: Objection to form.

23          A.    The first line is simply stating exactly

24     what Mr. Graham did.  I disagree with his reasoning

25     for running the correlation the way he did, but if you

1    ask me whether there is -- I'm disputing whether you
2    can run a correlation between two series, I'm not
3    disputing that fact. I'm disputing how you interpret
4    the results of that.
5         Q.    You don't dispute the fact that the
6    Capital One information present on defendants' laptops
7    at issue in this case were correlated to a
8    statistically significant extent with respect to 132
9    companies in this case?
10              MR. SOMENSATTO: Objection to form.
11        A.    I have no reason to disagree with
12   Graham's representation that when you are plotting the
13   trend between the transaction data and the aggregate
14   data that the trend seems very similar.
15        Q.    Let's go to the next line.  The
16   correlation of revenues to abnormal returns.  What
17   bearing if any does this analysis have on evaluating
18   whether the Capital One transaction data in
19   defendants' possession was of a type that it was
20   valuable to a reasonable investor?
21              MR. SOMENSATTO: Objection to form.
22        A.    So I looked at -- I wanted to examine
23   whether the total revenue how I responded or
24   correlated with the returns.  That would guide me in
25   understanding my expectation for what I would find

1   when I looked at the transaction data versus the

2   returns and as you can see whether you are looking at

3   the total aggregate revenue or you're simply looking

4   at the small portion of transaction amounts that the

5   defendants had access to, there is hardly or there is

6   between 17 and 2 companies that had significant

7   correlations in sharp contrast to 132.

8        Q.   But let's be honest here.  The results in

9   the second through the fourth test as set forth in

10  Exhibit 7 are not at all surprising, correct?

11            MR. SOMENSATTO: Objection to form.

12       A.   I will correct that to say it's certainly

13  not surprising in row one that when you call it

14  revenue against revenue that you find a high number of

15  significant related companies.  I think it really

16  depends row 2 to 4 it's plausible not having done the

17  analysis, but you have to look at a larger sample of

18  companies whether these results hold, but for the

19  companies that the defendant looked at there is little

20  relationship between revenue and returns.

21       Q.   But isn't it true that's not at all

22  surprising given the fact that in none of these

23  analyses in lines 2 to 5 in Exhibit 7 are you taking

24  into account whether or not there is a revenue

25  surprise?

```
1               MR. SOMENSATTO: Objection to form.
2          A.    So I think you can argue that 1 through 5
3    if in fact the consensus estimate are embedded into
4    the price and there is no additional earnings surprise
5    above that, then you don't expect to find a
6    significant correlation.
7               MR. KELLY: Could you please read back not
8          this one but the prior Q and A.
9               (Record read.)
10         Q.    Dr. Voetmann, when you testify that it's
11   not all surprising that when you correlate revenue to
12   revenue you find statistically significant
13   correlations, you are talking about the analysis that
14   Mr. Graham did when he calculated whether the actual
15   revenue reported by companies was correlated with the
16   Capital One transaction data defendants had access to,
17   correct?
18         A.    Correct.
19         Q.    Why isn't it all surprising to you that
20   that result is true?
21         A.    Simply because you are measuring the
22   population against a subset of itself so that's not
23   surprising that those two are related.
24         Q.    Is that result obvious to you?
25               MR. SOMENSATTO: Objection to form.
```

1          A.     I think you have to examine one at a

2     time, but it seems obvious to me that if you are

3     looking at revenue and you're measuring a subset of

4     revenue of that revenue that there is a high

5     probability that it will be correlated.

6          Q.     Let's try to switch gears for a minute.

7     Dr. Voetmann, would it be fair to say that what's most

8     important to a potential investor is the firm's

9     ability to generate enough revenues to cover its

10    expenses?

11         A.     I wouldn't necessarily agree with that

12    statement.

13         Q.     That is essentially your statement as set

14    forth in this report correct.  There is an ellipsis

15    there, but we can turn to it.  You state on the top of

16    page 7, paragraph 12, ultimately, what is most

17    important to the health of a firm and a potential

18    investor is the firm's ability to general enough

19    revenues to cover its expenses.  Do you agree with

20    that sentence now?

21         A.     Sorry, can you tell me where the sentence

22    is again?

23         Q.     The top of page 7, paragraph 12, top of

24    page 7.

25         A.     Could you read what he said?

```
 1              (Record read.)
 2         A.    You are missing the last half of the
 3   sentence which is i.e. to generate positive earnings
 4   and steady cash flows.
 5         Q.    So is your testimony that without the
 6   i.e. you disagree with that statement?
 7              MR. SOMENSATTO: Objection to form.
 8         A.    No.
 9         Q.    So I understand that was not the full
10   quote, but do you agree with the statement in your
11   report that ultimately what's most important to the
12   health of a firm and a potential investor is the
13   firm's ability to generate enough revenues to cover
14   its expenses?
15         A.    I think as a general matter I think it's
16   a fair statement that in order to be having a
17   successful business you need to generate sufficient
18   revenue to cover your expenses otherwise again as a
19   general matter you would not be in business for long.
20         Q.    So, Dr. Voetmann, could you please look
21   at paragraph 7B?
22         A.    Okay.
23         Q.    You state that Mr. Graham confuses
24   correlation with causation in that second sentence, do
25   you see that?
```

1        A.    Yes.

2        Q.    Where in Mr. Graham's report does he make

3   any conclusions or observations with respect to

4   causation?

5        A.    So as I understand it in paragraph 3 of

6   his report he's asked to examine whether the

7   transaction data would make an investor or could

8   assist an investor in deciding whether on whether they

9   would make a buy or sell transaction.  Let me look at

10  his report.  He's asked to evaluate whether a

11  reasonable investor would consider this information

12  the Teradata to be important when making a decision to

13  buy or sell securities in those companies so I read

14  that as his analysis is supposed to support -- the

15  analysis he's providing is supposed to support his

16  conclusion to establish whether or not an investor

17  would make a buy and sell decision and in my opinion

18  simply reporting a correlation is not sufficient

19  analysis to reach a conclusion of whether or not an

20  investor would make a buy and sell decision.

21       Q.    I'm confused now.  Later in paragraph 7B

22  you talk about that Mr. Graham should have considered

23  the correlation between the transaction data and the

24  stock price returns -- withdrawn.

25            So the causation you're talking about is

1  you're saying that Mr. Graham confuses correlation
2  with causation because by concluding that the Capital
3  One transactional data is predictive of not yet
4  reported company revenues -- withdrawn.
5          So I'm confused by your answer, Dr.
6  Voetmann.  The correlation analysis has nothing to do
7  with what an investor will do with the information,
8  correct?
9       A.   I would agree with you that the entire
10  first half of the Graham report where he talks about
11  correlation does not answer the question of whether an
12  investor would make a buy and sell decision.
13       Q.   Let's focus on the actual correlation
14  then before we turn to opinions based on the actual
15  correlation.  Your statement that Mr. Graham confuses
16  correlation with causation, does that relate to
17  whether or not the Capital One transactional data
18  causes the actual not yet reported revenues or does it
19  relate to something else?
20       A.   Something else.
21       Q.   What is that?
22       A.   So in my opinion what he should have
23  considered is whether or not if you had access to the
24  transaction data he should have done a study to
25  determine whether that data could lead you to reach a

1    decision to buy or sell a security.

2           Q.    How would he do that study?

3           A.    It's not something that I've attempted to

4    undertake.  I'm simply responding to Graham's analysis

5    that he did not do that so as I sit here right now I

6    have to think about how you would do such study, but I

7    think as a first pass you at least would want to know

8    if that information, the transaction information, is

9    related to price responses, returns, when earnings are

10   released to the market and as I've demonstrated in

11   Exhibit 1 through 6 there is no correlation between

12   those returns and transaction data.

13          Q.    What were the defendants doing with the

14   Capital One transactional data as they were making

15   their investment decisions?

16               MR. SOMENSATTO: Objection to form,

17          foundation.

18          A.    I have not seen any documents in the

19   production provided to me that would suggest to me

20   that I could understand what they did with the data.

21          Q.    For all you know they were taking their

22   predictions of revenue from the Capital One

23   transaction data and comparing it with consensus

24   earnings estimates -- sorry, consensus revenue

25   estimates and deciding whether or not the release of

1    that information would result in a stock drop or

2    increase?

3              MR. SOMENSATTO: Objection to form.

4         A.    The DONE files or the production of

5    materials that have been provided to me it's what I

6    see is that they are attempting to estimate or come up

7    with an estimate for total earnings for a given

8    quarter.  In those files, the DONE files, there's no

9    consensus estimate information.  It's just the actual

10   earnings and the transaction amounts.

11        Q.    For clarity, you said earnings in your

12   last response, do you mean earnings or revenues?

13        A.    I appreciate that, revenue.

14        Q.    But for all you know, there's other

15   documents out there that show that defendants are in

16   fact looking at consensus revenue estimates, correct?

17        A.    It's possible they looked at consensus

18   estimates.  I know Graham put forward some consensus

19   estimate and there might have been a single file, I

20   can't recall as I sit here right now, among hundreds

21   of files that contain some data on consensus

22   estimates, but in the DONE files where they as I

23   understand it did their analysis of estimating total

24   revenue, I didn't see any consensus estimate.

25        Q.    Going back to your point about causation,

```
 1  is it your testimony that in order to issue an opinion
 2  about whether information is of the type that an
 3  investor would like to know in making an investment
 4  decision, the person offering that opinion would need
 5  to do a causation analysis to determine whether access
 6  to that information made the person invest in the
 7  stock?
 8            MR. SOMENSATTO: Objection to form.
 9       A.   I think it would be the responsibility of
10  someone offering that opinion to at least examine the
11  total mix of information and contextualize whether a
12  piece of that information such as revenue was material
13  and as I reviewed Graham's report, I didn't see him
14  offer such opinion that the transaction data was
15  statistically significantly related to returns.
16       Q.   Let's focus on the causation piece
17  because you complain or you offer an opinion that Mr.
18  Graham's analysis failed for failing to do a causation
19  analysis.  Are you aware of any academic journals or
20  other publications that stand for the proposition that
21  in order to weigh in on materiality information, there
22  needs to be a causation analysis done to determine
23  whether that information actually caused an investor
24  to buy or sell a security?
25            MR. SOMENSATTO: Objection to form.
```

1        A.    I believe if you want to publish in a
2    peer reviewed journal you might include a univariat
3    analysis which might include correlation analysis of
4    trends of sorts, but I would also believe that on top
5    of that you would build a multivariat analysis to at
6    least confirm the trends you see in the correlations.
7    The correlation by itself would not in my opinion be
8    sufficient.
9            MR. KELLY: Let's take a very quick
10           break.  I'm trying to get through a lot here.
11           THE VIDEOGRAPHER: We are now off the
12           record at 2:43 p.m., October 16, 2015.
13               (Recess taken.)
14           THE VIDEOGRAPHER: This is tape five of
15           the deposition of Dr. Torben Voetmann.  We are
16           now on the record at 2:57 p.m., October 16,
17           2015.
18           MR. KELLY: Could you please read back the
19           last question and answer.
20               (Record read.)
21       Q.    Just to follow up, the analyses that you
22    set forth in that answer are analyses that you
23    performed to determine causation?
24           MR. SOMENSATTO: Do you understand the
25           question?

```
 1          A.    I'm not sure I understand the question.
 2          Q.    I'd asked you previously what peer
 3   reviewed journals -- whether there were any peer
 4   reviewed journals that stand for the proposition that
 5   in order to prove materiality of a certain set of
 6   information you'd have to do a causation analysis to
 7   determine that information caused an investor buy or
 8   sell a security and you gave an answer in response and
 9   you mentioned a few different tests.  The question I
10   have is whether those tests that you mentioned in that
11   answer were tests to conclude causation or whether
12   those were just simply correlation tests?
13          A.    You would include causation tests.
14          Q.    That would be a multivariat causation
15   analysis?
16          A.    Typically, yes.
17          Q.    You have seen in peer reviewed academic
18   journals the authors of that paper employing a
19   causation analysis to conclude materiality with
20   respect to certain sets of information?
21          A.    Yes.
22          Q.    Please identify what publication or
23   publications those are?
24          A.    That pretty much covers any of the peer
25   reviewed journals.
```

1          Q.    Your testimony is that all the peer

2     reviewed journals when they determine materiality use

3     causation analysis?

4                    MR. SOMENSATTO: Objection to form.

5          A.    I was responding to your general question

6     about whether or not you need to establish causation

7     to get a paper published in a peer reviewed journal

8     and my answer is as I understand it all peer reviewed

9     journals would expect you to find causation in order

10    to make any affirmative conclusions about your

11    findings.

12         Q.    So, Dr. Voetmann, just to confirm your

13    testimony that in any academic journal that's peer

14    reviewed that in order to make any conclusions

15    regarding materiality, that the authors of that study

16    would need to do a causation analysis; is that

17    correct?

18                    MR. SOMENSATTO: Objection to form and

19         testimony, mischaracterizes.

20         A.    When I think of peer reviewed

21    publications, I'm not sure I think about the

22    definition of materiality as we are discussing it here

23    in terms of if you are trying to connect materiality

24    as we are discussing in this particular case to other

25    studies.  I think it's reasonable to expect that

1   anyone who wants to publish in a peer reviewed journal

2   would need to establish with some form of reasonable

3   scientific methodology that there's some causation in

4   order to reach some conclusion about their findings.

5        Q.   Dr. Voetmann, I don't think you are

6   answering the question I asked.

7             MR. KELLY: Could you please read back the

8        question.

9             (Record read.)

10             MR. SOMENSATTO: Objection to form.

11        A.   I think an author would need to do some

12   form of multivariat or causation analysis to establish

13   their findings, whether or not their findings have a

14   level of materiality or level of significance.

15        Q.   Dr. Voetmann, you are not opining in this

16   case that investors could care less about revenue

17   information, correct?

18        A.   Correct.

19             MR. SOMENSATTO: Objection to form.

20        Q.   Please turn to paragraph 13 of your

21   report.  In that paragraph you note that Mr. Graham

22   cites to a few publications that were taken out of

23   context and misinterpreted.  Doesn't Mr. Graham

24   identify the fact that -- withdrawn.

25             Dr. Voetmann, do you dispute the fact

1    that in the Graham, Harvey and Rajgopal study that the

2    second most important firm performance measure was

3    cited by 401 financial executives to be revenues?

4            A.    It depends how you read the table that

5    Mr. Graham cites.  It's listed among four other

6    variables having 36 similar ranks by executives so if

7    you rank all 4 as having 36 and revenues one of the

8    four, it's not unreasonable for him to say it's an

9    important or sorry, among the second highest ranked

10   metrics.

11           Q.    Do you agree with that interpretation?

12           A.    I think it's not a fair characterization

13   of the paper.  The paper clearly states that out of

14   all these financial executives by a large margin

15   earnings is the most important.  Next to that you have

16   operating cash flows, revenues and a couple I think

17   they said free cash flow and a couple other cash flow

18   metrics so among those group of key metrics asked of

19   the executives, clearly earnings is by far the most

20   important.

21           Q.    Does Mr. Graham dispute that fact?

22           A.    No.

23           Q.    In fact, he acknowledges that earnings is

24   recognized ahead of revenue, correct?

25           A.    He does.

1        Q.    Dr. Voetmann, do you place revenue among

2   the top five important measures of firm performance?

3               MR. SOMENSATTO: Objection to form.

4        A.    It's not a question I can answer with

5   that level of information.

6        Q.    Why not?

7        A.    Because I think it's specific to the

8   company you are evaluating.

9        Q.    What types of companies would you place

10  more value on revenue?

11       A.    It's not a question I have undertaken in

12  my report to analyze, but as I sit here now it's not

13  unreasonable to think that if you are valuing a

14  company like a start up tech company, you are valuing

15  it using a revenue metric as opposed to earnings.

16       Q.    What other companies would you rely more

17  on revenue -- withdrawn.  In how many instances have

18  you performed a discounted cash flow analysis of

19  companies?

20       A.    Many.

21       Q.    In how many instances of those have you

22  used revenue information in the analysis?

23       A.    Revenue is part of income statements so

24  if you are doing a strict discounted cash flow

25  analysis, you would have revenue as part of that

1  analysis.

