## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE** | : | **CIVIL ACTION** |
| **COMMISSION** | : | |
| | : | |
| v. | : | |
| | : | **NO.  15-269** |
| **NAN HUANG** | : | |

### MEMORANDUM

**KEARNEY, J.**                                                                          **FEBRUARY 25, 2016**

Diligently researching a retailer's financial information before buying or selling its stock is appropriate.  Using your employer's admittedly non-public database to learn, before other investors, facts concerning a retailer's credit card revenue before buying or selling its stock could be considered insider trading if your employer's non-public information would be considered material to a reasonable investor.  As the jury found after carefully listening to and evaluating the credibility of witnesses including experts for both sides, non-public information on a retailer's sales revenues may become material to a reasonable investor especially when he routinely uses an identical mathematical formula measuring credit card revenue derived from his employer's non-public data base which highly correlates to significant profits when selling a retailer's stock after an earnings announcement.  With this information, the employee gained over $4.4 Million by buying low and then selling high when the market learned what he largely knew.  As the jury found the employer's non-public information material and the employee liable for insider trading, we now order the employee/investor disgorge the proven amount of the ill-gotten gains from this ingenious systematic scheme, along with a double penalty and requested pre-judgment interest.

## I.   BACKGROUND

On January 21, 2015, the Securities and Exchange Commission ("Commission") sued Nan Huang ("Huang") alleging he violated § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5[1] by systemically trading in hundreds of retailer stocks based on detailed analysis of confidential credit card revenue data for the retailers gathered by his employer Capital One.

Huang is a former data analyst working for Capital One, which is among other things a credit card company.  Capital One maintains a large database, referred to as Teradata, which logs information relating to Capital One services provided to its customers.  One piece of information stored in Teradata is customer credit card spending (the "credit card revenue data").  For example, if a Capital One credit card user purchases a product at Walmart, the transaction is logged into Teradata.  The Teradata database is accessible to certain Capital One employees, including Huang during his employment.

The only issue centered on whether the Teradata information could be material to a reasonable investor.  The parties stipulated:

1.  As a Capital One employee, Huang had access to a large searchable database maintained by Capital One containing the confidential credit card activity of its customers, known as the Teradata Database Management System.

2.  Huang conducted thousands of searches of Teradata for the confidential credit card revenue data of over 100 publicly traded consumer retail companies.

3.  Huang downloaded the results of these thousands of searches of Teradata.

4.  Huang lacked a business reason to conduct the searches of Teradata or to download the results.

5.  Huang accessed and used Capital One's confidential credit card revenue data.

2

6. Huang understood the information he accessed and used from Teradata was nonpublic information.

7. Huang personally traded in the stock of consumer retail companies on the basis of the nonpublic credit card revenue data from Teradata.

8. Huang understood he was violating Capital One's policies and procedures regarding confidentiality including, "End User Responsibilities and Acceptable Use Standard," "Code of Business Conduct" dated July 13, and Teradata warning screens, when he ran searches of Teradata and used the results for his own personal stock trading.

The Commission proved Huang accessed and used the credit card revenue data to trade in stocks of companies who accepted Capital One credit cards from February 16, 2012 through January 7, 2015. Specifically, Huang created computer code, or queries, which enabled him to search Teradata for a specific company's credit card revenue data and download data to an excel spreadsheet on his computer. The Commission showed Huang engaged in the exact same practice for hundreds of companies. In admitted Exhibit 721 with supporting corroborative evidence from its experts and investigators, the Commission showed: company name, search date, first trade date, earning announcement date and Huang's profit. Huang then used the credit card revenue data to predict the specific company's total amount of revenue for a particular sales quarter. Then, when the company announced it would be reporting earnings on a specific date, Huang traded in these stocks based on the credit card revenue data, yielding profits. The issue throughout the case, and argued at trial, centered exclusively on whether Capital One's Teradata information could be material information to the targeted company's financial status. Huang proffered one jury instruction. He focused only on materiality. Using a jigsaw puzzle analogy, Huang repeatedly argued to the jury his admitted access to the Teradata information represented one (1) piece of a one hundred (100) piece puzzle and could not have been material information given the variety of financial factors forming the market's setting of a stock price.

