IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | : CIVIL ACTION :  : |
| v. | : : : NO. 15-269 |
| NAN HUANG | : |

MEMORANDUM

**KEARNEY, J.**                                                                                                                   **MAY 9, 2016**

After considering admitted evidence, the jury returned a verdict finding Nan Huang bought and sold securities based on material insider information admittedly derived from his employer's confidential credit card revenue data. After denying the Plaintiff's motion for summary judgment, we asked the jury to determine whether the confidential credit card revenue data, under the facts of Nan Huang's trading, constituted material information. As we find the Plaintiff adduced substantial evidence of materiality to support the jury's verdict of materiality, we deny Nan Huang's motion for judgment as a matter of law or alternatively for a new trial.

**I.     Facts**

The Securities and Exchange Commission ("Commission") alleged Defendant Nan Huang misappropriated material non-public information from his employer Capital One to trade in securities. Huang admittedly accessed Capitol One's database ("Teradata") to obtain information relating to sales revenues based on Capitol One credit card spending with target companies. Teradata captures information relating to Capital One's credit card sales. Huang created computer code, or queries, which enabled him to scour Teradata for a specific company's credit card revenue data and then import responsive data into an Excel spreadsheet. Huang did this for hundreds of companies. He then used the information to trade in the same companies

near their earnings announcement date, yielding large profits. The jury considered whether the Teradata confidential information was material.

On January 14, 2014, following a three-day jury trial, the jury found Huang violated the federal securities laws by trading stocks on the basis of admittedly confidential credit card revenue data. On February 25, 2016, we granted the Commission's request for disgorgement, a civil penalty, and prejudgment interest totaling $13,499,600.

## II.   Analysis

Huang now moves for judgment as a matter of law, or in the alternative, for a new trial. Huang challenges the sufficiency of the Commission's evidence. Federal Rule of Civil Procedure 50 permits us to enter judgment as a matter of law if we find "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."[1] In doing so, we should consider all of the evidence in the record.[2] We may grant the motion only if "the record is critically deficient of the minimum quantum of evidence to sustain the verdict."[3] While judgment as a matter of law should be granted sparingly, a "scintilla of evidence" is insufficient to sustain a jury's verdict.[4] "The question is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found its verdict."[5] We must "view the evidence in the light most favorable to the non-moving party" and avoid "weigh[ing] the evidence, determin[ing] the credibility of witnesses, or substitute[ing] [our] version of the fact's for the jury's version."[6] We may only grant the Rule 50 motion "if upon review of the record it can be said as a matter of law that the verdict is not supported by legally sufficient evidence."[7]

Huang argues the Commission did not introduce sufficient evidence for a reasonable jury to find the Capital One credit card revenue data material. Huang contends the Commission

failed to introduce evidence regarding the "total mix of information". According to Huang, the Commission did not offer evidence "regarding the circumstances of the specific companies on the specific days for the specific trades in question." [8] Huang also argues we must find the credit card revenue data is immaterial as a matter of law because the Commission did not present evidence concerning the data's effect on the "reasonable investor." [9] Huang argues the credit card revenue data is quantitatively immaterial.[10] Huang argues the Commission failed to show the credit card revenue data was "market moving" or impacted the price of any of the relevant stock.[11] We reject each argument and deny his motion.

In arguing the Commission failed to introduce sufficient evidence of the "total mix of information" Huang relies on *In re Adams Golf Inc. Securities Litigation*, where our court of appeals reversed the district court's dismissal of a securities fraud claim.[12] Adams Golf's public offering materials disclosed sales of its golf equipment exclusively to authorized retailers and a flourishing business.[13] Five months after its initial public offering, Adams Golf issued a press release disclosing its sales would "continue to suffer as a result of the gray market distribution of its products to a membership warehouse club."[14] Plaintiffs alleged membership club Costco—an unauthorized golf club dealer—had approximately 5,000 golf clubs out of 235,000, or two percent (2%), of golf clubs sold by Adams Golf that quarter.[15] The district court dismissed the claim finding any omission of the Costco's unauthorized possession of 2% of clubs was not material.[16] Our court of appeals reversed, finding the relatively small number of clubs itself not determinative of materiality.[17] Rather, to make the "delicate assessment involved in a materiality determination", the court would need information regarding the "importance of the limited distribution arrangement to Adams Golf's business model" and "the nature of the golf club industry more generally."[18]

Pouncing on the above quoted language, Huang argues "one bit of information in a vacuum does not lend itself to a materiality determination."[19] Huang inaccurately characterizes the Commission presenting the jury with "one bit of information". The Commission presented the jury with the information our court of appeals found to be helpful in making the "delicate assessment" of materiality. Capital One Senior Director of Data Analysis Dwight Brooks testified Capital One's 2014 credit card purchase volume was $225 billion making it the fourth largest credit card issuer in the United States.[20] Each transaction by a Capital One credit card holder counts toward the $225 billion purchase volume and is captured by its Teradata system and logged for future use by Capital One.[21] The jury knew Capital One's position in the marketplace, the relative import of Capital One's credit card revenue data and the importance of the information contained in Teradata.