2      Q.    So is it your testimony for every single

3  discounted cash flow analysis that you have done you

4  have included revenue information in that analysis?

5      A.    It depends on whether or not we include

6  in that discounted cash flow multiples analyses where

7  you use a price earnings multiple or some other type

8  of multiple, but for a strictly DCF where you are

9  projecting income statements and cash flow statements

10  for the majority of those I would include revenue.

11      Q.    Would it be fair to say that revenue is

12  an important variable in determining the value of the

13  company?

14          MR. SOMENSATTO: Objection to form.

15      A.    I think you have to again look at the

16  total mix of information and the contribution from

17  that revenue information.  You have to examine an

18  understanding whether that revenue information is

19  contributing to increasing cash flows or decreasing

20  cash flows for that matter in order to determine

21  whether or not just knowing revenue levels is

22  important.

23      Q.    Please turn to paragraph 14 on page 8 of

24  your report.  You state it is highly unlikely in my

25  opinion that the sales transaction data obtained by

1  the defendants was material to a reasonable investor,

2  do you see that?

3      A.    Yes.

4      Q.    Can you please explain this conclusion?

5      A.    Sure.  So based on my analysis both

6  correcting Graham's correlation analysis where I find

7  that there's no correlations between revenue and

8  returns based on my regression analysis where I

9  include transaction data and returns, the marginal

10  contribution that the Capital One transaction data had

11  was not statistically significant returns.

12      Q.    Dr. Voetmann, you had testified earlier

13  that you didn't include any analysis in determining

14  whether or not the Capital One transaction information

15  predicted ability of company revenues not yet reported

16  revenues as compared with analyst expectations

17  contributed to abnormal returns, correct?

18      A.    I was -- I could not hear the whole

19  question.

20          MR. KELLY: Can you read it back, please.

21          (Record read.)

22      A.    I'm not sure I fully understand the

23  question.  My analysis is exactly showing whether the

24  contribution of the not yet reported transaction data

25  if you include that as an independent variable with

1   consensus surprises whether or not that could explain
2   the price responses.
3       Q.   Let's go over that then.  These are
4   Exhibits 16 and 17 you are referring to?
5       A.   Yes.
6       Q.   Let's walk through that again.  So you do
7   not include as an independent variable the expected
8   revenue surprise as predicted by the Capital One
9   transaction data in either of these Exhibits 16 and
10  17, correct?
11      A.   Depends on how we define a surprise.  If
12  you look at row C, it is looking at the growth in the
13  Capital One transaction data for a given quarter year
14  over year so to that extent it's what's the surprise
15  of the change in that transaction data.  If you look
16  at row D, I'm specifically calculating defendant's
17  expectation of total revenue for a given quarter
18  compared to how that expectation was a year ago for
19  that quarter so depending how we define surprise I'm
20  measuring the impact of how defendants' expectations
21  are changing.
22      Q.   Dr. Voetmann, does revenue surprise have
23  a meaning in the financial economics industry?
24      A.   To me it does.  When you read the
25  academic literature on analyzing earnings surprises,

1    the definition of an earnings surprise is the actual

2    earnings minus the consensus divided by actual

3    earnings so you can see how off was the consensus

4    compared to when the actuals came out.

5         Q.    Sorry, go ahead --

6         A.    However, that's not the definition that

7    Graham chose to use for a surprise in his report and

8    so what I have done in my analysis in order to

9    understand exactly what Graham did, I accepted his

10   definition of a surprise and applied that in this

11   analysis here where he's not comparing consensus to

12   actual, he's simply looking at consensus or actual

13   sales as a ratio.

14        Q.    Do you think that Mr. Graham did the

15   analysis correctly?

16        A.    I do not.

17        Q.    So why did you follow his methodology?

18        A.    Because what we are attempting to answer

19   here is the question as Graham set out in his

20   assignment in paragraph 3 whether or not the

21   information from the transaction data could be used to

22   form some opinion about whether you would buy or sell

23   a security so you are looking at information that is

24   immediately prior to an earnings announcement so

25   that's different from the academic literature which is

1  looking at how did the market respond to actual

2  earnings where you can calculate the surprise of those

3  earnings and then observe by looking at the abnormal

4  return how the market responds.

5           What Graham did instead he took the

6  consensus estimate as a measure of surprise relative

7  to actual last year reported sales and said is it

8  growing or declining for the current quarter and he's

9  comparing that to what was ex-post reported by the

10 company so he's actually taking the components of the

11 independent variable and putting part of the component

12 on the dependent side and the other part on the

13 independent side so he's mixing up the traditional

14 methodology that's used in academic literature for

15 earnings prices.

16      Q.   Let's focus on your Exhibits 16 and 17,

17 your methodology. Do you think that you did these

18 regression analyses correctly?

19      A.   In order to answer the question we are

20 attempting here which is whether the information of

21 the transaction data could be used to determine

22 whether you make a buy or sell decision, yes.

23      Q.   So let's walk through what this means so

24 A, what is an intercept in connection with a

25 regression analysis?

1         A.     That's just the place in which the value

2    intercepts zero sales.

3         Q.     So let's look at analyst expectations.

4    What do you expect ex-anti, what do you expect analyst

5    expectations effect to be on whether there's abnormal

6    returns?

7         A.     We are looking at the abnormal returns?

8         Q.     Focusing on your analysis?

9         A.     Yes.

10        Q.     What would you expect there to be --

11   withdrawn.  Focusing on analyst expectations in your

12   analyses, what would you expect the analyst

13   expectations variable to have in predicting whether or

14   not there's abnormal returns?

15               MR. SOMENSATTO: Objection to form.

16        A.     No impact on the abnormal return.

17        Q.     Why is that?

18        A.     Because remember the definition of the

19   analyst expectation, this is the same definition that

20   Graham uses, it's the consensus that's known to the

21   market immediately before I think Graham said one to

22   two weeks before the earnings announcement and it's

23   the sales of that company a year ago. All that

24   information has been known by the market for over a

25   year at least sales from a year ago and the consensus

1   has been known for a while. All that has been embedded

2   into the current stock price so if you believe in

3   market efficiency, then all that information is

4   already embedded into the price and so I have no

5   reason to expect that there will be a significant

6   additional impact from analyst expectation as defined

7   by Graham here because that information has already

8   been incorporated into the price.

9          Q.    So let's turn to the next variable,

10  growth in Capital One transactions.  What effect would

11  you expect that variable to have on abnormal returns?

12         A.    This is the interesting variable to

13  examine because that tells us something about whether

14  or not this non public information when you look at a

15  large sample cross sectionally can explain some of the

16  return patterns so what we have here is the

17  transaction -- in regression one the transaction data

18  that the defendant had access to for that current

19  quarter relative to that same transaction data a year

20  ago so they can observe whether or not they believe

21  the transaction data should guess revenue is going up

22  or down and so if in fact I believed that this

23  information would be material, I would expect to find

24  a significant co-efficient on that variable and I do

25  not, in other words, this information across all these

1    companies and these announcements does not appear to

2    have any impact on the price of the securities when

3    the actual sales is released to the market.

4            Q.    I'm going to follow up on that.  I'm

5    confused by your answer.  So let's say in time period

6    T zero Capital One transaction data is X and then in T

7    one the Capital One transaction data is 2X?

8            A.    Okay.

9            Q.    What effect does that have on abnormal

10   returns?

11                 MR. SOMENSATTO: Objection to form.

12           A.    None.

13           Q.    Why?

14           A.    Because this shows when you run this

15   regression the co-efficient is .01, it's a very

16   marginal impact.

17           Q.    Let me see.  Let's talk about revenue for

18   a second.  If revenue of a company in T one was X and

19   revenue in T two goes to 2X, what expectation does

20   that have -- what expectation would you have on the

21   abnormal return of that security?

22           A.    This regression would not tell me or

23   answer that question.

24           Q.    Let's just take a step back for a second

25   then when you are dealing with revenues, revenue goes

1    from X to 2X from time period one to time period two.

2    How does the stock price move?

3                 MR. SOMENSATTO: Objection to form, asked

4          and answered.

5          A.    So if the -- now we are back in as I

6    defined an earnings surprise. If I wanted to

7    understand the impact of reporting actual earnings of

8    2X, I would compare this 2X to the consensus and if

9    the consensus was 2X as well, my expectation would be

10   that there's no impact.  If the consensus was higher

11   or lower, I could form an opinion on whether it would

12   be a positive or negative impact.

13         Q.    Why doesn't that same explanation apply

14   with respect to whether or not the Capital One

15   transaction data goes up from one period to another?

16         A.    First of all, you don't have a consensus

17   estimate for transaction data so what you need -- you

18   need the estimate and you need to compare it to the

19   actual so what this regression is doing it's saying

20   immediately prior to the earnings announcement what

21   was known by the defendant and what was known by the

22   analyst in the market.  Do those two pieces of

23   information explain the abnormal return, the answer to

24   that is no.

25         Q.    In order to determine whether or not a

1   revenue surprise has an effect on a company's stock

2   price you would need to -- withdrawn.

3           Dr. Voetmann, in order to determine

4   whether or not a change in revenue has an effect on a

5   company's stock price you would need to take into

6   account analyst expectations, correct?

7       A.   Correct.

8       Q.   So let's assume you wanted to determine

9   whether 1/100 of the company's revenue would have a --

10  withdrawn.  You had testified earlier -- withdrawn.

11          Dr. Voetmann, why aren't you treating the

12  Capital One transaction information in your regression

13  on Exhibit 16 and 17 consistent with the way you would

14  be treating revenue information in determining whether

15  or not the release of that information to the market

16  has an impact on company stock price?

17      A.   Can you read that back.

18          (Record read.)

19      A.    If I understand the question correctly,

20  we are here to establish whether or not the

21  information that the defendant had access to would put

22  them in a situation where they could make a decision

23  prior to the earnings announcement whether they would

24  buy or sell a security so looking at it ex-post

25  defeats the purpose of understanding whether they

1  would make a buy or sell decision because then the
2  profit is already gone from that strategy if there
3  were a strategy.
4            MR. KELLY: Could you please read back
5        that answer.
6            (Record read.)
7        Q.    Whenever you're trying to analyze the
8  effect of the release of information in the market
9  though don't you need to analyze it ex-post?
10       A.    Yes, if you are measuring earning
11 surprises you are trying to ask the question which is
12 a little bit different which is if the market was
13 surprised by the reported earnings, how did they
14 respond, but at that point in an efficient market as
15 soon as that announcement occurs, the market price
16 would adjust and so a strategy to buy or sell that
17 security after the announcement would not necessarily
18 be fruitful or you wouldn't be able to make any profit
19 from it.
20       Q.    Variable C on Exhibit 16, you do not
21 factor in whether or not the Capital One transactions
22 -- withdrawn.  There's no consideration of analyst
23 expectations in connection with item C, correct?
24       A.    C is purely looking at Capital One
25 transaction data.

1        Q.    Item D, there is no consideration of

2   analyst consensus expectation in connection with this

3   item, correct?

4        A.    If you look at the variable in isolation,

5   the answer is no, but you have to look at the

6   regression in totality because in row B you have the

7   consensus estimate which is included in all three

8   regressions here.

9        Q.    What's an independent variable?

10       A.    It's the variable that you're checking to

11  see if it's related to the dependent variable.

12       Q.    So is B analyst expectations an

13  independent variable or dependent variable situation?

14       A.    All the variables listed here are

15  independent variables.

16       Q.    So you're comparing item B, the effects

17  of item B analyst expectations on abnormal returns,

18  correct?

19       A.    Yes.

20       Q.    You are comparing item C, growth in

21  Capital One transactions with abnormal returns,

22  correct?

23       A.    In order to compare it, you have to use

24  the co-efficients on intercept B and either C or D in

25  order to calculate the expected abnormal return.

1   Q. I don't think you answered my question.

2     MR. KELLY: Could you please read it back.

3     (Record read.)

4   A. By item C you mean the co-efficient on

5 the variable for growth in Capital One transactions?

6   Q. You are comparing item C growth in

7 Capital One transactions and determining how changes

8 in that variable effect or are associated with

9 abnormal returns, correct?

10   A. Correct.

11   Q. The same with item D, transaction data

12 forecast, you're comparing how changes in transaction

13 data forecast is associated with abnormal returns,

14 correct?

15   A. Correct.

16   Q. At any point in this analysis are you

17 analyzing whether the transaction data forecast by

18 defendants as compared with analyst expectations has

19 an effect on abnormal prices, abnormal returns?

20   A. So as I stated when you want to compare,

21 you can't compare an independent variable in a multi

22 regression in isolation. You have to look at the mix

23 of all the variables so in order to estimate what the

24 abnormal return is from this regression, you would

25 have to look at both B and C combined as well as B and

1  D combined.

2          B is the consensus estimate from analysts

3  so, for example, if you look at two, there is a

4  positive co-efficient on B although it's not

5  significant so it might as well be zero, but you

6  expect that to have a positive impact -- the consensus

7  to have a positive impact on the abnormal return

8  although it's statistically insignificant.

9          D, the data that defendants had access to

10 and their estimate of total sales immediately prior to

11 the earnings announcement in fact had a negative

12 co-efficient so you would combine both of those in

13 order to understand how that effects the dependent

14 variable.

15      Q.    These are all independent variables B

16 through D, correct?

17      A.    Correct.

18      Q.    So there is no determination as to

19 whether or not the transaction data forecast as set

20 forth by the -- withdrawn.

21          Dr. Voetmann, you could have analyzed

22 whether the transaction data as forecast by the

23 defendants predicted a revenue surprise, correct?

24          MR. SOMENSATTO: Objection to form.

25      A.    Depends how you define revenue surprise.

1           Q.    I'll re-ask the question.  Dr. Voetmann,
2    you could have analyzed and included as an independent
3    variable whether the transaction data forecasted by
4    defendants predicted an increase or decrease in the
5    consensus analyst revenue forecast, correct?
6                 MR. SOMENSATTO: Objection to form.
7           A.    I'll try to restate and see if we agree
8    on the question.  If you are asking if I move the
9    analyst expectation as the dependent variable and
10   regress that against the transaction data forecast?
11          Q.    No, that's not what I'm asking.  You
12   could have -- withdrawn.  If I were to tell you that
13   the Capital One transaction data is predicting
14   revenues of a billion dollars, would you predict that
15   the stock price would go up or down?
16                MR. SOMENSATTO: Objection to form.
17          A.    I don't have that specification here, but
18   if you told me that the transaction data changed by a
19   billion dollars in its prediction of revenue,
20   co-efficient D tells me the abnormal return would go
21   down, but it's not statistically significant so it may
22   as well just be zero.
23          Q.    What I'm telling you is let's talk about
24   the variables, but put aside the actual results.  The
25   question is if I were to tell you that the defendants'

1   projections of company A's revenue was going to

2   increase from the prior year to the current year by a

3   billion dollars, how would you predict the stock price

4   of the company would react?

5            MR. SOMENSATTO: Objection to form.

6       A.    That would be insufficient information

7   for me to make any prediction.

8       Q.    Why is that?

9       A.    Ignoring this all I have information

10  about is a change in revenue.  I would need to look at

11  the totality and the total mix of information and

12  determine whether or not a change of a billion dollars

13  was expected or not or whether or not that information

14  of a billion dollar increase would lead the market to

15  change the price either up or down.

16      Q.    When would -- what's the role of revenue

17  expectations on whether or not the release of that

18  information would make the market price the security

19  up or down?

20      A.    I have a hard time hearing.

21            (Record read.)

22      A.    The role of the transaction data

23  information, again, I think it's insufficient

24  information to draw any conclusion whether for me to

25  determine whether the price would go up or down.

0413

1          Q.    Let's put it this way.  If the

2    transaction data forecast was in line with analyst

3    expectations of revenue, would you expect the price of

4    the company -- price of the security to go up or down?

5                    MR. SOMENSATTO: Objection to form.

6          A.    As it's measured in my analysis and in

7    Graham's analysis, if you look at the analysts

8    expectation and that expectation is already embedded

9    into the market because the market knows about that

10   expectation, you are telling me that the expectations

11   that the defendant had was exactly the same as the

12   market, the consensus, as I sit here right now I have

13   no reason to believe that that information would tell

14   me whether the price would go up or down or the price

15   reaction would be any different whether I knew that

16   information or not.