3

On January 14, 2016, following a three-day jury trial, the jury found Huang violated the federal securities laws by trading stocks on the basis of Capital One's Teradata information. After the jury returned the verdict, we held argument on the Commission's requested remedy.

## II.    LEGAL STANDARD

Disgorgement is an equitable remedy intended, after a jury finding of insider trading, to divest the stock trader of his ill-gotten gains.[2]  While disgorgement is meant to deprive the wrongdoer of his unjust enrichment and deter others from engaging in fraudulent activity, the remedy is not punitive in nature.[3]  Further, because the Commission "pursues its claims independent of the claims of individual investors", disgorgement is not a means by which it is seeking to make whole investors injured as a result of the defendant's scheme.[4] Accordingly, the "goal is 'not to compensate for losses but to deprive the wrongdoer of his ill-gotten gain.'"[5]  To that end, we have broad discretion in fashioning a disgorgement figure.[6]

The initial burden rests on the Commission.   The Commission must establish its requested disgorgement amount is a reasonable approximation of the amount of unjust enrichment.[7]  In doing so, the Commission need not trace every single dollar of gains.[8]  Once an approximate amount is established, the burden then shifts to the defendant to demonstrate the Commission's approximation is in fact unreasonable.[9]  Because the risk of uncertainty falls on the wrongdoer, all doubts concerning the approximation are resolved against the defendant.[10]

We also have discretion to award prejudgment interest on the amount of disgorgement.[11] When calculating the amount of prejudgment interest, courts look to the Internal Revenue Service's rates for underpayment of taxes.[12]

Finally, the United States Congress at 15 U.S.C. § 78u-1(a)(1)(A) vested this Court with "jurisdiction to impose, a civil penalty to be paid by the person who committed such violation." We determine the penalty "in light of the facts and circumstances, but shall not exceed three

4

times the profit gained or loss avoided as a result . . . ."[13]   "Civil penalties are intended to enhance deterrence against insider trading, and where deterrence fails, to augment the . . . detection and punishment of this behavior."[14]   Courts consider the following factors in determining whether penalties are appropriate and in what amount: (1) the egregiousness of the violations, (2) the isolated or repeated nature of the violations, (3) the degree of *scienter* involved, (4) the deterrent effect given the defendant's financial worth, and (5) other penalties arising from the conduct.[15]

## III.   ANALYSIS

The Commission requests we order Huang to disgorge $4,403,545 of ill-gotten gains, $288,965 of prejudgment interest, and impose a civil penalty of $13,210,635 trebling the gains.[16] The Commission argues we can determine the appropriate disgorgement figure from the evidence compounded by the jury's finding of insider trading, which under our jury instructions, required the jury to find the credit card revenue data constituted material information for each of the trades made by Huang.[17]   The Commission asserts the arguments made to the jury framed the issue leading to the only possible interpretation being the jury concluded Huang made all trades on the basis of material information in a consistent pattern based on his access to the credit card revenue data and documents found on his computer confirming his scheme. [18]

Huang contends we cannot make reasonably approximate disgorgement because the jury's fact determinations are unknown.[19]   Huang challenges the Commission's charging strategy, the jury instructions, and the verdict form submitted to the jury.[20]   He contends the Commission could have brought numerous counts making the jury's determination as to each count more straightforward.[21]   Further, Huang argues the jury instructions given to the jury lead to the conclusion it may have found Huang liable for only one instance of insider trading, resulting in a disgorgement amount of as little as $45.[22]   Finally, Huang argues the verdict form

insufficiently detailed which specific trades constituted insider trading.[23]   Huang requested the court alter the verdict form to make it more specific but the Commission objected based on a common pattern of conduct and we decided to overrule Huang's objection.   Huang concludes we cannot determine a disgorgement amount because the jury's verdict is so uncertain as to which specific trades constituted insider trading.