The Commission also showed the importance of the credit card revenue data to the market through Stephen Graham's testimony. Graham is a Commission Senior Financial Analyst. Graham described statistical analyses in evaluating the materiality of the credit card revenue data. Graham studied the files forensically imaged by Capital One from Huang's computer.[22] Graham testified files showed Huang capturing the credit card revenue data from the Teradata system, putting it in Excel spreadsheet files, and using this information to predict earnings for his target companies.[23] He explained his correlation analysis and concluded the credit card revenue data is predictive of total company revenue.[24] His correlation analysis examined the relationship between the credit card revenue data and the total company revenue for each company.[25] Graham concluded all the correlations were above a .5 and 132 companies were over .75, "which by most definitions can be considered a strong correlation."[26] Graham

4

opined Huang could use the credit card revenue to predict the total company revenue because they move in "lockstep" with each other.[27]

Graham also performed a regression analysis using numerous analyst reports as one variable and the credit card revenue data as another, to test the influence of those variables on total company revenue.[28] Graham explained the regression analysis further evidences the credit card revenue data's predictive power.[29] Graham's testimony provided the jury with empirical support for his opinion of the importance of the credit card revenue data to the market. As we stated in denying summary judgment: "these delicate assessments are peculiarly within the province of the jury[.]"[30] Given Mr. Brooks' testimony regarding Capital One's place in the industry and Mr. Graham's testimony, we find the record was not "critically deficient" of evidence concerning materiality.

Huang argues two other points which we find unpersuasive. First, he argues the Commission failed to present evidence "about the reasonable investor's view" of the credit card revenue data. We are not aware of any case, and Huang cites none, requiring the Commission to have a random "reasonable investor" testify. If we could devine "reasonable investor" testimony, we do not see how the inquiry would remain objective; any investor's testimony would delve into her investment practices. Huang also argues "the Third Circuit requires proof that the information was market moving[.]"[31] As the Commission observes, our court of appeals does not require price impact evidence to prove materiality.[32]

The Commission cites other evidence bolstering its materiality showing. The Commission contends Huang's conduct itself indicated the materiality of the credit card revenue data:

1. Huang searched for Capital One credit card revenue data containing nonpublic quarterly revenue information in advance of each of his trades.

5

2. Huang analyzed the Capital One credit card revenue data using detailed spreadsheets for each company.

3. Huang had no legitimate purpose to search for the information for each and every search he conducted.[33]

As the Commission notes, where the "insider" himself finds it "sufficiently material" to trade on the given stocks, it is evidence of the materiality of the information traded upon.[34] The evidence showed Huang utilized computer code to systematically search Teradata for credit card revenue data, which he then analyzed to predict the total revenue a company would report. He then traded on this information and reaped a benefit from having it in advance of the public. Huang found the credit card revenue data sufficiently material to misappropriate it and trade on the basis of the information. A jury is free to rely on this evidence of materiality in reaching its verdict.

Based on pre-trial rulings, we instructed the jurors they were free to draw an adverse inference on the issue of materiality and, according to the Commission, this is further evidence of the materiality of the credit card revenue data. We find given the other evidence bearing on materiality, the adverse inference is simply another reason to refrain from disturbing the jury verdict in this case.[35] Huang's argument essentially boils down to a new evidentiary requirement for the Commission to put into evidence every single piece of information surrounding the companies Huang traded in on the trading day. We are aware of no such requirement and refuse to impose one. We focus on whether the credit card revenue data is "important to a reasonable investor in making his or her investment decision."[36] Huang observes Graham acknowledged the "total mix of information included: earnings per share, mergers and acquisitions information, cash flow, gross margin, new product lines, restructurings, company

forecasts, analyst opinions, company filings, the health of key employees and much more." [37] But Huang does not reveal the benefit or necessity of introducing any of these figures or events, to the extent they exist, into evidence. We suppose one reason Huang would want this information introduced is to argue no reasonable investor would alter their investment strategy based on the disclosure of the credit card revenue data if this other information were available. But the standard is not whether the information at issue would cause the reasonable investor change his investment decision.[38]

The Commission presented evidence demonstrating Capital One is the fourth largest credit card issuer in the United States and Huang had insider access to every single purchase made by a Capital One credit card holder during the relevant time period. The Commission presented evidence Huang accessed this information and used it to trade in companies for which he had the credit card revenue data. The Commission's expert testified the credit card revenue data is significantly correlated with the actual total revenue reported by the companies Huang traded in such that it held predictive power. After hearing this evidence, the jury decided the credit card revenue data constituted information "a reasonable investor would have considered significant in making an investment decision." Given our high deference to the jury's verdict and in light of the evidence presented at trial, we cannot conclude as a matter of law the Commission failed to present the minimum quantum of evidence concerning the materiality of the credit card revenue data.