17         Q.    If the defendants' projections of company

18   revenue exceeded the analyst expectations of revenue,

19   how would you expect that to effect the stock price of

20   the company?

21         A.    Again, it's insufficient information for

22   me to make any conclusion about that.  The prediction

23   that the defendants came up with was sometimes

24   contra-indicative to what actually happened even

25   though it was different from the consensus.

1        Q.    Let's focus on a hypothetical.  If you

2   are able to predict that revenue is going to proceed

3   analyst expectations and that's the only thing you

4   know, does the stock price go up, does it go down or

5   does it stay the same?

6              MR. SOMENSATTO: Objection to form.

7        A.    In your hypothetical if you predict an

8   estimate of revenue to be greater than the consensus,

9   you might have an expectation that the price should go

10  up, however, that is not determined just by those two

11  pieces of information because it could be that the

12  actual sales came out below consensus in which case

13  you might actually make the wrong bet.  The

14  expectation price going up is reversed and it goes

15  down even though you had an expectation that was

16  greater than the consensus.

17       Q.    Dr. Voetmann, do you agree -- in

18  paragraph 17 you refer to a study cited by Mr. Graham,

19  Rees and I'm going to leave it there and call it the

20  Rees study.  The authors state next to earnings,

21  revenues forecasts are perhaps the most widely

22  followed performance metric by analysts.  Do you

23  disagree with that statement?

24       A.    No, that's a statement that was provided

25  by the author.  I'm confused there.  You are reading

1   the statement in sentence two of paragraph 17?

2       Q.   Yes, so let me just restate it.  Dr.

3   Voetmann, do you agree or disagree with the following

4   statement; next to earnings, revenues forecasts are

5   perhaps the most widely followed performance metric by

6   analysts?

7           MR. SOMENSATTO: Objection to form.

8       A.   I think that statement is taken out of

9   context.

10      Q.   Do you have an opinion one way or the

11  other whether you agree with that statement?

12      A.   I have not done an analysis to confirm

13  whether I agree or disagree with that statement.

14      Q.   In paragraph 18 Mr. Graham cites

15  Fairfield, Ramnath and Yohn and they state in their

16  article that sales growth is the fundamental driver of

17  firm growth.  Dr. Voetmann, do you agree or disagree

18  with that statement?

19          MR. SOMENSATTO: Objection to form.

20          Agree that's what's written in the article or

21          that that's a correct statement?

22          MR. KELLY: I'm asking whether you agree

23          with that statement, not whether it's written

24          in the article.

25      A.   I have insufficient information in order

1    to determine whether that's a fair or true statement.

2         Q.   As used in that sentence, what does firm

3    growth mean?

4              MR. SOMENSATTO: Objection to form.

5         A.   I don't have the article in front of me

6    so I cannot say with certainty what that means.

7         Q.   Let me ask you in the next sentence when

8    you refer to firm growth, what do you mean?

9         A.   So when I think of firm growth, I think

10   of growth in the market value of the firm.

11        Q.   Dr. Voetmann, let me ask you did you read

12   the Fairfield, Ramnath and Yohn article prior to

13   issuing your report?

14        A.   I reviewed the article prior to issuing

15   the report, yes.

16        Q.   Did you read the sentence sales growth is

17   the fundamental driver of firm growth?

18        A.   I did.

19        Q.   Did you read the Rees article referred to

20   in paragraph 17 prior to issuing your report?

21        A.   I did.

22        Q.   Dr. Voetmann, did you read the Beaver

23   article referred to in paragraph 16 of your report?

24        A.   I did.

25        Q.   Dr. Voetmann, please turn to paragraph

1  30.  Dr. Voetmann, you state Mr. Graham's correlation

2  analysis neither proves a predictive relationship

3  between transaction data and aggregate revenues.

4  Let's stop there.  What's the basis for that opinion?

5       A.   The basis for that opinion is simply

6  looking at the analysis that I performed in my report.

7  When I changed the variable to include returns, all of

8  the correlations that Mr. Graham cites as being

9  significant disappears.

10       Q.   But to be fair, Dr. Voetmann, you are

11  testing something different than Mr. Graham tested,

12  correct?

13            MR. SOMENSATTO: Objection to form.

14       A.   I'm not sure I follow the question.

15       Q.   Did Mr. Graham analyze abnormal returns

16  at all in his analysis?

17       A.   He did not.  He did not connect the sales

18  data to price returns.

19       Q.   So when you are comparing your

20  correlation results with his results, you are talking

21  about two entirely different tests, correct?

22            MR. SOMENSATTO: Objection to form.

23       A.   The test is still a correlation test, but

24  what's relevant here is to determine whether the sales

25  data would guide an investor in making their buy and

 1    sell decision and Mr. Graham has not connected that
 2    analysis he performed to that decision.
 3         Q.    Is it your opinion that you have?
 4         A.    Yes.
 5         Q.    As you sit here today, do you --
 6    withdrawn.  As you sit here today, would you like to
 7    make any changes to your report?
 8         A.    No.
 9         Q.    As you sit here today, would you make any
10    corrections to your report?
11         A.    It's possible that I would maybe phrase
12    something differently, but I can't think of any
13    corrections I would make as I sit here right now.
14              MR. KELLY: Let's break for a few
15         minutes.
16              THE VIDEOGRAPHER: We are now off the
17         record at 3:47 p.m., October 16, 2015.
18              (Recess taken.)
19              THE VIDEOGRAPHER: This is tape six of
20         the deposition of Dr. Torben Voetmann.  We are
21         now on the record at 4:00 p.m., October 16,
22         2015.
23         Q.    Welcome back, Dr. Voetmann.  I want to go
24    back to a question I asked you a moment ago that
25    relates to paragraph 30 where in that paragraph you

```
 1   state Mr. Graham's correlation analysis neither proves
 2   a predictive relationship between transaction data and
 3   aggregate revenues, do you see that?
 4           A.    Yep.
 5           Q.    Dr. Voetmann, you testified earlier today
 6   that Dr. Graham's correlation analysis did prove a
 7   predictive relationship between the transaction data
 8   and aggregate revenue; is that correct?
 9           A.    No, I'm not sure that's correctly stated.
10   I did testify that he found a correlation between the
11   data.
12           Q.    So let me ask you this, Dr. Voetmann, Mr.
13   Graham's correlation analysis does prove a correlation
14   between transaction data and aggregate revenues,
15   correct?
16           A.    For a large number of the companies that
17   he analyzed I think it was 132 out of 226.
18           Q.    And you stated earlier today that that
19   was obvious to you, correct?
20               MR. SOMENSATTO: Objection to form,
21           mischaracterizing testimony.
22           Q.    Let me rephrase.  Dr. Voetmann, you
23   testified earlier today that it was obvious to you
24   that there was a correlation between the transaction
25   data and the company aggregate revenues, correct?
```

1              MR. SOMENSATTO: Objection to form.

2        A.    For Graham's historical analysis,

3   historical data, I have no reason to disagree with the

4   correlation he found.

5        Q.    So what's the distinction in your mind

6   between a correlation and -- withdrawn.  Dr. Voetmann,

7   what's the distinction you are drawing between whether

8   variable is correlated with another variable and

9   whether one variable is predictive of that variable?

10       A.    So either way as I responded to Graham's

11  analysis he was looking at the predictability of the

12  aggregate data based on the correlation.  I'm not sure

13  -- my opinion just having a correlation is not

14  necessarily confirmative of a predictive relationship.

15  There may be other factors that could influence that

16  predictability.

17       Q.    If one variable has a correlation of one

18  with another variable, what does that mean?

19       A.    As a matter of principal it's perfectly

20  correlated.

21       Q.    What does it mean for one perfectly

22  correlated variable with another variable?

23       A.    I'm trying to think about a classic

24  statistical example we often find and I believe it's

25  the consumption of apple juice and murder is perfectly

1   correlated. Does that mean drinking more apple juice

2   suggests a higher rate of murder, I don't believe so

3   so one has to be very careful when drawing conclusions

4   when you see a correlation of one that that's the same

5   as predictive.

6        Q.   If something has a perfect correlation

7   and there are two variables and they have a perfect

8   correlation of one and I tell you this is the number

9   for one of those variables, can you determine what the

10  other variable's value is?

11              MR. SOMENSATTO: Objection to form.  Is

12       that the question?

13              MR. KELLY: Yes.

14       A.   No.

15       Q.   Why not?

16       A.   I think my example illustrated it.  Just

17  because you know that relationship, doesn't

18  necessarily imply that you can tell how one will

19  change.

20       Q.   What do you mean by how one would change?

21       A.   The change or predictive relationship.  I

22  don't think that's a fair characterization.

23       Q.   Is that because -- withdrawn.  Is your

24  answer assuming that the correlation between the two

25  variables will change over time?

1          A.    It's possible it might change over time,

2    but one might also want to establish whether there are

3    other factors that would influence that correlation.

4          Q.    Typical correlation analysis is between

5    one variable and another, correct?

6                MR. SOMENSATTO: Objection to form.

7          A.    Very high level principal, yes, that's

8    the typical definition of a correlation analysis.

9          Q.    All you're concerned about is how one

10   variable interacts with another variable, correct?

11         A.    No, I would disagree with that.  If you

12   were a statistician, you would be concerned about the

13   causation as well and explaining whether in fact you

14   found a true correlation or whether just a spurious

15   correlation.

16         Q.    Please look at paragraph 32, subparagraph

17   B.  You state that Mr. Graham's regression analysis

18   does not account for any time or fixed effects.

19   What's the basis -- withdrawn.  You say it is standard

20   in the literature to include these effects when

21   investigating -- let me just start again.

22                In paragraph 31B of your report, Dr.

23   Voetmann, you state that it is standard in the

24   literature to include time or fixed effects when

25   investigating impact of information; is that correct?

```
 1              A.    Correct.
 2              Q.    What's the basis for that statement?
 3              A.    The basis I cite -- one of the basis for
 4   that is in footnote 20.
 5                    MR. KELLY: Exhibit 9.  Hold on a second.
 6                    (Exhibit 9, Article entitled The Impact
 7         of Analysts' Forecast Errors and Forecast
 8         Revisions on Stock Prices, marked for
 9         Identification.)
10              Q.    Why don't you put that one to the side
11   for a minute.
12              A.    Okay.
13                    MR. KELLY: Exhibit 10.
14                    (Exhibit 10, Article entitled The Impact
15         of Analysts' Forecast Errors and Forecast
16         Revisions on Stock Prices, marked for
17         Identification.)
18              Q.    Dr. Voetmann, could you please identify
19   this document?
20              A.    This is the article by Beaver, et al.
21   from 2008.
22              Q.    Dr. Voetmann, is this the article that
23   you cite in support of your statement?
24              A.    I believe it is.
25              Q.    Let me get it out.
```

1        A.    Sorry.

2        Q.    I was finding it.  Dr. Voetmann, is this

3    the article that you cite in support of your statement

4    that it's industry standard to include time or fixed

5    effects in regression analyses?

6        A.    I didn't say industry standard, but it's

7    standard in the literature, yes.

8        Q.    Standard in the literature, correct?

9        A.    Yes.

10       Q.    Could you please identify where in that

11   article it states that it's standard in the literature

12   to account for time or fixed effects?

13       A.    Sure.  If you go to page 719, there is a

14   section subsection 2ii, incorporate of year and

15   industry fixed effects.  Fixed effects are included to

16   capture sources of time dependent and cross sectional

17   dependency, so on and so forth.

18       Q.    Does this article state that it's

19   standard in literature to use time and fixed effects?

20       A.    It's an illustration of an article that

21   implements the time and fixed effects and recommends

22   doing so.

23       Q.    Could you please identify the

24   recommendation?

25       A.    Simply by stating that -- the paper

1  itself doesn't state that it's industry standard,

2  sorry, standard in the literature.  It's employing and

3  citing other papers, but it's employing the

4  methodology of fixed firm effects and I included this

5  paper as an illustration of a study similar to the

6  study that Graham had undertaken at looking at

7  surprises, analyst forecasts where in fact they

8  included fixed firm effect.

9        In addition, the paper also spends a fair

10  amount of discussion throughout where it tries to

11  demonstrate the importance of controlling, for

12  example, of the quarter year end as an illustration

13  of a fixed effect.

14        Q.   Dr. Voetmann, could you have run Mr.

15  Graham's regression analysis and accounted for time

16  and fixed effects?

17        A.   Yes.

18        Q.   Did you?

19        A.   Did I run Graham's specification with

20  time and fixed effects?

21        Q.   Correct.

22        A.   I don't recall that I did.  I ran my own

23  regression with time and fixed effects.  It made no

24  difference on the conclusion of opinions of my

25  analysis.

1    Q.    Why didn't you perform Mr. Graham's

2  regression analysis with time and fixed effects?

3    A.    As I said, I don't recall if I did.  I

4  would have to go back and check.

5    Q.    If Mr. Graham were to account for time

6  and fixed effects and if the results were

7  substantially similar, would you have more confidence

8  in the accuracy of his regression results?

9    A.    No.

10    Q.    Why not?

11    A.    Again, I'm not challenging the regression

12  itself, but I'm challenging the specification that

13  he's not answering the question he set out to answer

14  by regressing revenues against revenues.

15    Q.    Dr. Voetmann, in any of your articles or

16  publications have you done regression analyses without

17  accounting for time or fixed effects?

18    A.    In some of my earlier publications I

19  have.

20    Q.    How many instances have you run

21  regression analyses without accounting for time or

22  fixed effects?

23    A.    I don't think it's uncommon to run a

24  regression without time and fixed effects, however, if

25  you are looking at a time period where there is a lot

1  of uncertainty in the market, it would not be

2  unreasonable to expect that you would control to see

3  if some periods of your analysis is influenced more

4  than others.

5       Q.    In those articles where you ran

6  regression analyses without accounting for time or

7  fixed effects, did you need to retract to those

8  articles in any way?  Retract them or modify the

9  results from those regression analyses?

10      A.    No and also a number of the studies I did

11  early on was focused on a very narrow time period. For

12  example, when I did my study on CEO turnover, there

13  was a very narrow time period so that's a good example

14  of specification where time effects and fixed effects

15  for time would not make much of a difference.

16      Q.    If you look at 31C in your report, Dr.

17  Voetmann, if you look at paragraph 31C in your report,

18  you critique Mr. Graham's regression analysis because

19  it doesn't control for any market, industry or company

20  specific factors, do you see that?

21      A.    Other than revenue, yes.

22      Q.    Is it standard in the literature to

23  control for market, industry or company specific

24  factors when you do a regression analysis?

25           MR. SOMENSATTO: Objection to form.

1          A.    Yes.

2          Q.    What's the basis for that opinion?

3          A.    It's articles I've read controls for

4    market in the industry and company specific

5    information.

6          Q.    There isn't such an article cited in

7    connection with paragraph 31C.  Could you please

8    identify what article or articles you are talking

9    about?

10         A.    There are so many articles I cannot tell

11   you which one would stand out among the many articles

12   that controls for market in the industry company

13   specific information.

14         Q.    If Mr. Graham were to control for market,

15   industry or company specific factors and if his

16   results were substantially similar, would you have

17   more confidence in the accuracy of his regression

18   results?

19         A.    I would have to review his new study and

20   determine based on what factors he included whether I

21   had more confidence in that.

22         Q.    If you turn to paragraph 33 you discuss

23   Mr. Graham's use of the data in the DONE files.  Look

24   at 33A.  You note that in several of the DONE files

25   the historical revenues data provided for a given

 1  company did not match the actual reported revenues, do

 2  you see that?

 3       A.   Yes.

 4       Q.   Had Mr. Graham solely used actual

 5  reported revenues for purposes of his regression

 6  analysis, would that fact eliminate the issue you

 7  identified in 33A and 33B of your report?

 8       A.   Could you read that question back.

 9            (Record read.)

10       A.   I'm not sure I understand the question.

11       Q.   The question is you're stating in

12  paragraph 33A and B that historic revenue data in the

13  DONE files are inaccurate, correct?

14       A.   Yes.

15       Q.   Assume Mr. Graham did not use that

16  information in his analysis and he used publicly

17  available actual revenue information.  Do your

18  critiques in 33A and 33B disappear?