We find Huang's arguments unpersuasive.   The Commission's decision to charge the improper trades in many companies based on proven identical practice has no bearing on our analysis.   Huang's arguments regarding the jury instructions and verdict form do not carry the day.   From the first appearance before the Court, the issue for the jury was pellucidly clear: was this Teradata information material?   Huang sought trial because he believed the credit card revenue data was small enough to render it immaterial to the reasonable investor, in this instance Huang.   Counsel's promise rang true throughout the entirety of the case as Huang continued to contest generally the materiality of the credit card revenue data.[24]   Huang's response in opposition to summary judgment states it best:

> ....as Defendants have consistently maintained, *the primary issue in dispute in this case is whether the Capital One transaction data was, at the time of each alleged improper transaction, material nonpublic information* as that term is defined by courts interpreting securities law.[25]

At trial, neither party changed their course of action.        The Commission presented evidence it believed established the materiality of the credit card revenue data and indeed Huang challenged the materiality of the credit card revenue data on a "size matters" defense.   To determine whether we have a sufficient basis for determining an appropriate disgorgement figure, we examine the evidence presented at trial, the manner in which it was presented, and counsel's arguments.[26]

6

The Commission's expert, Stephen Graham, addressed materiality of the credit card revenue data. Mr. Graham first testified to the files he relied on in reaching his opinion on materiality, including the "done" files captured on the forensic imaging of Huang's hard drive.[27] This evidence showed Huang captured information from Capital One's Teradata system and imported them into a spreadsheet, which Huang then used to predict future earnings for various companies.[28] By evaluating evidence of Huang's use of the credit card revenue data information, Graham opined the credit card revenue data "is going to help a reasonable investor make better decisions on to buy or sell securities in these individual companies."[29]

Mr. Graham performed two statistical analyses. First, Mr. Graham "performed a correlation between the information that was contained on Nan Huang's hard drive . . . to correlate that Capital One transaction information pulled to actual company revenue."[30] Essentially, Mr. Graham tested the relationship between the credit card revenue data and total company revenue. Mr. Graham's correlations analysis highlighted over 130 companies in which Huang traded in after obtaining the credit card revenue data, having a positive and statistically significant correlation.[31] Mr. Graham considered this correlation to have predictive power. As a result, Mr. Graham concluded having the credit card revenue data gave Huang an advantage over those investors without the data as he could better predict the total revenue for the companies traded in.[32]

Mr. Graham additionally ran a regression analysis to further test the materiality of the credit card revenue data.[33] A regression analysis is another tool used to investigate the relationships between variables.[34] Mr. Graham used numerous analyst reports as one variable set, as well as the credit card revenue data accessed and used by Huang.[35] Mr. Graham used the regression analysis to determine whether each of these factors could help explain the actual

company-reported revenue.[36]  Through this analysis, Mr. Graham determined both variables had

a positive, statistically significant value in predicting the total company-reported revenue.[37]  In

other words, these variables helped predict total company revenue.

The Commission also called Dr. Cain to testify as an expert in the area of economic

analysis.[38]  Dr. Cain testified to Huang's profits from the insider trades.[39]  He examined all of

Huang's trades after accessing credit card revenue data.[40]  He then observed when Huang opened

a position on a company (i.e., purchasing a company stock, option, or put), when the company

made its earnings announcement, and the stock price was after the earnings announcement.[41]

Dr. Cain set the end date for individual trades immediately after the earnings announcement

because once the credit card revenue data became public it no longer provided Huang with an

advantage over other investors and any movement in the stock price could be caused by other

events.[42]  Dr. Cain testified Exhibit 721 provided the total trading profits for Huang.  He

calculated Huang's illegal trades allowed him to gain $4,403,545, the disgorgement figure

sought by the Commission.[43]

Finally, the Commission presented its staff accountant Dustin Ruta.[44]  Mr. Ruta analyzed

Huang's Teradata searches and his stock trading activity, and visually depicted this correlation

for the jury.[45]  Mr. Ruta testified as to exemplar stocks Huang traded in.  Dr. Cain provided Mr.