In his oral Rule 50(a) motion and now, Huang cites *In re Westinghouse Securities Litigation*,[39] a case predating *In re Adams Golf*, for the proposition "a small amount of data, particularly when provided without context, cannot be said to be material simply because it is a portion of something an investor would want to know."[40] In *Westinghouse,* our court of appeals

affirmed a district court's dismissal of a § 10(b) action for failing to plead materiality.[41] The court of appeals agreed with the district court's reasoning the information—amounting to 0.54% of Westinghouse's net income—was "*de minimis*" and "hardly conducive to informed decisionmaking." [42] But the court rejected the defendants' "categorical assertion that materiality must be quantified at a specified percentage of income or assets" and reaffirmed materiality must be determined "on a case-by-case basis[.]"[43] While the percentage of total company revenue which represents the credit card revenue data may, in some instances, be quantitatively small, we think it qualitatively differs from data found to be immaterial in *Westinghouse*.[44] The Commission demonstrated the credit card revenue could have advantaged Huang in making his investments and thus, was more "conducive to informed decision-making" than the information in *Westinghouse*. At summary judgment, we found room for "differing opinions on the question of materiality" and submitted the question to the jury. The Commission convinced the jury of the materiality of the credit card revenue data and Huang does not meet his burden of persuading us to overturn the jury's well-founded verdict.

### III. Conclusion

The Commission adduced substantially more than the minimum quantum of evidence necessary to sustain the jury's verdict. It presented evidence demonstrating the importance of the credit card revenue data to the reasonable investor. The evidence included Stephen Graham's expert opinion the credit card revenue data held predictive power as to total company revenue. The Commission further showed the significance the credit card revenue data played in Huang's investment decisions. We also instructed the jury it was free to draw an adverse inference against Huang with regard to materiality. In sum, the Commission presented sufficient evidence, coupled with the adverse inference, to sustain the jury's verdict in its favor. Huang is

8

not entitled to judgment as a matter of law or a new trial and we deny his motion in the accompanying order.

---

[1] Fed.R.Civ.P. 50(a)(1).

[2] *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 150 (2000).

[3] *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009).

[4] *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

[5] *Eshelman* v. Agere Sys., *Inc.*, 554 F.3d 426, 433 (3d Cir. 2009) (citation omitted).

[6] *Acumed LLC*, 561 F.3d at 211 (citing *Lightning Lube, Inc.*, 4 F.3d at 1166)

[7] *Parkway Garage, Inc. v. City of Phila.*, 5 F.3d 685, 691-92 (3d Cir. 1993).

[8] (ECF Doc. No. 105-1, at 2.)

[9] (*Id.* at 8.)

[10] (*Id.* at 9-10.)

[11] (*Id.* at 10.)

[12] 381 F.3d 267, 274-75 (2004).

[13] *Id.* at 270.

[14] *Id.* at 272.

[15] *Id.* at 275.

[16] *Id.* at 274.

[17] *Id.* at 275.

[18] *Id.*

[19] (ECF Doc. No. 105-1, at 8)

[20] (Trial Tr., Day 1, at 51.)

[21] (*Id.* at 51-52.)

[22] (*Id.* at 111-115.)

[23] (*Id.* at 121-22.)

[24] (*Id.* at 150.)

[25] (*Id.* at 146.)

[26] (*Id.* at 150.)

[27] (*Id.* at 150.)

[28] (*Id.* at 157-61.)

[29] (*Id.* at 158-59.)

[30] (ECF Doc. No. 69, at 1-2 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).)

[31] (ECF Doc. No. 105-1, at 10.)

[32] *See United States v. Schiff*, 602 F.3d 152, 171 (3d Cir. 2010) (noting a drop in stock price "is not the only method of proving materiality").

[33] (ECF Doc. No. 109, at 5.)

[34] *See Rothenberg v. Rosenbloom*, 771 F.2d 818, 821 (3d Cir. 1985); *see also SEC v. Texas Gulph Sulphur Co.*, 401 F.2d 833, 851 (2d Cir. 1968).

[35] *See SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 191 (3d Cir. 1994) ("[A] defendant's silence in itself was insufficient to support an adverse decision, but that such silence in conjunction with other evidence against the defendant could support that result.")

---

[36] *Oran v. Stafford*, 226 F.3d 275, 226 F.3d 275, 282 (3d Cir. 2000) (citation omitted).

[37] (ECF Dc. No. 105-1, at 6 n.2)

[38] *See SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) (citing *TSC Indus.*, 426 U.S. at 449).

[39] 90 F.3d 696 (3d Cir. 1996).

[40] (ECF Doc. No. 105-1, at 10.)

[41] 90 F.3d at 715.

[42] *Id.* at 714.

[43] *Id.* at n.14.

[44] *See In re Home Health Corp. of Am., Inc.*, No. 98-834, 1999 WL 79057, *6-7 (E.D. Pa. Jan. 29, 1999) (finding 3% of net revenues material).