19       A.   So I think my critique is directed in a

20  different direction.  As I understand it, Mr. Graham

21  did not use the reported aggregate sales data in DONE

22  files for his regression analysis, he pulled in the

23  reported revenue data for each company from Compustat

24  so what I'm addressing here is the simple fact that if

25  you want to understand the potential benefit that

1  defendants had by having access to the transaction

2  data from Capital One, I would want to pause and try

3  to understand how are they using that transaction data

4  when in fact a large portion of these files that they

5  supposedly relied on to come up with the estimates had

6  the wrong information in it so this is not so much --

7  it's more critique of it might have been worth

8  understanding what the implication of using wrong

9  information in these files would have on the estimate

10  that defendants came up with.

11       Q.    In forming your opinions, would you like

12  to know what defendants actually did with the data

13  that they had access to?

14       A.    Sorry?

15            (Record read.)

16       A.    Well, I would like to know what they

17  actually did.  I don't know that I know what they

18  actually did with the data.

19       Q.    You have been engaged by defendants in

20  this matter, correct?

21       A.    Correct.

22       Q.    Have you asked either the defendants what

23  they did with the data?

24       A.    I have not.

25       Q.    Why not?

1        A.    I have not had any access or opportunity

2   to speak to defendants.  I'm looking at Graham's

3   analysis to examine exactly what he did to see whether

4   he did the job to understand what was in these files

5   so he could draw a conclusion or base his opinion on

6   whether or not an investor would be able to make a buy

7   or sell decision based on the data contained in the

8   DONE files and as I see these DONE files, I'm not sure

9   I exactly understand how they use that information to

10  make any trading decision.

11       Q.    Dr. Voetmann, are you aware of the fact

12  that defendants in this case have asserted their Fifth

13  Amendment rights against self incrimination and refuse

14  to respond to the vast amount of the discovery served?

15       A.    I understand.

16       Q.    Dr. Voetmann, is that the reason why you

17  don't have any information as to what exactly

18  defendants did with the data?

19            MR. SOMENSATTO: Objection to form.

20       A.    I'm actually not sure.  That's possibly a

21  reason why.

22       Q.    So if you look at paragraph 33C, Dr.

23  Voetmann, you state that the reported composite

24  capture rate as reported in defendants' revenues

25  forecasts for a given quarter do not reconcile with

1  Mr. Graham's calculations, do you see that?

2        A.    Yes.

3        Q.    Does Mr. Graham rely on defendants'

4  forecast in any way for his regression analysis?

5        A.    No and that's partly surprising to me

6  that he didn't.

7        Q.    Given that Mr. Graham is not relying on

8  the composite capture rate in the DONE files, does

9  your concern as set forth in 33C disappear?

10       A.    No.  Again, what I've discovered in these

11  DONE files is that at times the composite capture rate

12  is wrong so it leads me to the question what exactly

13  did the defendants use this data for.  How would they

14  be able to predict revenues if they didn't have the

15  following their own methodology the right composite

16  rate and I have not seen any evidence that Graham

17  looked into what that information -- how that

18  information could be used to make a decision to either

19  buy or sell a security.

20       Q.    As you sit here today, what could you

21  tell me about what defendants did in analyzing the

22  Capital One transaction data and making their

23  investment decisions?

24             MR. SOMENSATTO: Objection to form.

25       A.    The only -- what I can say is my analysis

1    of the transaction data that they had access to, that

2    information in isolation does not explain price

3    movements so in other words there's no statistically

4    related relationship between the information they had

5    access to and stock price movements so it's not clear

6    to me how they would have used this information to

7    actually make any buy and sell decisions.

8         Q.   In answering that question do you have

9    any first hand knowledge as to what exactly defendants

10   did with the Capital One transaction data?

11              MR. SOMENSATTO: Objection to form.

12        A.   I don't have any first hand knowledge

13   other than I have looked at hundreds of these DONE

14   files and seen how they compiled the DONE files.

15        Q.   Please turn to paragraph 35.  Why don't

16   you turn to Exhibit 15?  We're probably going to flip

17   back between paragraph 35 and Exhibit 15?

18        A.   Okay.

19        Q.   What does Exhibit 15 reflect?

20        A.   So Exhibit 15 was an attempt to show how

21   one might understand the use of the defendants'

22   forecast and I compared this to Mr. Graham's Exhibit E

23   for the company BeBe and what you will see on this

24   exhibit is if you look at the left hand side, we have

25   an estimate from defendants which is approximately 125

1    million, the consensus estimate was 133-and-a-half

2    million so in other words the defendants' estimate of

3    actual sales for BeBe is eight-and-a-half million less

4    than what the consensus was.

5             Based on that information alone prior to

6    an earnings announcement you might imply that this

7    company if you believe that defendants' forecast is

8    more correct you would sell that stock.  When you look

9    at the earnings announcement and you see actual

10   earnings comes out, it comes out at 135 and some;

11   actually an actual earnings of revenue that was

12   greater than the analyst forecast and so this is a

13   good example just one example where the defendants'

14   forecast might have driven them to sell this stock,

15   but in reality the true revenue for that quarter for

16   BeBe was actually higher than analyst expectation so

17   if you believe in an earnings response approach, this

18   is a positive response. You would expect the positive

19   price impact and when you look at the return that day,

20   you actually see a positive price impact so this

21   calendar goes just in the opposite direction of what

22   defendant might have done if they followed their own

23   strategy of looking at their own forecast as opposed

24   to the analyst consensus forecast.

25             Q.   Did you or did someone else pick BeBe to

1  use as an example in this exhibit?

2       A.    I picked BeBe based on looking at Exhibit

3  E of Mr. Graham just to pull an example where he

4  predicted so the numbers you see here, the 8.5

5  million, I pulled that out of Mr. Graham's Exhibit E

6  just to demonstrate. Now my cross sectional analysis

7  where I examined almost a thousand of these similar

8  transaction earnings announcements you confirm that

9  the information of defendants' forecast doesn't

10  predict the price return so in other words there's no

11  statistical relationship between the transaction data

12  and the price return.

13       Q.    Does Mr. Graham conclude that there is a

14  statistically significant relationship between the

15  BeBe Capital One transaction data and actual not yet

16  reported revenues?

17       A.    Mr. Graham in his Exhibit E have a chart

18  that confirms that the actual sales based on his

19  analysis predicted Capital One transaction is lower

20  than the actual sales.  What Graham didn't do on this

21  Exhibit E is just adding the consensus estimate so

22  he's not drawing any conclusions one way or the other

23  how the predictive is relevant for the actual here and

24  he's not drawing any conclusion how it connects to

25  whether an investor would buy or sell based on the

1   predictive sales of BeBe on his Exhibit E.

2        Q.    Let's look at your Exhibit 6 for

3   instance.  So if you look at Graham correlations

4   revenues to Cap One transaction amount, do you see

5   that column?

6        A.    Yes.

7        Q.    And you see there is a star under most of

8   those and its says indicates statistical significance

9   of correlations at the five percent level, do you see

10  that?

11       A.    Yes.

12       Q.    If you look at your Exhibit 6 which is

13  the comparison of the correlations that Mr. Graham set

14  forth in his report, is it fair to say that the only

15  company that Mr. Graham -- withdrawn.  Is it fair to

16  say the only company that Mr. Graham includes in his

17  analysis -- withdrawn.

18            I need to get a little more precise on

19  what this is.  Dr. Voetmann, is it fair to say that

20  the only company that Mr. Graham includes in his

21  Exhibit E charts for 20 DONE files that's not

22  statistically significant is BeBe?

23       A.    If you look at Exhibit E of his report,

24  I'm not sure that's a fair characterization.  He

25  estimates two correlation co-efficients, one of .43

 1  and one of .88.  I suspect I don't have the data in

 2  front of me, but the .88 is probably statistically

 3  significant.

 4       Q.    Let's look at your Exhibit 6 when you say

 5  revenues to Cap One transaction amount and you have a

 6  star with respect to every single company except BeBe?

 7       A.    Yes.

 8       Q.    What does that star mean?

 9       A.    It's referring to his Exhibit B where he

10  concludes that there is no significant correlation on

11  his Exhibit B for BeBe, however, when you look at his

12  Exhibit E, you notice he actually does two

13  calculations and it's not clear to me whether he's

14  reporting one or the other and I don't think it

15  distracts from the point that I'm making in my Exhibit

16  15 which is looking at a quarter and you are trying to

17  assess whether could regardless of the correlations

18  could defendant have traded on this information or

19  make an informative decision on this information and

20  as I demonstrate in Exhibit 15 it's not clear that

21  they could have.

22       Q.    I'm a little confused, Dr. Voetmann.  My

23  understanding is that Mr. Graham is not offering an

24  opinion that there is a statistically significant

25  correlation between the Capital One transaction data

1   and the not yet reported company revenue for BeBe

2   stores.  Are you saying that that is incorrect and in

3   fact you think there is a statistically significant

4   correlation for BeBe stores?

5          A.    I'm saying I'm not sure. I haven't seen

6   -- I don't recall seeing any evidence of the

7   significant level if he excluded the first two

8   quarters as he did in Exhibit E because if you look at

9   Exhibit F of his analysis, you can see he lists out

10  132 companies with statistically significant

11  correlations and the cut off for a correlation to be

12  significant is like .55 which would be somewhat lower

13  than point .88 for BeBe and it's too small for me to

14  read if BeBe is actually on here.  I suspect it's not

15  because he included the first two quarters of BeBe,

16  but he does report on Exhibit E a correlation of .88

17  which based on his Exhibit F would suggest BeBe might

18  in fact be statistically significant.

19         Q.    Dr. Voetmann, did you perform any

20  analyses as set forth in Exhibit 15 with respect to

21  any other companies that were set forth in Exhibit E

22  of Mr. Graham's report?

23         A.    I believe I did.

24         Q.    What were the results of those analyses?

25         A.    At a conceptual level these results I

1   explain in Exhibit 16 and 17 where when you look at it

2   as a cross section across all the earnings

3   announcements similar to one announcement that I

4   present in Exhibit 15, you find that the incremental

5   value of the transaction data is not material.

6        Q.    Let's go back to why exactly did you pick

7   BeBe to do your analysis for Exhibit 15?

8        A.    I don't recall exactly.  I was looking at

9   the 20 companies and I settled on BeBe.  I believe I

10  could have settled on other companies as well.

11       Q.    Do you think that -- withdrawn.  Looking

12  at Mr. Graham's analysis of BeBe stores in Exhibit E,

13  do you believe that given the fact that excluding the

14  first two quarters that the correlation of Capital One

15  transaction data to sales as reported by the company

16  is .88, that that information for BeBe is sufficiently

17  correlated with not yet reported revenue information,

18  that using BeBe as an example in your 15 doesn't skew

19  your results?

20            MR. SOMENSATTO: Objection to form.

21       A.    There was something in that question that

22  I've not yet reported revenue sales is confusing.  The

23  correlations are based on reported revenues and the

24  transaction data.

25       Q.    Correct.

1          A.     But the answer is I don't think that

2    would not skew my point of Exhibit 15.

3          Q.     Why don't you focus on paragraph 38.  It

4    relates to Exhibit 16, but I'm not going to have us go

5    back to that exhibit specifically.  The question is

6    you say you substitute out Mr. Graham's growth in

7    transactions data variable for the yearly change in

8    the defendants' revenues forecast based on the

9    transaction data, do you see that?

10         A.     Yes.

11         Q.     In making that change, would you have any

12   expectation that the defendants' revenue forecast

13   variable would have any impact on the abnormal returns

14   of a given stock?

15         A.     That's the question I'm trying to answer.

16   Since this is non public, I want to see if that

17   information have any explanatory power of the abnormal

18   return.

19         Q.     Dr. Voetmann, in your regression analyses

20   as set forth in Exhibits 16 and 17, do you use actual

21   sales numbers?

22         A.     I use actual sales numbers as similar to

23   Graham for the consensus surprise.

24         Q.     Could you just identify where it is that

25   you use actual sales numbers of the company?

1          A.    Exhibit 16, analyst expectation defined

2     as analyst revenue forecast or reported sales or

3     actual sales.

4          Q.    That's item B?

5          A.    That's item B.

6          Q.    But that's revenue forecast for a current

7     time period, current quarter with reported sales for

8     prior year's quarter, correct?

9          A.    Correct.

10          Q.    Do you use reported sales for the actual

11     reported sales for that quarter?

12          A.    No.

13          Q.    Why not?

14          A.    Because I'm trying to answer the question

15     when that information -- could I trade on that

16     information prior to the release of the actual sales.

17     Could I by having access to the transaction data,

18     could I determine that that information would put me

19     in a position to make a decision about buying or

20     selling a security and so by including the actual

21     sales, I'm not really testing the question of whether

22     I can connect the transaction data to the actual

23     advantage that defendants might have had by having

24     access to that information.

25          Q.    Dr. Voetmann, if you want to include a

```
 1   true revenue surprise independent variable, you would
 2   include both an analyst revenue forecast for a given
 3   quarter as well as and compared with the reported
 4   sales for that quarter, correct?
 5        A.    Correct.
 6        Q.    You don't do that here, correct?
 7        A.    I considered that as I was thinking about
 8   how to analyze this question, but I come to the
 9   conclusion and realization if you are doing that you
10   are testing the -- you are measuring instead the
11   surprise of actual versus consensus.  You are not
12   measuring the impact or the potential impact of the
13   transaction data.  You are doing an ex-post evaluation
14   of the surprise as opposed to testing the information
15   content from the transaction data.
16        Q.    Does Mr. Graham use actual sales data as
17   reported by a company in that quarter?
18        A.    Yes.
19        Q.    Dr. Voetmann, in your regression
20   analyses, do you account for time and fixed effects?
21             MR. SOMENSATTO: Objection, asked and
22        answered.
23        A.    I ran a model where I included time and
24   fixed effects, but I didn't report that here and it
25   didn't make an impact on the co-efficient of the
```

1  analysis.

2       Q.    When did you run that analysis?

3       A.    Same time I ran and prepared this

4  exhibit.

5       Q.    Why did you decide to use the regression

6  analysis that did not include the time and fixed

7  effects?

8       A.    I was addressing directly what Mr. Graham

9  had done so by replicating his analysis and including

10 the transaction data it was similar or easier or --

11 easier to do a comparison to his results so I didn't

12 see a need to include the co-efficients on the

13 effects.

14      Q.    In your regression analysis, did you

15 control for market industry or company specific

16 factors?

17      A.    Yes.

18      Q.    Is your analysis set forth in this report

19 reflective of that control for market industry or

20 company specific factors?

21      A.    Yes.

22      Q.    Dr. Voetmann, what were defendants'

23 trading profits from January 2012 to December 2014?

24            MR. SOMENSATTO: Objection to form.

25      A.    I don't recall the exact number.  It's in

1    Graham's report how much they -- I understand he did

2    an analysis of how much they invested and how much the

3    account had at the end of a three year period.

4            Q.    Did you separately calculate defendants'

5    profits from the time period January 2012 to December

6    2014?

7            A.    I did not.

8            Q.    Why not?

9            A.    I was asked to examine the Graham report

10   and the Cain report for the methodology they used to

11   calculate the profit and then determine whether I

12   agreed with those methodologies, but I didn't

13   undertake for a couple of reasons undertake the same

14   analysis.  It wasn't clear to me I had access to all

15   the information I needed for that in the files that

16   were produced to me and two, based on my analysis that

17   the transaction data that the defendants had access to

18   since it's not statistically significant related to

19   the returns, it's not clear to me that those are the

20   factors or that's a factor that they put weight on

21   when they made their trading decisions.

22           Q.    Dr. Voetmann, did Mr. Graham make any

23   mathematical errors in calculating defendants' rates

24   of returns?

25           A.    I have not verified his computation of

1   the account statements of the rate of return so I have

2   no reason to believe one way or the other whether it's

3   correct or not.

4          Q.    Please look at paragraph 40.  You state

5   Mr. Graham concludes that since each defendant's

6   initial balance grew dramatically during this time

7   period, yielding returns that were hundreds of times

8   greater than corresponding returns on the market and

9   industry index as well as far greater than the

10  corresponding returns of top performing hedge funds,

11  the defendants' investment returns were extraordinary;

12  do you see that?