Ruta with Exhibit 721, listing all profitable trades made around an earnings announcement and

Mr. Ruta researched whether Huang conducted query searches of Teradata in those particular

companies for relevant credit card revenue data.[46]  Mr. Ruta then added the search date to

Exhibit 721 and prepared visual charts showing Huang's search and trade activity for each

earnings report.[47]  For example, he testified to Huang's trading activity in Carter's Inc.

("Carter's").[48]  On June 29, 2014, Huang ran a query in Teradata to obtain credit card revenue

data for Carter's.[49]   Then, on July 17th, 2014, Carter's announced it would release its second quarter earnings on July 24th, 2014.[50]   On July 23rd, 2014, Huang purchased 40 call options with a strike price of $72.50.[51]   On July 24, 2014, prior to the market opening, Carter's released its second quarter earnings revealing it beat analyst expectations.[52]   Before the market opened, Carter's stock price was $73.18.[53]   As a result, Carter's stock price rose 8% to $78.96 and, on the same day, Huang closed his Carter's position realizing an $11,800 profit.[54]   Huang held the position for one day.[55]   Mr. Ruta provided similar analysis for Huang's trading activity in certain other companies: Chipotle, Coach, Express Inc., Outerwall Inc., Ulta Salon, and Walmart.[56]

Huang's rebuttal expert, Dr. Torben Voetmann challenged materiality.   Dr. Voetmann testified he did not believe it possible to "affirmatively conclude you can predict one variable with the other based on a correlation analysis . . . ."[57]   In support, Dr. Voetmann observed it was not surprising the credit card revenue data and the total company-reported revenue were highly correlated because they are both revenue figures.[58]   Rather, because the percentage of total company-reported revenue captured by the credit card revenue data is so small—approximately 2.4%—further analysis was required.[59]   Further, Dr. Voetmann testified he did not believe Mr. Graham's regression analysis indicated the credit card revenue data held any predictive power.[60]   Dr. Voetmann's analysis instead focused on the price movement of the stock.   When Dr. Voetmann ran his regression analysis, he kept the analyst estimates and credit card revenue data, just as Mr. Graham's analysis did, but instead of total company revenue he used the stock price return.[61]   His analysis sought to measure how the price responded to the earnings announcements, which necessarily included the credit card revenue data.[62]   When Dr. Voetmann ran his regression the "significance of the Capital One transaction data disappeared."[63]   The analysis, according to Dr. Voetmann, evidenced the insignificance of the credit card revenue data

on predicting the stock price.[64]   In sum, both sides presented competent and helpful expert testimony on materiality as to each of Huang's questioned transactions.

At the close of trial, we instructed the jury on the elements of insider trading.[65]   First, Huang must have "obtained material nonpublic information from his employer, Capital One."[66] Second, Huang must have "owed a duty of trust and confidence to Capital One."[67]   Third, Huang "breached that duty of trust and confidence by trading in securities on the basis of material nonpublic information."[68]   Four, Huang "intended to deceive, manipulate or defraud or was reckless in not knowing that his conduct was deceptive, manipulative or fraudulent." [69]   Finally, Huang "used or caused to be used any means or instrumentalities of interstate commerce or communication, including the mails, or the facilities of a national securities exchange, stock exchange, in furtherance of a scheme to defraud or fraudulent conduct."[70]

As to materiality, we instructed the jury:

> Material information is information which a reasonable investor would have considered significant in making an investment decision.   In other words, information is material where there is a substantial likelihood that disclosure of the information would be viewed by the reasonable investor as significantly altering the total mix of information concerning that company, in determining whether the information is material, you are to consider all of the circumstances as they existed at the time of the trades or trade. [71]

We further instructed the jury it must consider whether the credit card revenue data "was both *material* and nonpublic *at the time he traded in each of the stocks*."[72]

Given the evidence presented at trial and our jury instruction on materiality, we find ample basis to determine a disgorgement figure.[73]   The Commission submitted evidence purporting to show all of the trades were material.   It offered Mr. Graham to show the credit card revenue data provided Huang with an advantage over other investors in the market.   Huang

provided rebuttal testimony in the form Dr. Voetmann and it asked the jury to decide whom they believed.