13         A.    Yes.

14         Q.    Dr. Voetmann, do you agree or disagree

15  each defendant's initial balance grew dramatically

16  during the time period?

17         A.    So I have not done any analysis of the

18  transaction or account statements.  What I understand

19  from the analysis that Graham has done and Cain, the

20  account balances were somewhere between 11,000 and it

21  grew to a few million dollars.  I have done no

22  analysis to determine what was their contributions and

23  withdrawals during that time period or when and how

24  much they invested around different earnings

25  announcements.

1        Q.     As you sit here today, you don't have an
2    opinion that refutes or conclusion that refutes that
3    the defendant's initial balances grew dramatically
4    during the January 2012 to December 2014 time period,
5    do you?
6        A.     I have no reason to not believe that the
7    account statement reflected in the beginning of the
8    investment and at the end of the investment were
9    incorrect.
10       Q.     You state yielding returns that were
11   hundreds of times greater than corresponding returns
12   on the market and industry index as well.  Are you
13   talking about the three year return rate or the annual
14   return rate?
15       A.     I was comparing the -- you can look at
16   Graham's last exhibit where he compares the different
17   benchmarks return each year and two year period
18   against the return defendants earned.
19       Q.     Dr. Voetmann, you don't dispute that
20   defendants' returns annually were hundreds of times
21   greater than the corresponding returns on the market
22   and industry indices, do you?
23            MR. SOMENSATTO: Objection to form.
24            MR. INGOGLIA: We have a continuing
25        objection that since he said he did no analysis

1          on this, you can ask a lot of questions of the

2          analysis he said he didn't do, but we don't

3          think those are meaningful questions.

4          A.    Could you repeat the question?

5               MR. KELLY: Can you re-read it, please.

6               (Record read.)

7          A.    So I can see the calculation that Graham

8     has done where he computes a four to 500 sum rate of

9     return per year and he's comparing that to different

10    benchmark.  I have done no analysis to confirm the

11    accuracy of those calculations by looking at any

12    account statements.

13         Q.    Dr. Voetmann, you don't dispute that the

14    defendants' returns were far greater than the

15    corresponding returns of top performing hedge funds

16    from January 2012 to December 2014, correct?

17              MR. SOMENSATTO: Same objection as last

18         time as Mr. Ingoglia.

19         A.    I don't dispute -- I can compare the

20    Exhibit G of Graham where he lists the hedge funds

21    return year by year over a three year period and he's

22    comparing that to the return earned by the defendants.

23    I have problems with the way he alleged that

24    defendants' return unnecessarily entirely connected to

25    the benefit of the transaction data so I'm not sure

1   it's a fair comparison to compare his funds to the
2   defendants' returns.
3        Q.   Dr. Voetmann, do you have an opinion one
4   way or the other as to whether defendants' investment
5   returns were extraordinary?
6             MR. SOMENSATTO: Objection to form and
7        basis.
8        A.   There is not enough information to answer
9   that question whether or not the defendants' earned
10  those returns and how they earned those returns so I
11  can't tell you whether someone else were in a position
12  like them to trade on the information available around
13  earnings announcement would have led to a similar
14  return that they earned.
15       Q.   In your professional experience, what's a
16  typical annual return earned by an investor?
17            MR. SOMENSATTO: Objection, scope.
18       A.   Of course it's a question that very much
19  depends on each investor's risk tolerance.
20       Q.   Dr. Voetmann, do you have an opinion
21  whether or not a 100 percent annual investment return
22  is a good return?
23            MR. SOMENSATTO: Objection to form, scope
24       of the deposition.
25       A.   If you are asking me if I would like to

1  have 100 percent return, sure, I would not say no

2  thank you to that.

3       Q.    How many people from your experience are

4  able to consistently get 100 percent annual returns

5  year after year?

6              MR. SOMENSATTO: Objection, same basis as

7         before.

8       A.    Of 100 percent, I would suspect it's very

9  few.  I'm looking at Exhibit H of Graham where he's

10  plotting historical returns and there is certainly a

11  number of hedge funds that consistently earn that type

12  of return.

13       Q.    Are you at all curious as to how

14  defendants were able to gain the returns that they

15  were in the time frame January 2012 to December 2014?

16              MR. SOMENSATTO: Same continuing

17         objection and to the form of the question.

18       A.    If you are asking me as someone who

19  teaches investment and finance, I'm very curious about

20  what additional factors they have considered when they

21  make their decisions to trade around earnings

22  announcements.  It's not clear to me based on my

23  review of Graham's analysis and my analysis that the

24  additional information from the sales data of Capital

25  One was the only information they would have

1  considered so I would definitely like to know what
2  additional factors did they consider when they make
3  their investment decisions.
4       Q.    Dr. Voetmann, just to be clear, you don't
5  know whether or not they considered additional
6  factors, correct?
7       A.    The only document I did read was the
8  interrogatory where it seems to suggest that they
9  considered a host of factors, but I'm not -- I have no
10 information to tell me what exact factors they
11 considered.
12      Q.    Which interrogatory are you referring to?
13      A.    I believe I read both of Bon Huang and
14 Nan and I believe they both answered to the extent
15 that they gave an answer that they looked at a lot of
16 factors, but I could have read that incorrect, but I
17 believe that's true.
18      Q.    If you look at paragraph 41 you state
19 that Mr. Graham's calculations of returns are
20 presented on an ex-post basis?
21      A.    Yes.
22      Q.    Please explain what you mean by that?
23      A.    What I mean it's simply measuring the
24 money that was deposited into the account and
25 presumably invested into different securities and then

 1   quarter end or year end report on what the balances
 2   was of those account statements.
 3       Q.    That's how you typically calculate
 4   someone's trading profits, correct?
 5       A.    Well, I think there are two elements.
 6   One, are we talking about the trading profit that they
 7   earned based on having had access to transaction data
 8   or are we talking about trading profit they earned
 9   through investments where the company either rose or
10   fell based on other factors, other information than
11   the transaction data.
12            I don't disagree that typically you
13   report the balance of your investments at the end of
14   the year in a yearly statement or a quarterly
15   statement.
16       Q.    So if you were to perform this ex-post --
17   withdrawn.  If you were to perform the analysis you
18   propose in paragraph 41, how would you do it?
19       A.    Well, if I were to examine what was the
20   trading profit from the defendants, first I would have
21   to understand what factors they considered when they
22   made their decision to buy and sell and based on those
23   factors determine whether they made a decision to
24   trade based on the transaction data from Capital One.
25   If the circumstances where they made a decision to

1  trade, but there was no weight placed on the Capital

2  One data, but it was put more weight on some other

3  factor, I'm not sure I would include that trading

4  profit in my analysis.  What profit came from or could

5  potentially be related to the non public information.

6       Q.   Dr. Voetmann, are you aware of the fact

7  that in the Commission's interrogatories the

8  Commission asked defendants what factors they

9  considered when making their investment decisions and

10 the response that we were given was that the

11 defendants were asserting their Fifth Amendment rights

12 again self incrimination?

13            MR. SOMENSATTO: Objection to form.

14      A.   Yes.

15      Q.   So the Commission asked the defendants

16 for the information set forth in your prior response

17 which was what did you consider in making your

18 investment decisions and you understand the Commission

19 was denied discovery to that question, correct?

20            MR. SOMENSATTO: Objection to form.

21      A.   I may have misread the interrogatory that

22 the question was about a host of factors, but it comes

23 to mind that the only place I saw some information I

24 had access to from them was in those documents so I

25 may have read them incorrectly.  I'm not sure as I sit

1    here.

2         Q.    Dr. Voetmann, are you aware of the fact

3    that Mr. Graham doesn't have access to the information

4    that he would need to, namely information from

5    defendants as to why they made their investment

6    decisions in order to perform the analysis that you

7    propose in your paragraph 41?

8         A.    I don't know that that necessarily is

9    true.  If we take one company Walmart and they

10   invested in Walmart, it's possible that you could,

11   it's not an analysis I have undertaken, but you could

12   look at was there any other announcements on the news

13   that came out about Walmart post their investment that

14   either increased the value of Walmart or decreased the

15   value of Walmart and those factors was in fact what

16   drove the account balances up as opposed to the

17   information that they had -- the non public

18   information they had access to.

19        Q.    If you look at paragraph 42 of your

20   report, you observe that Mr. Graham did not factor in

21   any post announcement returns earned by defendants in

22   calculating their investment returns; do you see that?

23        A.    Yes.

24        Q.    Did you calculate whether defendants had

25   any post announcement returns?

```
 1        A.    I did not undertake any analysis to
 2   quantify the return that was specifically related to
 3   if any the information advantage that they might have
 4   had.
 5        Q.    As you sit here today, can you identify
 6   any returns that were earned post announcement by
 7   defendants?
 8        A.    I cannot point to any specific company
 9   and what return that might be.  I'm posing it more as
10   if I were to actually truly measure what return they
11   earned based on the information, at least I would
12   undertake a study to examine whether or not there was
13   returns earned that was completely unrelated to the
14   transaction data and I have not seen Mr. Graham
15   undertake such analysis.
16        Q.    On average how long were defendants'
17   positions opened?
18        A.    It's my understanding from in particular
19   Dr. Cain's analysis it was a short window, but it
20   could also go up to months.
21        Q.    What percentage of the defendants'
22   returns were held for one day or less?
23        A.    Again, if I recall Cain's analysis, it
24   was a high percentage that was a very short window.
25        Q.    Do you have any further recollection as
```

1    to what percentage that was?

2         A.    I have his report so I could look at it

3    if you would like.

4         Q.    Does the fact that the vast majority of

5    defendants' investments were held for a very short

6    time frame mitigate against the concerns of any post

7    announcement returns?

8                   MR. SOMENSATTO: Objection to form.

9         A.    It might have some. You might believe it

10   has some mitigating factor to the extent that when you

11   hold it for a longer time period more information

12   would be released by the company that might change the

13   return on a given company nonetheless even in a short

14   time window one could still examine whether there are

15   other factors that drove the price in that short

16   window as opposed to the transaction data and I didn't

17   see neither Dr. Cain nor Mr. Graham undertake such

18   analysis.

19        Q.    To follow up on that last point, you

20   acknowledge in your report that Dr. Cain does in fact

21   calculate the trading profits through the earnings

22   announcement, correct?

23        A.    I believe he undertook the proper

24   approach to measure the return. What he failed to do

25   was to examine whether or not some of these returns

1   were caused by factors other than the transaction

2   information and this goes to my broader point about

3   Dr. Cain, I don't have so much dispute with his

4   approach, but the fact that he examined only the

5   companies that had a significant correlation, I would

6   dispute that given that my analysis of the Graham

7   shows that there is no correlation when you measure it

8   based on returns so to that extent Dr. Graham may have

9   undertaken a reasonable approach, but it's not of the

10  right set of companies.

11              MR. SOMENSATTO: You said Dr. Graham.

12       A.   I should state that I said Dr. Graham,

13  but I meant Dr. Cain.

14              MR. SOMENSATTO: You guys in a position

15         to take a break?

16              MR. KELLY: What time is it now?  Want to

17         do three minutes?

18              THE VIDEOGRAPHER: We are off the record

19         at 5:09 p.m., October 16, 2015.

20              (Recess taken.)

21              THE VIDEOGRAPHER: This is tape seven of

22         the deposition of Dr. Torben Voetmann.  We are

23         on the record at 5:16 p.m.

24       Q.   Welcome back, Dr. Voetmann.  Please look

25  at paragraph 43 of your report.  You state that

1  comparing defendants' returns to those of hedge funds
2  are like comparing apples to oranges; is that right?
3      A.    Yes.
4      Q.    So can you please explain the basis for
5  that opinion?
6      A.    So the way I'm thinking of this is the
7  basis of my opinion is in a hedge fund compared to
8  defendants where defendants are trading in as far as I
9  understand very small amounts, at the time sometimes
10  thousands of dollars, it's a very different investment
11  view than we are dealing with a hedge fund where you
12  are talking about millions of dollars so when they are
13  making a decision, I think it's maybe fair to argue
14  it's more carefully considered -- it's a different
15  investment decision that's made at the hedge fund
16  level than when you are dealing with a defendant
17  that's trading $2,000 or $5,000 at a time.
18      Q.    Dr. Voetmann, who would you expect to be
19  more profitable in their securities trading;
20  securities industry professionals who are paid to
21  trade securities on behalf of their clients or
22  defendants in this action who are fraud analysts at a
23  credit card company?
24           MR. SOMENSATTO: Objection to form.
25      A.    Well, from an academic perspective you

```
 1    might think you would argue the hedge fund managers
 2    who maybe have more training in picking investments.
 3    On the other hand, it's not uncommon to see that there
 4    are certain number of individuals that are engaging in
 5    trading in rapid trading or frequent trading thus
 6    those individuals often out perform even seasoned
 7    investment professionals.
 8         Q.    What are the reasons that the individuals
 9    out perform hedge funds?
10         A.    Again, I didn't do any specific analysis
11    to confirm how these defendants traded other than
12    looking at account statements, but reasons that you
13    might out perform a hedge fund is your ability to take
14    on greater risk so your capital at risk might be more
15    willing to risk that than a hedge fund who has a much
16    larger capital and it has investors in those funds
17    that may not agree with taking on the same level of
18    risk as an individual deciding to trade on their own
19    account.
20         Q.    Did defendants engage in rapid trading
21    tactics?
22         A.    I have not looked at any information or
23    account statements to determine what frequency of
24    trading they did.
25         Q.    In paragraph 42 you state the defendants
```

1    allegedly used the transaction data to forecast

2    revenues and trade on stocks ahead of their actual

3    revenues announcements, do you see that?

4         A.    Yes, I see that.

5         Q.    Do you believe that to be an accurate

6    statement?

7              MR. SOMENSATTO: Objection to form.

8              MR. INGOGLIA: Do you mind reading that

9         statement.  The defendants allegedly used the

10        transaction data to forecast revenues and trade

11        on stocks ahead of their actual revenues

12        announcements, that's one?

13             MR. KELLY: Yes.

14             MR. SOMENSATTO: Are you asking is the

15        allegation accurate or is the actual substance

16        of the allegation accurate?

17             MR. KELLY: I'm asking whether you

18        believe that the allegation here is that the

19        defendants allegedly used transaction data to

20        forecast revenues and trade on stocks ahead of

21        their actual revenues announcements.

22        A.    I have not undertaken any analysis of the

23   account statements to see if they line up with the

24   actual earnings announcements, but it's my

25   understanding that the DONE files was used to come up

1   with an estimate of forecasted revenues.

2        Q.    Let me ask you this, what securities were

3   defendants trading?

4             MR. INGOGLIA: I have an objection which

5        is he said several times he's done zero

6        analysis and has not even looked at account

7        statements and this is about the twentieth

8        question about the trading activity.  You have

9        45 minutes left.  His answers are meaningless

10       on that subject so that's my objection that

11       it's an improper question and there is

12       absolutely no foundation to get his answers on

13       any of the questions.

14            MR. KELLY: I'm asking about a statement

15       in his report.

16            MR. INGOGLIA: Which is repeating the

17       report he read from your guy.

18            MR. KELLY: Your objection is noted.

19       A.    Could you re-read the question.

20            (Record read.)

21       A.    I have not done any analysis to confirm

22  in the account statements since I have not looked at

23  them, but it's my understanding that Mr. Graham

24  identified 226 securities that he listed in the

25  Exhibit B.

1          Q.    Let me ask you this, Dr. Voetmann.  Were

2     defendants trading stocks or were they trading debt or

3     were they trading options?

4                MR. INGOGLIA: Same objection.

5          A.    I haven't looked at the account

6     statements so I can't confirm the different types of

7     securities that they traded.

8          Q.    If you look at paragraph 44, you state

9     that Dr. Cain's analysis is based entirely on Mr.

10    Graham's flawed premise that a correlation and thus

11    predictive relationship exists between the transaction

12    data and aggregate revenues, do you see that?

13         A.    Yes.

14         Q.    Where specifically in Dr. Cain's report

15    does he assume a correlation and predictive nature

16    between Capital One's transaction data and aggregate

17    revenues?