Huang argues we cannot determine what the jury decided other than he engaged in insider trading. We do not find this argument persuasive as we required the jury to evaluate the materiality of the credit card revenue information for each trade. Further, the Commission presented the same evidence of identical conduct, summarized in Ex. 721, with respect to the each trade by amount, company, date, announcement and profit. In the Commission's words, "evidence of materiality for Huang's JC Penney trade on April 25, 2012 was not stronger (or weaker) than the evidence of materiality for Huang's Chipotle trade on July 1, 2014."[74] Huang staked out his position by arguing 2.4% of revenue was simply too small to give Huang any advantage over other investors. He did not advance the position 2% was material but 0.8% was not. He took just as general a position as the Commission. He cannot now complain of a lack of specificity when he argued no materiality in the Teradata confidential information.

The Commission cites Exhibit 721 as evidence of Huang's misappropriation of the credit card revenue data for retailers through his Teradata queries, and his trading activity in the queried retailers. Huang argues Exhibit 721 cannot serve as a basis for a disgorgement figure because the general verdict sheet did not require the jury to answer a special interrogatory for each trade in Exhibit 721. Huang's argument here fails for the same reason: we required the jury to evaluate the materiality of the information for each trade.[75] The evidence presented at trial and our jury instruction required, for Huang to be liable, the jurors must consider whether the Commission proved materiality for each trade. By checking, "Yes" the jury found materiality for each trade.

This conclusion is not changed by our jury instruction regarding the unanimity of the jury's verdict. At the urging of Huang's counsel, we amended our proposed instruction on unanimity to make clear to the jurors they had to be unanimous with respect to at least one specific trade.[76] Again, we do not find his argument renders the verdict form ambiguous or denies us the ability to determine disgorgement. In evaluating materiality, we still required the jury to evaluate each trade. Huang proffers possibilities ranging from the jury finding materiality only in one trade to the jury finding materiality in numerous trades. The other possibility is the jury followed our instruction and found this admittedly confidential information material in each instance and thus, Huang committed insider trading. Of course, we cannot know what the jury thought in the deliberation room but given our instructions, we must find they evaluated the materiality for each trade and found it to be material in each instance, which is reflected in the verdict form.

### A. Calculating disgorgement and prejudgment interest.

Having found an ample evidentiary basis for determining a disgorgement figure, we now decide whether the Commission adduced evidence of a "reasonable approximation" of Huang's ill-gotten gains.[77] Huang argues the general verdict form renders the SEC's approximation unreasonable, and Dr. Cain's analysis could not have separated legal from illegal trades when it is unknown whether any of the trades were illegal.[78]

Examining all of the evidence presented at trial, the jury verdict, and the arguments of counsel, we find the Commission's disgorgement figure is a reasonable approximation of Huang's ill-gotten gains. Our finding with regard to the basis for determining disgorgement essentially resolves Huang's challenge to the number. Huang argues because we did not issue a jury verdict form listing each trade, the jury did not find materiality for each and every trade and it is possible Huang made some trades based on material information and some trades on

12

immaterial information.  Or, it is possible Huang made no trades on material information.
Huang's speculation is foreclosed by our finding above.  We see no error in Dr. Cain's analysis
of all the trades.[79]

The Commission adduced evidence of material credit card revenue data used when
trading resulting in Huang's specific profits.  The jury agreed and found Huang liable for insider
trading for every trade, as required by the jury instructions.  Accordingly, we exercise our broad
discretion in accord with the jury's finding and order disgorgement of $4,403,545.  We will also
exercise our discretion to award prejudgment interest of $288,965.