18         A.    Exhibit B.  Sorry, Dr. Graham's Exhibit B

19    lists the securities and Dr. Cain analyzed those

20    securities that was identified in Graham's Exhibit B.

21         Q.    Dr. Voetmann, are you just saying that --

22    withdrawn.  Dr. Cain's analysis is simply a

23    mathematical summing up of defendants' gains from a

24    certain set of securities, correct?

25         A.    I've not confirmed that analysis, but Dr.

1    Cain -- but in paragraph 12 of Dr. Cain he states that

2    he received a list of tainted stock symbols and

3    company names from Steven Graham's as explained in the

4    Graham report.

5         Q.    Is your point in paragraph 44 simply that

6    you disagree that the companies listed in Exhibit B of

7    the Graham report should be considered tainted

8    companies?

9              MR. SOMENSATTO: Objection to form.  You

10        can answer.

11        A.    So in my opinion is that when I looked at

12   my analysis and corrected Graham's correlation

13   analysis, I found that instead of 132, only eight had

14   a significant correlation so with that if Dr. Cain was

15   going to apply the same methodology but on the right

16   set of companies, he should have analyzed those eight

17   companies.

18        Q.    But just to be clear, Dr. Cain was simply

19   doing the math he was asked to do, correct?

20        A.    I believe that's what he was asked to do,

21   correct.

22        Q.    Your noted objection is that you disagree

23   that the list of securities that he did his analysis

24   over is the appropriate set of securities, correct?

25        A.    Two things; the list of securities and

1  two, I have not analyzed Dr. Cain's analysis by

2  replicating it to confirm whether he made any

3  computational errors in his calculation of the profit.

4          Q.    So Dr. Voetmann, if you turn to paragraph

5  45, you note that Dr. Cain uses the FIFO accounting

6  method for his analysis, correct?

7          A.    Correct.

8          Q.    You note that Dr. Cain could have used

9  the LIFO method instead, correct?

10         A.    Correct.

11         Q.    You note that the PSLRA majority view is

12 that securities fraud losses should be calculated

13 using only the LIFO method, correct?

14         A.    Yes, I understand that.

15         Q.    So what's the PSLRA?

16         A.    The PSLRA is used in securities class

17 actions to control for circumstances where a stock

18 price rebounds after a corrected disclosure so that

19 you can cap the out-of-pocket losses to investors in

20 that class action.

21         Q.    What does the PSLRA stand for?

22         A.    Private Securities Law. Now I'm blanking.

23 Private Securities Law Reform Act I believe.

24         Q.    I think it's the Private Securities

25 Litigation Reform Act?

```
 1        A.    You are right.
 2        Q.    Let's focus on the first three words of
 3   that, private securities litigation.  Is this case a
 4   private securities litigation?
 5        A.    I don't believe so.  The point of my
 6   statement here in paragraph 45 is to demonstrate that
 7   Dr. Cain chose one accounting methodology for
 8   measuring profit when there's other methodologies that
 9   he could have examined and explored as well and at
10   least compare to see if it would yield different
11   answers.
12        Q.    This case also does not involve
13   securities fraud losses, correct?
14        A.    Correct.
15        Q.    Have you done a similar analysis to Dr.
16   Cain's using the LIFO methodology?
17        A.    For this case I have not done any
18   analysis to confirm or verify Dr. Cain's analysis.
19        Q.    So in your last sentence you say Dr.
20   Cain's use of the FIFO method may thus understate the
21   cost basis and overstate corresponding profits, do you
22   see that?
23        A.    Yes.
24        Q.    It's also true that Dr. Cain's use of
25   FIFO may overstate the cost basis and understate
```

1    corresponding profits; is that correct?

2          A.    I've not confirmed one or the other way.

3    I'm basing that statement on the traditional

4    understanding of how a LIFO works compared to a FIFO.

5          Q.    Given the fact that the vast majority of

6    the trades were very short term, does that mitigate

7    the concern with using one method over another?

8                    MR. SOMENSATTO: Objection to form.

9          A.    I've not done the analysis so I can't

10   confirm one way or the other.

11         Q.    In the abstract if you are using a FIFO

12   methodology versus a LIFO methodology over

13   transactions that are either a three year holding

14   period or a one day holding period, where would you

15   expect there to be greater differences in the results

16   of those two methods?

17                    MR. SOMENSATTO: Objection to form.

18         A.    You would need more information than

19   that.  If in your hypothetical you only hold the stock

20   you purchase and you had no other holdings in the

21   security and you sold it after a few days and now you

22   have no more of that security, if that's your

23   hypothetical, it's possible that the two methods would

24   yield very similar results.

25         Q.    Dr. Voetmann, can you please explain why

1  in paragraph 46 you opine that Dr. Cain's methodology

2  for computing ill-gotten gains is unfounded?

3       A.    Again, it's unfounded because it's

4  resting entirely on a fraud and an insufficient

5  analysis that's produced a list of companies that when

6  I corrected was not correlated. Second, he's

7  calculating gains over a period of time, the holding

8  period of the investments as I understand it, but

9  again, he's not controlling for any potential

10  confounding information or any information that might

11  have driven the prices other than the transaction

12  data.

13       Q.    Let's shift to the next paragraph and

14  that's paragraph 47 and that's actually the paragraph

15  that has the term unfounded in it.  Let me ask you

16  about this one now.  Why based on paragraph 47 do you

17  claim Dr. Cain's analysis is completely unfounded?

18            MR. SOMENSATTO: Objection, asked and

19       answered.

20       A.    There is one more element, the third

21  element.  Dr. Cain and again, I have not verified or

22  done the analysis, but he stated in his report that he

23  offset losses against gains before he calculates the

24  net profit, however, reading his report he also makes

25  it clear that he only does a partial offset.  If

1    there's a trading position that actually had an

2    aggregate net loss, he excludes that from the trading

3    profits so, in other words, he's only counting where

4    there's a positive return.

5         Q.   Let me give you a hypothetical here.  You

6    understand that insider trading is a crime, correct?

7         A.   I assume it is.

8         Q.   You understand that in this case there

9    are lots of allegations that there were a number of

10   trades that were illegal, correct?

11        A.   I've not done any analysis of any

12   specific trades that were illegal.  My analysis is

13   entirely looking at the information that Mr. Graham

14   put forward to verify whether he could prove any

15   relationship between that information and price --

16   sorry, whether that information was material to an

17   investor.

18        Q.   Let's just -- I understand that.  Let's

19   just assume for purposes of discussion then that this

20   is the understanding that the Commission is alleging a

21   number of instances of insider trading.  This was not

22   one trade.  This was a number of instances over a long

23   period of time in a number of different companies.

24   With that let me go to a hypothetical here.  Let's

25   talk about another crime, right.

1             Let's say there were a team of bank
2    robbers, right, and they had certain costs to go along
3    with their illegal business in terms of getting guns,
4    getting get away cars and what not and so ten banks
5    they try to rob and they successfully rob eight of
6    those banks and they get a million dollars each, but
7    they are unsuccessful in robbing two banks and so they
8    have net losses because of the money they put out fore
9    man power and guns and get away vehicles.
10            Do you offer an opinion that those bank
11   robbers if they are pursued for that money stolen that
12   they should be able to deduct the costs associated
13   with their unsuccessful robberies from the amount of
14   money they actually stole from the banks?
15            MR. SOMENSATTO: Objection to form. He's
16        asking are you offering that opinion.
17       A.    It's an interesting hypothetical.  If I
18   read Dr. Cain's report correctly, if there was a loss
19   in one of the banks that they actually made away with
20   a million, he would offset that loss and let them get
21   away with that so he's partially correcting for a loss
22   so if he's going to do it, he's either going to do it
23   or he's not going to do it.
24       Q.    It seems like Dr. Cain is correcting for
25   the loss the costs within a given bank job, but he's

1  not offsetting for the unsuccessful bank jobs; isn't
2  that correct?
3           MR. SOMENSATTO: Objection to form.
4       A.    I have not verified his analysis, but it
5  appears to me that if he's going to offer up some kind
6  of offset, partial offset, it would be prudent to
7  calculate what the total true trading profit was for
8  the trading strategies that was implored.
9       Q.    Let me ask you this.  Are you able to
10 offer an opinion legally as to whether or not an
11 individual who is successfully engaged in insider
12 trading in certain instances, but unsuccessfully
13 engaged in insider trading in other instances is able
14 to offset the losses from the unsuccessful insider
15 trading with the gains from the successful insider
16 trading?
17           MR. SOMENSATTO: Objection. Are you
18       asking if he can provide a legal opinion on
19       that?
20           MR. KELLY: Yes.
21       A.    I'm not a lawyer so I don't think I can
22 opine on that.
23           MR. INGOGLIA:  If the commission is now
24       taking the view that if you lose money on a
25       trade it's by definition not insider trading

1        that's valuable information for us and for the
2        firm's clients generally. That would be a new
3        position for the Commission to say that.
4              MR. KELLY: Sorry, I missed what you
5        said.
6              MR. AXELROD: I think we should let the
7        witness finish an answer.
8        A.    I answered.
9        Q.    Let me just modify that question with one
10   thing. Are you able to offer any sort of opinion as to
11   whether it's appropriate for unsuccessful insider
12   trading losses to be offset against successful insider
13   trading gains?
14             MR. SOMENSATTO: Objection to form.
15       A.    I'm not offering that opinion.
16             THE VIDEOGRAPHER: We are now off the
17        record at 5:39 p.m., October 16, 2015.
18             (Recess taken.)
19             THE VIDEOGRAPHER: We are now on the
20        record at 5:41 p.m., October 16, 2015.
21             MR. KELLY: Thank you, Dr. Voetmann. I
22        have no more questions at this time.
23             THE WITNESS:  Thank you.
24   EXAMINATION BY
25   MR. SOMENSATTO:

1          Q.    Dr. Voetmann, a few questions on
2    redirect.  First, in Graham's analysis for how many
3    companies did he not find a correlation between the
4    Capital One transaction data and the revenue data for
5    that company?
6          A.    I believe --
7               MR. KELLY: Objection to form.
8          A.    I believe he had identified in the
9    production of materials 226 companies or 212,
10   something like that and he determined that there was a
11   significant correlation of 132.
12         Q.    Earlier in your deposition, do you recall
13   testimony you gave identifying the documents that you
14   relied on and looked at in this case?
15         A.    Yes.
16         Q.    You didn't have access to the universe of
17   documents that the SEC has not yet produced to the
18   defendants; is that correct?
19         A.    That's what I understand, yes.
20         Q.    So you didn't consider those documents in
21   your analysis, correct?
22         A.    I did not consider those documents.
23         Q.    You were asked about payment earlier in
24   your deposition, do you recall?
25               MR. KELLY: Objection to form.

1          A.     Yes.

2          Q.     Have you submitted a bill in this case

3    yet?

4          A.     Not yet, but it's short coming.

5          Q.     Have you prepared a bill?

6          A.     At the end of the month I will have

7    prepared a bill.

8          Q.     You were shown a publication, I believe

9    it was Exhibit 2 at the start of your deposition. I'm

10   looking for the publication. It's event study methods.

11         A.     Correct.

12         Q.     It's actually Exhibit 3.  Had you read

13   this article before today?

14         A.     I can't recall I read it.  I'm familiar

15   with the Securities Litigation Handbook, but I can't

16   recall and if I had read it, it's a number of years

17   ago.

18         Q.     Did you read that entire article before

19   providing your testimony today?

20              MR. KELLY: Objection, asked and

21         answered.

22         Q.     You can answer.

23         A.     For this preparing today I did not read

24   this particular article.

25         Q.     Let me clarify that. After it was entered

1  as an exhibit today, did you read the entire article
2  or just a portion of the article?
3      A.   I only read a couple of sentences that
4  was pointed out to me.
5      Q.   If you were doing an analysis to
6  determine whether particular information is material
7  in an insider trading case like this, what kinds of
8  information would you review and assess?
9          MR. KELLY: Objection to form.
10     A.   I'm sorry, I have to have you read that
11 again.
12         (Record read.)
13         MR. KELLY: Same objection.
14     A.   Well, as a starting point I would look at
15 a number of factors that might help me understand how
16 that information against the non public information
17 could be used, but as a starting point I would
18 definitely do an analysis similar to what I performed
19 in my report where I would examine whether the
20 incremental value of this non public information could
21 explain price movements, but there may be a host of
22 other factors that one would want to consider as well.
23 How the defendant like in this case would use this
24 information and how in conjunction with what other
25 factors would they use this information.

```
 1        Q.    When you say other factors, what other
 2   factors publicly available to the market would you
 3   look at?
 4        A.    One factor I think is consensus
 5   estimates, but if I'm looking to possibly trade around
 6   an earnings announcement, I might have examined the
 7   company, the stock to determine whether there is some
 8   events or some information that might be coming out as
 9   well around that earnings announcement. Is the company
10   engaging in any merge and acquisition deals or is the
11   company engaging in any other projects that would
12   improve their cash flows so I think there are a number
13   of different factors one might look at and then try to
14   parse out to see if the non public information
15   explains the stock price movement.
16        Q.    Did you look at any of the defendants'
17   account statements in this case?
18        A.    I did not.
19        Q.    When you were answering Mr. Kelly's
20   questions about the defendants' trading activities,
21   was your factual understanding of that activity based
22   entirely on their experts' reports?
23              MR. KELLY: Objection to form, leading.
24        Q.    You can answer.
25        A.    Yes.
```

1       Q.    Did you read the Complaint in this case?

2       A.    I did.

3       Q.    Did you obtain an understanding of the

4  allegations that the SEC is making in this case from

5  that Complaint?

6       A.    I believe I did.

7             MR. SOMENSATTO: I don't think we have

8       anything else.

9             MR. KELLY: I'm good.  We're good.

10            THE VIDEOGRAPHER: This concludes today's

11       deposition of Dr. Torben Voetmann.  We are now

12       off the record at 5:48 p.m., October 16, 2015.

13            (Time noted: 5:48 p.m.)

14

15

16

17

18                      _____

19                           TORBEN VOETMANN

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3   STATE OF NEW YORK  )

 4                      ) ss.:

 5   COUNTY OF NEW YORK )

 6

 7              I, SHARI COHEN, a Notary Public within

 8   and for the State of New York, do hereby certify:

 9              That TORBEN VOETMANN, the witness whose

10   deposition is hereinbefore set forth, was duly sworn

11   by me and that such deposition is a true record of the

12   testimony given by such witness.

13              I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage; and that I am in no way interested in the

16   outcome of this matter.

17              IN WITNESS WHEREOF, I have hereunto set

18   my hand this 19th day of October, 2015.