### B.  Civil Penalties.

We consider various factors when deciding the appropriateness of a civil penalty: (1) the
egregiousness of the violations, (2) the isolated or repeated nature of the violations, (3) the
degree of *scienter* involved, (4) the deterrent effect given the defendant's financial worth, and (5)
other penalties arising from the conduct. [80]  Having considered all of these factors the court will
impose a civil penalty equal to two (2) times the disgorgement figure.  We have no information
on Huang's net worth or whether other penalties (i.e., criminal proceedings) have arisen as a
result of his conduct, so these factors are neutral.  However, Huang participated in this scheme
for approximately three years, making hundreds of trades along the way, all the while breaching
a duty owed to his employer, Capital One.  His repeated his misconduct over and over.  He
should not escape penalty because his conduct is not the worst we have seen.  It is reprehensible
conduct.  Accordingly, we impose a civil penalty of $8,807,090.

### IV.  CONCLUSION

The jury found Huang used material information to obtain ill-gotten gains. He used the
same mathematical formulas to access the insider information and the Commission proved his
searches, trades and profits based on information not disclosed before the retail company's

earnings announcement.   We find sufficient evidence of Huang's ill-gotten gains and a penalty equal to two (2) times his gains is warranted.   The Commission identified the amount of pre-judgment interest and, as Huang does not dispute, we have no independent basis to dispute those calculations.

---

[1] The Commission originally filed suit against two Defendants: Nan and Bonan Huang, who are unrelated.  On December 2, 2015, Bonan Huang consented to judgment and the court entered judgment against him on the next day.  (ECF Doc. Nos. 82 & 84)  Any reference to "Defendant" in this memorandum will only refer to Nan Huang unless otherwise noted.

[2] *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014); *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997).

[3] *See SEC v. Teo*, 746 F.3d 90, 103 (3d Cir. 2014) (citing *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1241 (D.C. Cir. 1989)).

[4] *Id.* at 102; *Contorinis*, 743 F.3d at 301.

[5] *Teo*, 746 F.3d at 105 (quoting *SEC v. Whittemore*, 659 F.3d 1, 11 n.2 (D.C. Cir. 2011)).

[6] *Id.* at 106; *Hughes Capital*, 124 F.3d at 455.

[7] *Teo*, 746 F.3d at 107 ("[H]aving established a reasonable approximation of profits tainted by the violation, the SEC met its evidentiary burden.")

[8] *SEC v. Chester Holdings, Ltd.*, 41 F. Supp. 2d 505, 528 (D.N.J. 1999).

[9] *Id.*

[10] *Teo*, 746, F.3d at 105; *Chester Holdings Ltd.*, 41 F. Supp. 2d at 528.

[11] *See SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 566 (S.D.N.Y. 2009).

[12] *See SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996); *SEC v. Secure Capital Funding*, No. 11-916, 2014 WL 936722, *3 (D.N.J. Mar. 10, 2014).

[13] § 78u-1(a)(2).

[14] *SEC v. Pardue*, 367 F. Supp. 2d 773, 778 (E.D. Pa. 2005).

[15] *SEC v. Berlacher*, No. 07-3800, 2010 WL 3566790, *16 (E.D. Pa. Sept. 13, 2010) (citation omitted).

[16] (ECF Doc. No. 99, at 1-2, 10 nn. 3&4.)

[17] (*Id.* at 1-2.)

[18] (*Id.*)

[19] (ECF Doc. No. 98, at 4-6.)

[20] (*Id.*)

[21] (*Id.*)  At argument on the equitable remedies, we encouraged the Commission to cite, if in existence, cases where it chose to bring one count for hundreds of illegal trades. (Trial Tr., Day 3, at 139.) The Commission has not cited any such cases. Neither did Huang, and we have been unable to find any. Just because it has not been done before is no reason, given the identical pattern of Huang's conduct, it could not be done in this civil action.

[22] (*Id.* at 5 n.2)

[23] (*Id.* at 6.)

[24] (*See* ECF Doc. No. 62, at 2.)

[25] *Id.*

[26] We recognize the professionalism with which counsel for both sides handled this case and conducted this trial. Counsel were thorough and prepared at all phases of litigation. The parties dealt with thorny issues which could have easily eroded all goodwill among counsel as is sometimes the case. *See Coyett v. City of Phila.*,   —F. Supp.3d—, No. 15-869, 2015 WL 8482815, at *1 n.1 (E.D. Pa. Dec. 10, 2015) ("We cannot help but comment on the civility, or lack thereof, on display by the attorneys in this case.") (Dalzell, J.).  Yet, counsel deftly navigated the waters (i.e., a novel Fifth Amendment issue and discovery concerns in China) without creating extraordinary delay under Fed.R.Civ.P. 1.