19   Reading and Signing was:

20   ___ requested   ___ waived   _X_ not requested

21

22

23   _____

24

25   SHARI COHEN
```

Cabela's - Investor Relations - News Release                                    Page 1 of 1



**WORLD'S FOREMOST OUTFITTER**

Print Page   Close Window

# News Release

### Cabela's Inc. Announces Earnings Date for Fourth Quarter and Full Fiscal Year 2013 Financial Results

SIDNEY, Neb.--(BUSINESS WIRE)--Jan. 15, 2014-- Cabela's Incorporated (NYSE:CAB) announced today it is scheduled to release fourth quarter and full fiscal year 2013 financial results before the market opens on Thursday, February 13, 2014. A conference call to discuss the results will be held at 11:00 a.m. ET that same morning. The call will be hosted by Tommy Millner, Cabela's Chief Executive Officer, and Ralph Castner, Cabela's Executive Vice President and Chief Financial Officer.

A webcast of the conference call can be accessed on the Investor Relations section of the Company's website at www.cabelas.com. To ensure access to the webcast, please visit the website at least 15 minutes prior to the call to register and download any necessary software. A replay of the webcast will be archived on the Company's website.

**About Cabela's Incorporated**

Cabela's Incorporated, headquartered in Sidney, Nebraska, is a leading specialty retailer, and the world's largest direct marketer, of hunting, fishing, camping and related outdoor merchandise. Since the Company's founding in 1961, Cabela's® has grown to become one of the most well-known outdoor recreation brands in the world, and has long been recognized as the World's Foremost Outfitter®. Through Cabela's growing number of retail stores and its well-established direct business, it offers a wide and distinctive selection of high-quality outdoor products at competitive prices while providing superior customer service. Cabela's also issues the Cabela's CLUB® Visa credit card, which serves as its primary customer loyalty rewards program. Cabela's stock is traded on the New York Stock Exchange under the symbol "CAB".

Source: Cabela's Incorporated

**Cabela's Incorporated**
**Investors:**
Chris Gay, 308-255-2905
or
**Media:**
Joe Arterburn, 308-255-1204

Bonan Huang Company A Queries

**QueryText**

2/7/2014 7:42:31 AM    insert into kwo874_svm_agent_infosel case when (mrch_nm like '%CACHE%#%') then 'CAC'   when (mrch_nm like '%cabela%' and mrch_catg_cd <> 0) then 'CAB'   when (mrch_nm like any ('%tractor%supply%', '%del%s%farm%') and mrch_catg_cd = 5599) then 'TSC'   when ((mrch_nm like '%coach%' and mrch_catg_cd = 5631) or mrch_nm like any ('%coh*%', 'COACH USA INC', 'COACH CANADA', 'PAYPAL *COACHSERVIC', 'PAYPAL *COACH INC')) then 'COH'   when (mrch_nm like '%weight%watch%') then 'WTW'   when (mrch_nm like '%body%central%' and mrch_catg_cd in (5621,5999,8999)) then 'BOD' when (mrch_nm like '%office%max%') then 'OMX'   when (mrch_nm like '%select%comfort%' and mrch_catg_cd = 5712) then 'SCS'   when ((mrch_nm like '%apple%' and mrch_catg_cd in (5734,5735)) or (mrch_nm like any ('%apple%store%', '%apple%retail%') and mrch_catg_cd = 5732)) then 'AAP'   when (mrch_nm like '%michael%kors%') then 'KOR'   when ((mrch_nm like any ('%bebe.com%', '%bebe%store%', 'BEBE #270%') and mrch_catg_cd = 5621) or mrch_nm like any ('PAYPAL *BEBE', '%2b%store%')) then 'BEB'   when (mrch_nm like any ('%advance%auto%part%', '%advance%auto%#%', '%autopart intl%', 'PAYPAL *ADVANCEAUTO') and mrch_catg_cd = 5533) then '1AA'   when ((SUBSTR(mrch_id, 1, 6) IN ('672023','672350') AND mrch_catg_cd IN ('5611','5691')) OR mrch_nm LIKE ANY ('%ralph%lauren%','PAYPAL *RUGBY','RUGBY.COM','RUGBY STORE #424','RUGBY CAFE LLC')) then 'RL'   when (mrch_nm like any ('%vitamin%shoppe%', '%SUPER SUPPLEMENTS%')) then 'VSI'   when (mrch_nm like '%big%5%spo%') then 'BGF'   when (mrch_nm like '%STAR%BUCK%') then 'SBU'   when (mrch_nm like '%blue%nile%' and mrch_catg_cd in (5944, 5094)) then 'NIL'   when ((mrch_nm like '%brio %' and mrch_catg_cd = 5812) or mrch_nm = 'brio' or (mrch_nm like '%brava %' and mrch_st_cd <> 'CA' and mrch_catg_cd = 5812)) and mrch_nm not like all ('%BRAVO BRAVO%','%CAF%','%BISTRO%','%PIZZ%','%ROBERTO%','%MEXIC%','%SANDWICH%','%ITALIAN%','%EL%BRAVO%','%BURRITO%','%MFA%','%BAKERY%','%BAR%',' %INC%','%FAMILY%','%rio bravo%') then 'BBR'   when (mrch_nm like any ('%bww%', '%buffalo wild%wing%') and mrch_catg_cd in (5812, 5814)) then 'BWL' when (mrch_nm like '%bj%s%restaurant%' and mrch_catg_cd = 5812) then 'BJR'   --when (mrch_nm like '%Harris%Teeter%') then 'HTS'   when (mrch_nm like '%manhattan%bagel%' or (mrch_nm like '%einstein%' and mrch_nm not like '%weinstein%' and mrch_catg_cd in (5812, 5814))) then 'BAG'   when ((mrch_nm like any ('cheesecake%', '%grand%lux%', '%cheesecake f%ct%ry%') and mrch_catg_cd = 5812 and mrch_nm not like all ('%bistro%', '%cheesecakes%')) or mrch_nm like any ('%cheesecake%gft%', '%grand%lux%gft%')) then 'CAK'   when mrch_catg_cd = 3260 then 'SAV'   when (mrch_nm like '%jet%blue%' and mrch_catg_cd not in (0, 8999)) then 'JBL'   when mrch_catg_cd in (3066, 3177) then 'LUV'   when (mrch_nm like any ('%amazon%', '%kindle%') and mrch_catg_cd in (7922, 7523, 7399, 5999, 5968, 5967, 5942, 5735, 5411, 5399, 4816)) then 'AMZ'   end stk, trxn_dt, trxn_post_dt,SUM(CASE WHEN debit_cr_cd = 'D' THEN trxn_amt WHEN debit_cr_cd = 'C' THEN trxn_amt *(-1) END) as trxn_amt from pcdw.t2_postd_trxn a, pcdw.t2_acct_stat_hist_bc bwhere (trxn_post_dt between date - 3 and date - 1)and stk is not null AND tsys_tcat_class_cd = 'PR' and mrch_cntry_cd like 'US%'and a.acct_id = b.acct_id and b.acct_sfx_num = 0 and SVC_OWNR_CD NOT IN ('000086', '000087')group by 1,2,3;

Bonan Huang Company A Queries

2/8/2014 9:41:57 AM  insert into kwo874_svm_agent_infosel case when (mrch_nm like '%CACHE%#%') then 'CAC'  when (mrch_nm like '%cabela%' and mrch_catg_cd <> 0) then 'CAB'  when (mrch_nm like any ('%tractor%supply%', '%del%6%farm%') and mrch_catg_cd = 5599) then 'TSC'  when ((mrch_nm like '%coach%' and mrch_catg_cd = 5631) or mrch_nm like any ('%coh*%', 'COACH USA INC', 'COACH CANADA', 'PAYPAL *COACHSERVIC', 'PAYPAL *COACH INC')) then 'COH'  when (mrch_nm like '%weight%watch%') then 'WTW'  when (mrch_nm like '%body%central%' and mrch_catg_cd in (5621,5999,8999)) then 'BOD' when (mrch_nm like '%office%max%') then 'OMX'  when (mrch_nm like '%select%comfort%' and mrch_catg_cd = 5712) then 'SCS'  when ((mrch_nm like '%apple%' and mrch_catg_cd in (5734,5735)) or (mrch_nm like any ('%apple%store%', '%apple%retail%') and mrch_catg_cd = 5732)) then 'AAP'  when (mrch_nm like %michael%kors%) then 'KOR'  when (mrch_nm like any ('%bebe.com%', '%bebe%store%', 'BEBE #270%') and mrch_catg_cd = 5621) or mrch_nm like any ('PAYPAL *BEBE', '%2b%store%')) then 'BEB'  when (mrch_nm like any ('%advance%auto%part%', '%advance%auto%#%', '%autopart int%', 'PAYPAL *ADVANCEAUTO') and mrch_catg_cd = 5533) then '1AA'  when ((SUBSTR(mrch_id, 1, 6) IN ('672023','672350') AND mrch_catg_cd IN ('5611','5691')) OR mrch_nm LIKE ANY ('%ralph%lauren%','PAYPAL *RUGBY','RUGBY.COM','RUGBY STORE #424','RUGBY CAFE LLC')) then 'RL'  when (mrch_nm like any ('%vitamin%shoppe%', '%SUPER SUPPLEMENTS%')) then 'VSI'  when (mrch_nm like %big%5%spo%') then 'BGF'  when (mrch_nm like '%STAR%BUCK%') then 'SBU'  when (mrch_nm like '%blue%nile%' and mrch_catg_cd in (5944, 5094)) then 'NIL'  when ((mrch_nm like '%brio %' and mrch_catg_cd = 5812) or mrch_nm = 'brio' or (mrch_nm like '%bravo %' and mrch_st_cd <> 'CA' and mrch_catg_cd = 5812)) and mrch_nm not like all ('%BRAVO BRAVO%','%CAF%','%BISTRO%','%PIZZ%','%ROBERTO%','%MEXIC%','%SANDWICH%','%ITALIAN%','%EL%BRAVO%','%BURRITO%','%MFA%','%BAKERY%','%BAR%',' %INC%','%FAMILY%','%rio bravo%') then 'BBR'  when (mrch_nm like any ('%bww%', '%buffalo wild%wing%') and mrch_catg_cd in (5812, 5814)) then 'BWL'  when (mrch_nm like '%manhattan%bagel%' or (mrch_nm like '%einstein%' and mrch_nm not like '%weinstein%' and mrch_catg_cd in (5812, 5814))) then 'BAG'  when ((mrch_nm like '%bj%restaurant%' and mrch_catg_cd = 5812) then 'BJR'  --when (mrch_nm like '%Harris%Teeter%') then 'HTS'  when (mrch_nm like any ('cheesecake%', '%grand%lux%', '%cheesecake f%ct%ry%') and mrch_catg_cd = 5812 and mrch_nm not like all ('%bistro%', '%cheesecakes%')) or mrch_nm like any ('%cheesecake%gft%', '%grand%lux%gft%')) then 'CAK'  when mrch_catg_cd = 3260 then 'SAV'  when (mrch_nm like '%jet%blue%' and mrch_catg_cd not in (0, 8999)) then 'JBL'  when mrch_catg_cd in (3066, 3177) then 'LUV'  when (mrch_nm like any ('%amazon%', '%kindle%') and debit_crt_cd = 'D') THEN trxn_amt WHEN debit_cr_cd = 'C' THEN trxn_amt *(-1) END) as trxn_amt from pcdw.t2_postd_trxn a, pcdw.t2_acct_stat_hist_bc bwhere (trxn_post_dt between date - 3 and date - 1)and stk is not null AND tsys_tcat_class_cd = 'PR' and mrch_cntry_cd like 'US%'and a.acct_id = b.acct_id and b.acct_sfx_num = 0 and SVC_OWNR_CD NOT IN ('000086', '000087')group by 1,2,3;

0480

Nan Huang Company A Query

**QueryText**

2/12/2014 11:08:05 AM      UPDATE a FROM oao009_base_date a,(SEL trxn_post_dt,SUM(CASE WHEN debit_cr_cd = 'D' THEN trxn_amt      WHEN debit_cr_cd = 'C' THEN trxn_amt *(-1) END) AS last_yr_pur_amt,COUNT(*) AS last_yr_pur_cntFROM pcdw.t2_postd_trxn a, oao009_base_date bWHERE a.trxn_post_dt = b.last_yr_dtAND tsys_tcat_class_cd = 'PR'AND mrch_nm LIKE ('%cabela%') and mrch_catg_cd in ('5941','5964')AND a.trxn_post_dt BETWEEN CURRENT_DATE - 374 AND CURRENT_DATE - 364GROUP BY 1) bSET last_yr_pur_amt = b.last_yr_pur_amt,   last_yr_pur_cnt =

| accountGroup | symbol | date | quantity | price | |
|---|---|---|---|---|---|
| Bonan Huang4ZE89435 | CAB 20140222P 70.000 | 12-Feb-14 | 400 | 3.40 | $ (1,360.00) |
| Bonan Huang4ZE89435 | CAB 20140222P 60.000 | 12-Feb-14 | (400) | 0.50 | $ 200.00 |
| Bonan Huang4ZE89435 | CAB 20140222P 65.000 | 12-Feb-14 | 300 | 1.29 | $ (387.00) |
| Bonan Huang4ZE89435 | CAB 20140222P 60.000 | 13-Feb-14 | 300 | 1.15 | $ (345.00) |
| Bonan Huang4ZE89435 | CAB 20140222P 65.000 | 13-Feb-14 | (300) | 2.20 | $ 660.00 |
| Bonan Huang4ZE89435 | CAB 20140222P 70.000 | 13-Feb-14 | (200) | 5.80 | $ 1,160.00 |
| Bonan Huang5PD69674 | CAB 20140222P 70.000 | 12-Feb-14 | 300 | 3.80 | $ (1,140.00) |
| Bonan Huang5PD69674 | CAB 20140222P 60.000 | 12-Feb-14 | (300) | 0.55 | $ 165.00 |
| Bonan Huang5PD69674 | CAB 20140222P 65.000 | 12-Feb-14 | 300 | 1.45 | $ (435.00) |
| Bonan Huang5PD69674 | CAB 20140222P 60.000 | 12-Feb-14 | (300) | 0.40 | $ 120.00 |
| Bonan Huang5PD69674 | CAB 20140222P 60.000 | 13-Feb-14 | 300 | 1.00 | $ (300.00) |
| Bonan Huang5PD69674 | CAB 20140222P 65.000 | 13-Feb-14 | (300) | 2.20 | $ 660.00 |
| Bonan Huang5PD69674 | CAB 20140222P 60.000 | 13-Feb-14 | 300 | 0.15 | $ (45.00) |
| Bonan Huang5PD69674 | CAB 20140222P 70.000 | 13-Feb-14 | (300) | 5.60 | $ 1,680.00 |
| Bonan Huang5PD91874 | CAB 20140222P 70.000 | 12-Feb-14 | 300 | 3.30 | $ (990.00) |
| Bonan Huang5PD91874 | CAB 20140322P 65.000 | 12-Feb-14 | 300 | 1.85 | $ (555.00) |
| Bonan Huang5PD91874 | CAB 20140222P 60.000 | 12-Feb-14 | (300) | 0.35 | $ 105.00 |
| Bonan Huang5PD91874 | CAB 20140222P 60.000 | 13-Feb-14 | 300 | 1.10 | $ (330.00) |
| Bonan Huang5PD91874 | CAB 20140222P 70.000 | 13-Feb-14 | (300) | 6.40 | $ 1,920.00 |
| Bonan Huang5PD91874 | CAB 20140322P 65.000 | 13-Feb-14 | (300) | 2.65 | $ 795.00 |
| Nan Huang5PD45586 | CAB 20140222P 70.000 | 12-Feb-14 | 1,000 | 3.70 | $ (3,700.00) |
| Nan Huang5PD45586 | CAB 20140222P 65.000 | 12-Feb-14 | 1,000 | 1.60 | $ (1,600.00) |
| Nan Huang5PD45586 | CAB 20140222P 70.000 | 12-Feb-14 | 1,000 | 3.50 | $ (3,500.00) |
| Nan Huang5PD45586 | CAB 20140222P 70.000 | 12-Feb-14 | 2,000 | 3.50 | $ (7,000.00) |
| Nan Huang5PD45586 | CAB 20140222P 70.000 | 12-Feb-14 | 1,000 | 3.40 | $ (3,400.00) |
| Nan Huang5PD45586 | CAB 20140222P 65.000 | 13-Feb-14 | (1,000) | 4.40 | $ 4,400.00 |
| Nan Huang5PD45586 | CAB 20140222P 70.000 | 13-Feb-14 | (2,000) | 10.00 | $ 20,000.00 |
| Nan Huang5PD45586 | CAB 20140222P 70.000 | 14-Feb-14 | (3,000) | 5.80 | $ 17,400.00 |
| Nan Huang5PD64034 | CAB 20140222P 70.000 | 12-Feb-14 | 1,000 | 3.60 | $ (3,600.00) |
| Nan Huang5PD64034 | CAB 20140222P 70.000 | 12-Feb-14 | 1,000 | 3.69 | $ (3,690.00) |
| Nan Huang5PD64034 | CAB 20140222P 70.000 | 12-Feb-14 | 2,000 | 3.60 | $ (7,200.00) |
| Nan Huang5PD64034 | CAB 20140222P 65.000 | 12-Feb-14 | 1,000 | 1.50 | $ (1,500.00) |
| Nan Huang5PD64034 | CAB 20140222P 70.000 | 12-Feb-14 | 2,000 | 3.50 | $ (7,000.00) |
| Nan Huang5PD64034 | CAB 20140222P 65.000 | 12-Feb-14 | 2,000 | 1.45 | $ (2,900.00) |
| Nan Huang5PD64034 | CAB 20140222P 70.000 | 12-Feb-14 | 1,000 | 3.40 | $ (3,400.00) |
| Nan Huang5PD64034 | CAB 20140222P 70.000 | 12-Feb-14 | 1,000 | 3.40 | $ (3,400.00) |
| Nan Huang5PD64034 | CAB 20140222P 65.000 | 13-Feb-14 | (2,000) | 5.00 | $ 10,000.00 |
| Nan Huang5PD64034 | CAB 20140222P 70.000 | 13-Feb-14 | (2,000) | 10.00 | $ 20,000.00 |
| Nan Huang5PD64034 | CAB 20140222P 70.000 | 14-Feb-14 | (3,000) | 5.70 | $ 17,100.00 |
| Nan Huang5PD64034 | CAB 20140222P 70.000 | 18-Feb-14 | (3,000) | 6.00 | $ 18,000.00 |
| Nan Huang5PD64034 | CAB 20140222P 65.000 | 19-Feb-14 | (1,000) | 1.05 | $ 1,050.00 |

| accountGroup | symbol | date | quantity | price | |
|---|---|---|---|---|---|
| Bonan Huang4ZE89435 | CAB 20140222P 70.000 | 12-Feb-14 | 400 | 3.40 | $ (1,360.00) |
| Bonan Huang4ZE89435 | CAB 20140222P 60.000 | 12-Feb-14 | (400) | 0.50 | $ 200.00 |
| Bonan Huang4ZE89435 | CAB 20140222P 65.000 | 12-Feb-14 | 300 | 1.29 | $ (387.00) |
| Bonan Huang4ZE89435 | CAB 20140222P 60.000 | 13-Feb-14 | 300 | 1.15 | $ (345.00) |
| Bonan Huang4ZE89435 | CAB 20140222P 65.000 | 13-Feb-14 | (300) | 2.20 | $ 660.00 |
| Bonan Huang4ZE89435 | CAB 20140222P 70.000 | 13-Feb-14 | (200) | 5.80 | $ 1,160.00 |
| Bonan Huang5PD69674 | CAB 20140222P 70.000 | 12-Feb-14 | 300 | 3.80 | $ (1,140.00) |
| Bonan Huang5PD69674 | CAB 20140222P 60.000 | 12-Feb-14 | (300) | 0.55 | $ 165.00 |
| Bonan Huang5PD69674 | CAB 20140222P 65.000 | 12-Feb-14 | 300 | 1.45 | $ (435.00) |