[27] (Trial Tr., Day 1, at 112-16.)

[28] (*Id.* at 121-22.)

[29] (*Id.* at 136.)

[30] (*Id.* at 146.)

[31] (*Id.* at 149.)

[32] (*Id.* at 150.)

[33] (*Id.* at 157.)

[34] *See* Alan O. Sykes, *An Introduction to Regression Analysis*, Univ. of Chicago (Dec. 1, 1992), http://www.law.uchicago.edu/files/files/20.Sykes_.Regression pdf.

[35] (Trial Tr., Day 1, at 157-58.)

[36] (*Id.* at 157.)

[37] (*Id.* at 161.)

[38] (Trial Tr., Day 2, at 117.)

[39] (*Id.* at 118-19.)

[40] (*Id.* at 122-23.)

[41] (*Id.* at 122-24.)

[42] (*Id.*)

[43] (*Id.* at 125.)

[44] (*Id.* at 134.)

[45] (*Id.* at 145.)

[46] (*Id.* at 163.)

[47] (*Id.*)

[48] (*Id.* at 148.)

[49] (*Id.* at 146.)

[50] (*Id.*)

[51] "A call option is an agreement that gives an investor the right (but not the obligation) to buy a stock, bond, commodity, or other instrument at a specified price within a specific time period." The strike price represents the price at which the call option holder can buy the stock. Investopedia (Feb. 22, 2016), http://www.investopedia.com/terms/c/calloption.asp. (*Id.* at 148.)

[52] (*Id.* at 152-53.)

[53] (*Id.* at 150.)

[54] (*Id.* at 153-54.)

[55] (*Id.*)

[56] (*Id.* at 154, 158, 160-63.)

[57] (*Id.* at 218.)

[58] (*Id.* at 219.)

[59] (*Id.* at 219-20.)

[60] (*Id.* at 227.)

[61] (*Id.* at 227-28.)

[62] (*Id.* at 228.)

[63] (*Id.* at 227.)

[64] (*Id.* at 229.)

[65] (Trial Tr., Day 3, at 88-89.)

[66] (*Id.* at 88.)

[67] (*Id.*)

[68] (*Id.*)

[69] (*Id.*)

[70] (*Id.* at 88-89.)

[71] (*Id.* at 89.)

[72] (*Id.*)

[73] *See SEC v. Capital Solutions Monthly Income Fund*, 28 F. Supp. 3d 887, 894-98 & n.4 (D. Minn. 2014) (rejecting argument general verdict form does not provide basis for remedial relief); *SEC v. Solow*, 554 F. Supp. 2d 1356, 1366 (S.D. Fla 2008).

[74] (ECF Doc. No. 99, at 7.)

[75] Huang also argues the time it took the jury to return a verdict indicates it was impossible for them to have considered each trade. We obviously cannot know what the jury did while deliberating in the jury room. However, we instructed the jury to evaluate each trade for materiality and in returning a verdict we must assume they did so.

[76] (Trial Tr., Day 3, at 93.)

[77] *Teo*, 746 F.3d at 107.

[78] Huang posits possible intervening events played a role in the profits ignored by the Commission. (ECF Doc. No. 98, at 9-10.) However, "intervening causation is not an element of the SEC's evidentiary burden in setting out an amount to be disgorged" and if the issue is to be raised, "it will normally be the defendant's burden to do so." *Teo*, 746 F.3d at 105-06. Huang has not presented evidence of intervening causes and has not met his burden. (ECF Doc. No. 98, at 3.)

[79] *See SEC v. McDonald*, 699 F.2d 47, 55 (1st Cir. 1983).

[80] *SEC v. Berlacher*, No. 07-3800, 2010 WL 3566790, *16 (E.D. Pa. Sept. 13, 2010) (citation omitted).