| Bonan Huang5PD69674 | CAB 20140222P 60.000 | 12-Feb-14 | (300) | 0.40 | $ 120.00 |
| Bonan Huang5PD69674 | CAB 20140222P 60.000 | 13-Feb-14 | 300 | 1.00 | $ (300.00) |
| Bonan Huang5PD69674 | CAB 20140222P 65.000 | 13-Feb-14 | (300) | 2.20 | $ 660.00 |
| Bonan Huang5PD69674 | CAB 20140222P 60.000 | 13-Feb-14 | 300 | 0.15 | $ (45.00) |
| Bonan Huang5PD69674 | CAB 20140222P 70.000 | 13-Feb-14 | (300) | 5.60 | $ 1,680.00 |
| Bonan Huang5PD91874 | CAB 20140222P 70.000 | 12-Feb-14 | 300 | 3.30 | $ (990.00) |
| Bonan Huang5PD91874 | CAB 20140322P 65.000 | 12-Feb-14 | 300 | 1.85 | $ (555.00) |
| Bonan Huang5PD91874 | CAB 20140222P 60.000 | 12-Feb-14 | (300) | 0.35 | $ 105.00 |
| Bonan Huang5PD91874 | CAB 20140222P 60.000 | 13-Feb-14 | 300 | 1.10 | $ (330.00) |
| Bonan Huang5PD91874 | CAB 20140222P 70.000 | 13-Feb-14 | (300) | 6.40 | $ 1,920.00 |
| Bonan Huang5PD91874 | CAB 20140322P 65.000 | 13-Feb-14 | (300) | 2.65 | $ 795.00 |
| Nan Huang5PD45586 | CAB 20140222P 70.000 | 12-Feb-14 | 1,000 | 3.70 | $ (3,700.00) |
| Nan Huang5PD45586 | CAB 20140222P 65.000 | 12-Feb-14 | 1,000 | 1.60 | $ (1,600.00) |
| Nan Huang5PD45586 | CAB 20140222P 70.000 | 12-Feb-14 | 1,000 | 3.50 | $ (3,500.00) |
| Nan Huang5PD45586 | CAB 20140222P 70.000 | 12-Feb-14 | 2,000 | 3.50 | $ (7,000.00) |
| Nan Huang5PD45586 | CAB 20140222P 70.000 | 12-Feb-14 | 1,000 | 3.40 | $ (3,400.00) |
| Nan Huang5PD45586 | CAB 20140222P 65.000 | 13-Feb-14 | (1,000) | 4.40 | $ 4,400.00 |
| Nan Huang5PD45586 | CAB 20140222P 70.000 | 13-Feb-14 | (2,000) | 10.00 | $ 20,000.00 |
| Nan Huang5PD45586 | CAB 20140222P 70.000 | 14-Feb-14 | (3,000) | 5.80 | $ 17,400.00 |
| Nan Huang5PD64034 | CAB 20140222P 70.000 | 12-Feb-14 | 1,000 | 3.60 | $ (3,600.00) |
| Nan Huang5PD64034 | CAB 20140222P 70.000 | 12-Feb-14 | 1,000 | 3.69 | $ (3,690.00) |
| Nan Huang5PD64034 | CAB 20140222P 70.000 | 12-Feb-14 | 2,000 | 3.60 | $ (7,200.00) |
| Nan Huang5PD64034 | CAB 20140222P 65.000 | 12-Feb-14 | 1,000 | 1.50 | $ (1,500.00) |
| Nan Huang5PD64034 | CAB 20140222P 70.000 | 12-Feb-14 | 2,000 | 3.50 | $ (7,000.00) |
| Nan Huang5PD64034 | CAB 20140222P 65.000 | 12-Feb-14 | 2,000 | 1.45 | $ (2,900.00) |
| Nan Huang5PD64034 | CAB 20140222P 70.000 | 12-Feb-14 | 1,000 | 3.40 | $ (3,400.00) |
| Nan Huang5PD64034 | CAB 20140222P 70.000 | 12-Feb-14 | 1,000 | 3.40 | $ (3,400.00) |
| Nan Huang5PD64034 | CAB 20140222P 65.000 | 13-Feb-14 | (2,000) | 5.00 | $ 10,000.00 |
| Nan Huang5PD64034 | CAB 20140222P 70.000 | 13-Feb-14 | (2,000) | 10.00 | $ 20,000.00 |
| Nan Huang5PD64034 | CAB 20140222P 70.000 | 14-Feb-14 | (3,000) | 5.70 | $ 17,100.00 |
| Nan Huang5PD64034 | CAB 20140222P 70.000 | 18-Feb-14 | (3,000) | 6.00 | $ 18,000.00 |
| Nan Huang5PD64034 | CAB 20140222P 65.000 | 19-Feb-14 | (1,000) | 1.05 | $ 1,050.00 |

# Cabela's Inc. Reports Record Fourth Quarter 2013 Results

**Published: Feb 13 2014 08:00:01**

## Cabela's Inc. Reports Record Fourth Quarter 2013 Results

- Total Revenue Increased to $1.2 Billion, or 4.9%, as Adjusted

- Comparable Store Sales Decreased 10.1%

- Fourth Quarter Diluted EPS Increased 5.6% to $1.32 vs. $1.25 a Year Ago, Adjusted for Certain Items

- Merchandise Gross Margin Increased 40 Basis Points to 36.6%

- Next Generation Stores Outperformed Legacy Stores by 50-60% in Sales and Profit per Square Foot

- After-Tax Return on Invested Capital Increased 30 Basis Points to 16.2% for the Full Year

**Business Wire**

SIDNEY, Neb. -- February 13, 2014

Cabela's Incorporated (NYSE:CAB) today reported strong financial results for fourth quarter fiscal 2013.

For the quarter, adjusted for the Visa antitrust settlement, total revenue increased 4.9% to $1.2 billion; Retail store revenue increased 7.3% to $711.8 million; Direct revenue decreased 4.1% to $369.7 million; and Financial Services revenue increased 23.4% to $102.7 million. For the quarter, comparable store sales decreased 10.1%. On a GAAP reported basis, total revenue increased 6.1% and Financial Services revenue increased 45.7%. See the supporting schedule to this earnings release labeled "Reconciliation of GAAP Reported to Non-GAAP Adjusted Revenue of Financial Services Segment and Total Revenue" for a reconciliation of the GAAP to non-GAAP revenue amounts.

For the quarter, net income increased 5.5% to $94.7 million compared to $89.8 million in the year ago quarter, and earnings per diluted share were $1.32 compared to $1.25 in the year ago quarter, each adjusted for certain items. The Company reported GAAP net income of $80.1 million and earnings per diluted share of $1.12 as compared to GAAP net income of $68.0 million and earnings per diluted share of $0.95 in the year ago quarter. Fourth quarter 2013 GAAP results included provisions for interest and taxes related to an increase in tax reserves of $0.16 per diluted share and an impairment loss of $0.04 per diluted share related to a retail store site. Fourth quarter 2012 GAAP results included impairment losses of $0.19 per diluted share primarily related to land held for sale and an $0.11 per diluted share reduction related to the Visa antitrust settlement. See the supporting schedules to this earnings release labeled "Reconciliation of GAAP Reported to Non-GAAP Adjusted Financial Measures" for a reconciliation of the GAAP to non-GAAP financial measures.

For fiscal 2013, net income increased 22.0% to $238.3 million compared to $195.3 million last year, and earnings per diluted share were $3.32 compared to $2.72 a year ago, each adjusted for certain items. The Company reported GAAP net income of $224.4 million and earnings per diluted share of $3.13 as compared to GAAP net income of $173.5 million and earnings per diluted share of $2.42 a year ago. Fiscal 2013 GAAP results included adjustments to the Visa antitrust settlement liability resulting in a $0.03 per diluted share

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Cabela's Inc. Reports Record Fourth Quarter 2013 Results

benefit, impairment and expense adjustments primarily related to two retail locations of $0.06 per diluted share, and provisions for interest and taxes related to an increase in tax reserves of $0.16 per diluted share. Fiscal 2012 GAAP results included impairment losses of $0.19 per diluted share primarily related to land held for sale and an $0.11 per diluted share reduction related to the Visa antitrust settlement. See the supporting schedules to this earnings release labeled "Reconciliation of GAAP Reported to Non-GAAP Adjusted Financial Measures" for a reconciliation of the GAAP to non-GAAP financial measures.

"Cabela's revenue and earnings per share for the full year grew at a double-digit rate for the fifth consecutive year," said Tommy Millner, Cabela's Chief Executive Officer. "However, results for the fourth quarter did not meet our expectations, which were set earlier under more robust conditions. Specifically, the two biggest short-term factors affecting results in the quarter were a much sharper than expected decline in ammunition sales as compared to last year's surge and a softer than expected holiday season as evidenced elsewhere. On the other hand, comparable store sales excluding firearms and ammunition were down 3.5% with positive comparable store sales in hunting apparel, men's casual apparel, footwear and non-shooting related hunting equipment in the quarter."

"At the same time, we are delighted with the growing success of our longer-term initiatives, which will lead to ongoing profitable growth for Cabela's," Millner said. "These include the results of our new stores, which performed at least 50% better than our older stores on a sales and profit per square foot basis and generated comparable store sales 200 basis points better than our older stores. For the full year, we operated 11 of our new format stores that averaged sales per square foot of over $500. We currently plan to open 14 new stores in 2014."

"We also are pleased that merchandise margins increased 40 basis points in the quarter to 36.6%. This is a result of the sales shift from firearms and ammunition to soft goods and also, importantly, the margin improvement in our soft goods category," Millner said. "Customer response to higher margin Cabela's branded products such as ZONZ™ camo, ColorPhase™ technology, the Regulator and Instigator bows and OutfitHER® clothing has been extremely encouraging. During the quarter, the penetration of Cabela's branded products across our entire assortment improved from 27.6% to 32.5% as compared to the same quarter a year ago. With our strong focus on product innovation, we expect future increases in Cabela's brand penetration throughout our entire product assortment. These factors taken together should generate merchandise margin improvement in 2014 and 2015."

"Our Direct business performed much like retail in that customers shifted away from ammunition more sharply than we expected," Millner said. "On the other hand, fishing, camping and most soft goods categories experienced sales growth in the quarter. Additionally, improvements in our mobile platform contributed to a meaningful lift in both traffic and conversion. Lastly, we also benefited from our implementation of omni-channel fulfillment from our retail locations."

The Cabela's CLUB Visa program had another solid quarter. During the quarter, growth in average active credit card accounts was 8.6% due to new customer acquisitions in our Retail and Internet channels. For the quarter, net charge-offs remained at historically low levels of 1.76% compared to 1.91% in the prior year quarter. Increased Financial Services revenue was driven by increases in interest and fee income as well as interchange income. Growth in average balance per active credit card account was 4.1%, and growth in average credit card loans was 13.1%.

"We are very pleased to see continued improvement in one of our most important metrics, return on invested capital," Millner said. "Return on invested capital for 2013 improved 30 basis points over last year to 16.2%. With our strong operational improvements, we are confident in our ability to generate even further

Cabela's Inc. Reports Record Fourth Quarter 2013 Results

improvements in return on invested capital for years to come."

During the fourth quarter, the Company reserved $9.3 million for potential adjustments to the provision for income taxes that may result from audits in progress and $3.6 million of interest related to these matters. For 2014, the tax rate is expected to be between 33.0% and 34.0%.

As previously announced, the Company's Board of Directors approved a share repurchase program designed primarily to offset shareholder dilution resulting from the granting of equity-based compensation awards. As a result, the Company intends to repurchase up to 650,000 shares of its common stock in open market transactions through February 2015.

"Despite the slower finish, 2013 represents a year of record breaking performance and significant accomplishment within our business," Millner said. "Fiscal year 2013 was our fifth consecutive year of double-digit earnings per share growth to a new record of $3.32. Comparable store sales increased by 3.9% which represented the fifth consecutive year of growth, and Direct revenue increased for the first time in six years growing 4.6%. Consolidated operating margin improved for the fifth consecutive year to 10.0%, and merchandise margins were 36.8%, representing the fourth consecutive year of improvement."

"We believe that our operational improvements combined with new store performance will continue to deliver outstanding returns to shareholders," Millner said. "At the same time, in the next two quarters, we expect moderation in both comparable store sales and in the Direct business due to the stronger than expected fall-off from last year's firearms and ammunition surge. We expect first quarter 2014 earnings per diluted share to be between $0.32 and $0.42 and full year 2014 earnings per diluted share to increase at a high single-digit or low double-digit rate versus 2013 adjusted earnings per diluted share of $3.32."

## Conference Call Information

A conference call to discuss fourth quarter fiscal 2013 operating results is scheduled for today (Thursday, February 13, 2014) at 11:00 a.m. Eastern Time. A webcast of the call will take place simultaneously and can be accessed by visiting the Investor Relations section of Cabela's website at www.cabelas.com . A replay of the call will be archived on www.cabelas.com .

## About Cabela's Incorporated

Cabela's Incorporated, headquartered in Sidney, Nebraska, is a leading specialty retailer, and the world's largest direct marketer, of hunting, fishing, camping and related outdoor merchandise. Since the Company's founding in 1961, Cabela's® has grown to become one of the most well-known outdoor recreation brands in the world, and has long been recognized as the World's Foremost Outfitter®. Through Cabela's growing number of retail stores and its well-established direct business, it offers a wide and distinctive selection of high-quality outdoor products at competitive prices while providing superior customer service. Cabela's also issues the Cabela's CLUB® Visa credit card, which serves as its primary customer loyalty rewards program. Cabela's stock is traded on the New York Stock Exchange under the symbol "CAB".

## Caution Concerning Forward-Looking Statements

Statements in this press release that are not historical or current fact are "forward-looking statements" that are based on the Company's beliefs, assumptions, and expectations of future events, taking into account the information currently available to the Company. Such forward-looking statements include, but are not limited to, the Company's statements regarding opening 14 new stores in 2014, future increases in Cabela's brand

**Bloomberg Law**®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service